**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| LANNY MARDEN | : | PRISONER |
| | : | NO. 3:02CV570(RNC) |
| VS. | : | |
| | : | |
| WARDEN LARRY MYERS | : | APRIL 13, 2005 |

<u>MEMORANDUM OF LAW IN SUPPORT OF</u>
<u>MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the defendants in the above-captioned matter respectfully move for summary judgment in their favor in this action brought pursuant to 42 U.S.C. § 1983. The defendants move for summary judgment first and foremost because the deprivation of medical care plaintiff alleges is insufficient to constitute a § 1983 action. In addition, all of the defendants are entitled to qualified immunity as it was not clearly established that their conduct was unconstitutional and as reasonable persons could differ as to whether or not their conduct violated clearly established law, and also move for summary judgment on that basis.

I.      <u>INTRODUCTION:</u>

The pro se inmate plaintiff brought this action against eight defendants one of whom, Dr. Edward Blanchette, the Court dismissed from the case. The remaining defendants are former Warden of Northern Correctional Institution (hereinafter "Northern") Larry Myers, Major Neil

Kearney, also formerly at Northern, former Major, now Warden Michal Lajoie, Lt. Marc Alderucci, Pamela Shea, Dr. Edward Pesanti and Nurse Cheryl Malcolm.  Myers, Kearney, Lajoie and Alderucci were all custody staff at Northern when the plaintiff  was there in 1999 and 2000.  The defendants Shea, Dr. Pesanti and Malcolm are medical staff who were employed by the State of Connecticut UCONN Correctional Managed Health Care at the time.  Dr. Pesanti and Nurse Malcolm were members of "URC" –the Utilization Committee for Correctional Managed Health Care.

The plaintiff seeks monetary damages for physical pain and suffering he alleges but has not alleged and does not at this time seek damages for any emotional or psychological distress. **Ex. G**, **Pl. Dep. 21-25.**

**Plaintiff's entire case rests on the undisputed deprivation of arch supports and, for purposes of this motion, orthotics for two time periods, five weeks in 1999 and 7 months spanning portions of 1999 and 2000.  It is important to note at the outset of this motion that the following material facts alleged in this complaint and elsewhere by the plaintiff are not in dispute:  all parties agree that the plaintiff had a some sort of accident in his youth somewhere between 1972 and 1986 in which he broke his right femur and left a length disparity between his legs.  All parties agree that in 1998, the plaintiff received his first "lift" orthotics while in the custody of the Commissioner of Correction, and that the lift**

shoes/boots were entirely taken away from him when he came to Northern after receiving a Disciplinary Report for slashing another inmate with a weapon fashioned of tape and razor blades. All parties agree that he was first without the shoes/boots entirely for 5 weeks while in Phase I of Administrative Segregation at Northern, and then he was left without arch supports in the boots and claims he did not wear them for a second time period of seven months while custody and medical staff evaluated the situation.

The defendants dispute that plaintiff's lack of lift shoes constitutes a sufficiently serious medical need to satisfy the standard set forth by the United States Supreme Court in *Estelle v. Gamble*, 29 U.S. 97 (1976). The plaintiff was treated with Tylenol and Motrin only during this time period, and spent at least 12 years prior to 1998 without any lift at all despite the injury to his leg and despite being seen by various medical staff within corrections and having a family physician on the outside. Exs H; G 38. The plaintiff was seen by medical staff often during the time period without the lift or during the time period he claims the lift was unwearable. The plaintiff's complaints of pain were not alleviated with receipt of the lift. The plaintiff is unable to establish a constitutional violation. Even if the plaintiff is able to establish a constitutional violation, the defendants are entitled to qualified immunity, as reasonable persons in their positions could differ as to whether their conduct violated clearly established law.

## II.    FACTS

### A.    Plaintiff's Allegations

The following facts are alleged in the Amended Complaint and plaintiff's deposition. The plaintiff was involved in a motorcycle accident, fracturing his femur and causing a disparity in the length of his legs. Amd. Compl. ¶ 12. The plaintiff alleges that due to the disparity in his legs, he suffers pain while walking and standing. Amd. Compl. ¶ 13.

The plaintiff alleges that in May 1998, an unnamed doctor at Cheshire Correctional Institution prescribed him a pair of medical orthopedic boots to address problems resulting from the accident. Amd. Compl. ¶ 14. The plaintiff claims that the boots, which he received for the first time in June 16, 1998, "significantly reduced the pain experienced by the plaintiff while walking or standing." Amd. Compl. ¶ 16. In his Amended Complaint the plaintiff describes the orthotic, alleging that the orthotic consists of a sole lift on the outside of the right boot, and an arch support for the inside of the boot. Amnd. Com. ¶ 15. He also adds the allegation that the "heel lift and arch support also were designed to prevent further, more permanent damage to the plaintiff's back and knee." Amnd. Com. ¶ 15.

The plaintiff claims that he received the prescribed orthotic approximately one month later, on June 16, 1998, and further claims that they reduced the pain he previously experienced while walking. Amnd. Com. ¶ 16. The plaintiff then claims that he was transferred to Northern

Correctional Institution (hereinafter "Northern") on May 18, 1999, at which point the boots were taken from him.  Compl. ¶ 17.  The plaintiff alleges that an unnamed nurse informed him that he could not have the boots at Northern "because of safety and security concerns".  Amd. Compl. ¶ 17.  At no point in the amended complaint does the plaintiff dispute that the boots raised security issues at Northern.

The plaintiff alleges that he wrote to the medical unit, presumably after the boots were taken away, and "the medical unit" responded by telling him he needed to write to Warden Myers "because this was a safety and security issue".  Amd. Compl. ¶ 18.  The plaintiff claims that he then spoke with the Warden and sent written requests to him on June 1 and June 14, 1999.  Amd. Compl. ¶ 19.  The plaintiff alleges that Warden Myers referred the plaintiff back to the medical unit.  Amd. Compl. ¶ 20.  The plaintiff adds the allegation to the Amended Complaint that he informed the Warden that he was in "a lot of pain".  Amnd. Com. ¶ 19.

The plaintiff then concedes in the Amended Complaint that his boots/orthotics were then returned to him on June 29, 1999, a little over a month after they were initially taken from him in May of 1999 and after he had written to the defendant Warden Myers.  Amd. Compl. ¶¶ 17, 21.

The plaintiff next alleges that on August 14, 1999, custodial staff performed a "shakedown", or search of the inmates' cells at Northern, and that during this search, the inserts to his boots were ripped out of the boots by unnamed staff, and the inserts were missing from the

boots upon plaintiff's return from his cell.  Amd. Compl. ¶ 23.  It is important to note that the plaintiff does not allege that the lift was taken from the boot, in fact, only the inserts were taken and the boots remained with the plaintiff.  **Ex. G, Plaintiff Dep. 72-73.**  The plaintiff claims, however, that he could not use the boots without the interior as some unnamed medical person told him he should not.  **Ex. G 73.**  At this point, the plaintiff claims and it is undisputed that he wrote requests to "the medical unit" asking that the boots be repaired or replaced.  Amd. Compl. ¶ 24.  He further alleges that Dr. Fedus who examined the plaintiff six days later on August 20, 1999 "said new orthotics were 'medically appropriate'".   Amnd. Com. ¶ 25.  The Amended Complaint did not allege that Dr. Fedus expressed any opinion regarding the security issues presented by the inserts.   More importantly, it is significant that the plaintiff does not allege that new orthotics were medically *necessary*, only "medically appropriate".

The plaintiff then claims that on September 3, 1999, two weeks after the "shakedown" Dr. Fedus submitted a request to the Utilization Review Committee (hereinafter "URC") for the State of Connecticut Department of Correction requesting a heel lift and orthotic for the plaintiff. Amd. Compl. ¶ 26.  The URC is alleged to have included the defendants Dr. E. Pesanti and Cheryl Malcolm.  Amnd. Com. ¶ 27.  The URC is alleged to have responded on September 14, 1999, less than a month after the shakedown, saying the matter should be reviewed with custodial staff.   Amd. Compl. ¶ 27.   The plaintiff then alleges that shortly thereafter, on

September 19, 1999, the matter was referred to custodial staff, namely the defendant Major Kearney, for investigation. Amnd. Com. ¶ 28. The defendant Lieutenant Alderucci is alleged to have investigated, preparing a report on an unspecified date that the plaintiff's boots were "fully functional" and recommending that no further action be taken. Amd. Compl. ¶¶ 23, 29. The plaintiff does not specify a date, but indicates that Lt. "Alderucci concluded that the plaintiff's boots were 'fully functional'". Amd. Compl. ¶ 23.

The plaintiff alleges that after the shakedown of his cell, he "had numerous conversations with and/or wrote requests to defendants [Major] Kearney, [Major] Lajoie and [Lt.] Alderucci and [Nurse Pamela] Shea in an attempt to gain approval for the repair or replacement of the boots." Amd. Compl. ¶ 30. He further alleges that he informed those defendants he could not wear his damaged boots as they caused pain. Amd. Compl. ¶ 30.

The plaintiff then alleges that medical staff at Northern submitted requests to the Utilization Review Committee, again specifying Dr. Pesanti and Cheryl Malcolm, for approval of both an orthotic and a heel lift and an orthopedic evaluation of the plaintiff. Amd. Compl. ¶ 31. In response, the plaintiff alleges that URC recommended "conservative management" of the plaintiff's alleged medical concerns, but said that the plaintiff could have an orthotic sent from home "if custody approves". Amnd. Com. ¶ 31.

After that, the defendant Pamela Shea, alleged to be regional healthcare director, informed the plaintiff that she had discussed the matter with custodial staff, and that he could have an orthotic sent from home.  Amd. Compl. ¶ 33.  The plaintiff alleges that he responded immediately in an emergency medical grievance that such help from family members would not be forthcoming.  Amd. Compl. ¶ 34.  Within a month thereafter, the plaintiff was fitted for an orthotic, and received the orthotic approximately one month after the fitting.  Amd. Compl. ¶¶ 35-36.  The plaintiff alleges and it is not disputed that, after the security shakedown in which the arch supports in his boots were taken, it was approximately seven months before new orthotics for his boots were provided to him by the Department of Correction.  Amnd. Com. ¶ 36.

### B.    Defendants' Summary Judgment Presentation

#### 1.    Plaintiff's Relevant Institutional History

The plaintiff has been in and out if the custody of the State of Connecticut Commissioner of Correction several times since his first admission in 1989.  **Ex. A RT 60.**  Prior to his current sentence, the plaintiff was incarcerated in Connecticut's custody from 1993 until November of 1995.  **Ex. A**.  He was returned to custody in January of 1996 and has remained in custody since that time.  **Ex. A**.

The plaintiff has been convicted of the following felonies:  Assault in the First Degree, Possession of a Weapon in an Institution, two counts of Robbery in the Second Degree, Possession of Narcotics, Larceny in the Second Degree, and Burglary in the Third Degree.  **Ex. B, Portions of Inmate Master File.**  The plaintiff was convicted of both Possession of a Weapon in an Institution and Assault in the First Degree for conduct engaged in while incarcerated on the Robbery conviction when the plaintiff assaulted and severely slashed another inmate's face and head with a weapon he constructed out of tape and four razor blades.  **Exs. B; C RT 67 Discipline History.**  The plaintiff's victim received 21 sutures from his forehead to the top of his chin as a result of the plaintiff's assault.  **Ex. B**.  This incident occurred on May 3, 1999.  **Exs. B; C.**  During his time as an inmate over the years, the plaintiff has incurred 29 Disciplinary Reports while incarcerated, including but not limited to Causing a Disruption, Threats, Assault, Fighting, Insulting Language or Behavior, and Contraband.  **Exs. B; C.**

The plaintiff has been housed at Northern for only 17 months out of his approximately 11 years incarcerated thus far.  **Ex. A**.  The plaintiff was placed at Northern in the Administrative Segregation Program after the slashing incident, as at that point in time, May of 1999, the Warden at Cheshire Correctional Institution (hereinafter "Cheshire") felt that the plaintiff was "a serious management problem.  If allowed to remain in General Population, he will continue to be a threat to the safety and security of this facility."  **Ex. B**.  At that point, prior to his permanent

placement at Northern, the plaintiff was given an Administrative Segregation Hearing.  **Ex. B**.

The plaintiff received notice of the hearing, a choice of advocates, and an opportunity to be heard

and present witnesses as to "whether or not [his] presence in general population represent[ed] a

threat to the safety and security of the institutional community."  **Ex. B**.  After his hearing, the

plaintiff was placed in Administrative Segregation at Northern.  **Ex. B.**

Northern was then and is now the designated restrictive housing facility for the

Connecticut Department of Correction, managing those inmates who have demonstrated a

serious inability to adjust to confinement in prison and pose a serious threat to the safety and

security of a correctional facility.    **Exs. D Northern website description; F Rose Aff.**

Placement in the Administrative Segregation Program at Northern both in 1999 and since then

comes after a hearing, and the decision of the Hearing Officer may be appealed.  **Exs. E; F**.

Since 1999, the Administrative Segregation Program has consisted of a three phase

program.  **Exs. E AS description; F.**   The Administrative Segregation Program "operates on the

basic assumption that inmates who engage in aggressive, violent, disruptive behavior, or who

pose an imminent risk … require a highly structured and secure environment."  **Exs. E; F**.  In

Phase I, which lasts for at least four months if an inmate is discipline free, or longer if not,

inmates are allowed very little time out of their cells.  **Exs. E; F**.  Meals are eaten in the cells;

inmates are restricted to three showers and five hours of recreation per week.  **Exs. E; F**.  Phase I inmates are precluded from any work assignments.  **Exs. E; F**.

Recreation in Phase I is provided for one hour per day five days per week, but is entirely voluntary.  **Exs. F; G Plaintiff dep. tr. 92.**  The religious service of "smudging", a Native American religious activity, was provided within the living unit on a daily basis in 1999 and 2000 for Phase I inmates, but was of course entirely voluntary.  **Exs. F; G 93-95.**  The distance for the plaintiff to walk when he was in Phase I at Northern if he wanted to smudge was "very, very short; not very long at all" as it was "just right within the unit."  **Ex. G 94-95.**  Medical care was primarily provided within the unit, and the only time the plaintiff would have to walk outside the unit was to go to an "outside" medical appointment to a specialty clinic or hospital, or to go to court.  **Exs. F; G 91-92.**

So, to summarize, the only required walking the plaintiff had to do in Phase I at Northern Correctional Institution in 1999 from May until at least the end of August was to go to court or a medical appointment, but the plaintiff could walk within his cell to recreate, or to smudge at his own discretion.  Nonetheless, the plaintiff testified in his deposition that during that time period he did choose to smudge on a near daily basis and, moreover, did "a lot of pacing in the cell."  **Ex. G 90, see also 92.**  When asked in his deposition if he was ever forced while in prison to participate in any physical activities, the plaintiff responded that he did not know.  **Ex. G 9-12.**

The plaintiff was in Phase II of Administrative Segregation when the boots were returned to him. **Ex. G 75.**

The Northern Inmate Handbook given to inmates entering Northern during the time period in question has a specific clause entitled "Arch Supports/ Special Shoes" which states, "Not routinely prescribed due to limited out of cell activity."   **Ex. J. 14.**

The plaintiff claimed in his deposition for the first time that he sprained his ankle during one of the time period that is the subject of this suit.  **Ex. G 34-35.**  If the plaintiff sprained his ankle during this time period, he did it without any treatment or formal diagnosis, as there is no mention of this in his medical records.  **Ex. H.**

### 2.     Plaintiff's Medical Records

#### i.     General Leg/Back Issues

The plaintiff was born in 1971.  **Ex. H, Health Record 23.**  At some point during his youth, he sustained a fracture of the  right femur, the large bone in the leg, as a minor, which did not heal properly.  **Ex. H 23.**  In his deposition, plaintiff attributed the injury to a dirt bike accident when he was somewhere in his early teens.  **Ex. G 31.**   There are varying accounts in his medical records regarding the date of the fracture, which is sometimes claimed to be something that happened when he was a teenager, 11, 12 or 19 years old, and sometimes said to

have happened in 1972 or in 1986.  **Exs. H 23, 25, 27, 36, 37, 48; K, Dr. Blanchette Aff.**   A reference to the accident taking place in 1972, when the plaintiff would have been one or at the most two years old, is common throughout his records.  **Exs. H 620, 707, 713, 717, 872; K.**  As a result of the improperly healed fracture, one leg is longer than the other;  the plaintiff estimates the disparity to be somewhere between 2 5/8 and 3 inches.  **Exs. G 42; H; K**.  This estimate is consistent with plaintiff's correctional medical records.  **Exs. H; K.**  The plaintiff has also been diagnosed as having a "deformed right knee" with the deformity noted to be mild.  **Exs. H 25, 27; K.**  The plaintiff walks with a "minimal limp."  **Exs. H 36; K.**  More specifically, the plaintiff has been described as having "Cruciate ligament and patella instability."  **Exs. H 46; K.**

There is no note in plaintiff's medical record regarding any injury to his feet.  **Exs. H; K.** The plaintiff himself was unaware if he suffered any injury to any part of his body other than his leg in the accident.  **Ex. G 31.**

As stated above, the plaintiff last entered the custody of the Commissioner of Correction in January of 1996.  **Ex. A.**   The plaintiff never had a lift until he received a lift from the Department of Correction two and one-half years later, in June of 1998.  **Exs. G 36; H 75; K.** This is remarkable as the plaintiff's records frequently indicate that his accident occurred one year after his birth, in 1972, making it a possible 26 years that he went without an orthotic prior to receiving it, with much of this time being spent *not* in the custody of the Commissioner of

Correction. **Exs. H 620, 707, 713, 717, 872; K.** Even if the accident was as recent as 1986, the plaintiff went at least twelve years since the time of his accident until receiving a lift from correctional medical staff in 1998. **Exs. H; K.** The plaintiff testified in his deposition that after the leg was injured, he went through a period of traction and immobilization, then physical therapy, and then he was able to walk unassisted without a lift. **Ex. G 34.**

During a previous period of incarceration, from December 1993 until November 1995, the plaintiff was seen by correctional medical staff for leg pain, receiving Motrin. **Exs. H 114, 115; K.** Every time the plaintiff was newly admitted to the custody of the Commissioner of Correction and often upon transfer to a new facility within the Department of Correction, an Inmate Medical Screening Form or a Transfer Summary is completed. **Exs. H 620-667; K.** At no time prior to his receiving the orthotics in June of 1998 for his childhood injury did the plaintiff ever state that he had in the past had an orthotic lift or arch supports until after he received them. **Exs. H 620-667, 908; K.** He consistently did not mention, and denied, any orthotics until June of 1998. **Exs. H 627, 620-667, 908; K.**

In December of 1996, the plaintiff was prescribed Motrin for knee pain. **Exs. H 106; K.** In May 1997, while at Radgowski Correctional Institution, the plaintiff's knee was x-rayed due to his complaints of pain, but with no mention by either the plaintiff or medical staff of a lift  or arch supports. **Exs. H 92-93; K.** The x-ray showed "mild degenerative changes with no recent

14

fracture or joint effusion." **Exs. H 92-93; K.**  The plaintiff was at that time prescribed Ibuprofen for his complaints of knee pain.  **Exs. H 93; K.**

     At various times in his medical record, medical staff notes in the plaintiff's record that his objective symptoms fall short of his subjective complaints.  **Exs. H 4, 10, 36, 47; K.**  One note states in 2002, when the plaintiff had his orthotic but was seeking stronger pain medication, that the plaintiff is "ambulating /s [without] any difficulty" and "on + off exam table s/ [without] any obvious problem".  **Exs. H 4; K.**  Another note, made about five months after the lift shoes were returned to the plaintiff the second time and when the plaintiff was complaining of pain, states: "Able to ambulate in medical screening room /c [with] steady gait; able to propel self in + out of chairs /s [without] difficulty;….No obvious acute S/S [signs or symptoms] discomfort; As inmate exited medical screening room he asked the C/O [Correctional Officer] to attend rec [recreation] this afternoon."  **Exs. H 47; K.**

     On  June 9, 2002, medical staff noted, in response to plaintiff's complaints of pain, "In NAD [no apparent distress].  Able to amb[ulate] and get up on exam table s/ [without] difficulty."  **Ex. H 10, see also p. 37** "No obvious distress."

     The crux of the plaintiff's allegations in this case is that staff at Northern and other defendants deprived him of his orthotic lift and arch supports and that this allegedly caused him severe pain.  ***Even with the lift and orthotics, however, and for years before and  after the time***

***period complained of in this lawsuit and after the lift and arch supports were returned to him,
the plaintiff complains of "a lot of discomfort" and pain in his knee and back.  Exs. H 31, 3,
47, 954, 1048, 1064, 4, 34, 46, 48, 49, 50, 580, 590, 603, 861, 862, 864, 870, 872, 874, 1003; K.***
While the plaintiff initially reported upon receipt of his lift and arch support at the end of the
longer period that is the subject of this lawsuit that "many of his symptoms in R ft [right foot],
lower extremity" were lessened, **ex. H 50,** the plaintiff's satisfaction soon waned, and within
three weeks of initially reporting improvement, he started complaining of pain, and admits that
he continues to complain of severe pain in his back and knee to this very day.  **Exs. H 4, 31, 34,
46, 48, 49, 50, 580, 590, 603, 861, 862, 864, 870, 872, 874 954, 1003, 1048, 1064; G 52; K**.

One entry made after the plaintiff received the lifts at Northern, "Pain *constant* **despite
lift**….pain is in lower back" **Exs. H 46 (emphasis added) ; K.**  One entry, made two months
after new boots were provided the plaintiff after the second period without them as the subject of
this lawsuit, states:  "Getting about better on lift now but having ***increased*** pain in R [right]
knee." **Exs. H 48; K.**  Another note made four months after he received the lift states, "R knee
and Lo Back chronic worsening pain problems *despite the special shoe and lift*." **Exs. H 48; K.**
One month after the plaintiff received his orthotics in March of 2000, he complained he still
needed  pain medication, and complained that his Tylenol prescription had been discontinued.
**Exs. H 864; K.**  Medical records indicate the podiatrist had anticipated "minimal soreness" with

the adjustment to the shoe orthotic and felt even Tylenol was unnecessary.  **Exs. H 864; K.**

Again the plaintiff's complaints of pain were far in excess of what medical specialists expected

from his objective condition.    Two months after the plaintiff received the orthotics, he reported

no alleviation of his symptoms, stating, "There is still something seriously wrong with my R

knee.  I'm still in sever[e] pain."  **Exs. H 861; see also 862; K.**  The plaintiff continued seeking

pain medication thereafter, up to the present.  **Exs. H 4, 31, 34, 46, 48, 49, 50, 580, 590, 603,**

**861, 862, 864, 870, 872, 874 954, 1003, 1048, 1064; G 52-58; K.**

   The plaintiff has also been diagnosed with "mild R [right] lumbar scoliosis."  **Exs. H**

**36; K.**  Even with the lift and orthotic arch support, the plaintiff has likewise been diagnosed

with "chronic back pain" secondary to his motor vehicle accident injuries.  **Exs. H 37; K.**

   Indeed, a review of plaintiff's complaints of pain in his knee and back both before and

after he received his lift and arch supports shows no qualitative difference between the reported

amount of pain or the frequency with which such complaints occur.  **Exs. H 31, 3, 47, 954, 1048,**

**1064, 4, 34, 46, 48, 49, 50, 580, 590, 603, 861, 862, 864, 870, 872, 874, 1003; K.**  In his

deposition, the plaintiff claimed the return of the lifts alleviated his pain, but concedes that the

pain continues even with the lift and orthotic arch support.  **Ex. G 52, 63.**  In his deposition, the

plaintiff was unable to state when he first started experiencing knee or back pain in his life other

than to refer to a document listing five periods of incarceration, some as short as a day, and

stating that he experienced pain consistent with his periods of incarceration and could not recall feeling any pain while outside of the Department of Correction. **Exs. G 52-58; A.** The plaintiff reiterated this at another point in his deposition, stating that he knows his pain has been sometime during time frames that he has been in the Department of Correction, but that he does not know if he ever experienced pain on the outside, although he conceded that it's possible he felt pain before he was incarcerated. **Ex. G 60, 65.** This is noteworthy as his five periods of incarceration are as follows:  one day April 22, 1989, from September 1992 until July 1993, December 1993 until November 1995, and then January 1996 until the present. **Ex. A.** The plaintiff testified he did not know if he ever sought treatment for his back pain when he was not incarcerated. **Ex. G 61-62.**

Tylenol and Motrin have frequently been prescribed for the plaintiff to address is complaints of pain related to his knee and/or back, although he frequently seeks stronger medication. **Exs. H 4, 31, 35, 46, 49, 580, 590, 603; K.** Tylenol and Motrin, or Ibuprofen, generically, have been prescribed for plaintiff's complaints of knee or back pain both before the plaintiff had lifts or arch supports, and afterwards; no more significant medication has been needed to alleviate this pain when the plaintiff did not have a lift. **Exs. H 4, 31, 35, 46, 49, 580; K.** One professional indicated the plaintiff should use "Motrin only PRN [as needed] and noted that the plaintiff had "no ROM [range of motion] defects" as of August of 2001. **Exs. H 34; K.**

Plaintiff's medical records indicate that at least once his behavior has been considered "drug seeking behavior". **Exs. H 102; K.** Exercises are also frequently recommended to the plaintiff. **Exs. H 46, 50, 884-886; K.** The plaintiff has also received Flexeril, a muscle relaxant, but not for any extended period of time, and not during the periods of time he was without his lift or his arch supports which periods are the subject of this complaint. **Exs. H 39; K.** The Flexeril was discontinued as "not indicated" for the plaintiff's level of pain. **Exs. H. 35; K.**

In 2001, the plaintiff had an x-ray of his back completed. **Exs. H 693; K.** No acute fracture was noted, although an old fracture was possibly indicated. **Exs. H 693; K.**

ii.    Time Period in Question

According to the plaintiff's complaint, his boots were taken from him on arrival at Northern for a period of a little over a month, from May 18, 1999 until June 29, 1999. During that time, the plaintiff was in Phase I in the Administrative Segregation Program at Northern. The next time period that plaintiff claims he could not wear his boots because the arch support was missing is from August 14, 1999 for approximately the next 7 months, so until approximately March of 2000. Comp. ¶¶ 20-36.

Aside from the orthotic issues, the plaintiff was seen and treated by health staff for myriad issues during the time he spent at Northern, as well as elsewhere within the Department of Correction. **Exs. H; K.** He received treatment for his recurring hernia issues, testing for

numerous conditions, care for upper respiratory conditions, gastrointestinal issues, split lips, cuts, pain in his chest, and others.  **Exs. H; K.**

Upon his arrival at Northern on May 18, 1999, after slashing the head and face of the other inmate, the plaintiff was seen at the medical unit at 2:00 p.m.  **Exs. H 61; K.**  The plaintiff was noted to have various medical issues, including a hernia, which was repaired surgically two months later in July of 1999.[1]  **Exs. H 61; K.**  The nurse noted, "i/m has lifts-shoes in property. I/M was told about Level 5 security issues and this author did not promise he would receive those non-issued NCI footwear.  Will refer to MD for eval."  **Exs. H 61; K.**   The plaintiff was seen in the medical unit on June 16, 1999, at which time the plaintiff asked about his boots and the medical personnel indicated they would check with custody.  **Exs. H 60; K.**

Over a month after the lift support boots were replaced after the first, month-long period that is the subject of this lawsuit, the plaintiff reported to sick call on August 11, 1999, with the boots, reporting "serious pain".  **Exs. H 56, 57; K.**  Six days after the boots were allegedly ripped on August 14, 1998, commencing the second period of alleged deprivation that is the subject of this lawsuit, when the arch supports were removed, the plaintiff saw Dr. Fedus, the

---

[1]      In addition to other issues, there are several references in plaintiff's medical records during this time period regarding his hernia and associated complaints of pain.  **Ex. H.**  This case does not involve the hernia or those other issues in any way; the complete medical chart is provided in hard copy in order that the plaintiff not claim redaction of pertinent entries.

podiatrist, who indicated that *if* the plaintiff *were* able to have the shoe with the orthotic, "I see it as medically approp. for this patient." **Exs. H 56; K.** Dr. Fedus did not indicate that it was medically necessary, and the plaintiff has no expert opinion that the orthotic or the lift were or are in fact "medically necessary." **Exs. H 56; K.**

Again, the second period that is the subject of this lawsuit during which time the plaintiff did not have both a lift and arch supports was a seven-month period commencing August 14, 1999. ***It is important to note that on August 14, 1999, the plaintiff admits he was left with the lift with the boots, that only his arch support was removed in the security shakedown.*** **Ex. G 72.** ***Indeed, on August 16, 1999, the plaintiff wrote, "During shake down my inserts to my boots were thrown away, they are gone, they had special insert things for my knee alignment."*** **Exs. H 822; K.** The plaintiff did not indicate in his written internal complaint of August 16, 1999, that the boots were destroyed or that the lift alone could not assist his alignment. **Exs. H 822; K.** The plaintiff claims now, however that "the boots were destroyed." **Ex. G 71.** While the plaintiff claims now that the boots were not able to be worn due to the ripping of the arch supports, and must be taken at his word for purposes of this motion, the fact that he still physically had his boots with lifts and initially only complained about the arch supports goes to the defendants' state of mind.

The plaintiff also claims that the boots were in such a state that "medical staff told [him] that [he] couldn't wear them." **Ex. G 73.** This is not borne out by the medical records, however, as medical staff make no note of having seen the boots, which are considered to have been "thrown away." **Exs. H 822; K.** The plaintiff testified in his deposition that he could not wear the boot with the lift that was in his possession because without the arch supports "was like unbearably hard." **Ex. G 75.** Despite claiming in his that the boots were gone, the plaintiff now claims that he "tried to give them to medical personnel, to custodial personnel" but admits that the boots were in his possession initially. **Ex. G 76-77**.

On August 25, 1999, the plaintiff was seen by Nurse Wollenhaupt, who wrote in his chart, "Placed on Podiatry List for 9/2/99 to discuss what specific arch supports are needed." **Exs. H 55; K.** At this point, there is no note in the chart that the lifts or boots themselves are unwearable, nor is there any point in the medical records which indicates that this is the case. **Exs. H; K.** Indeed, the plaintiff did not initially report to medical staff that the boots were destroyed or unwearable, or that he could not use the lift, but rather that the arch supports were no longer present. **Ex. H 807.**

On September 3, 1999, a couple of weeks after the shakedown, the plaintiff was seen by Dr. Fedus, a podiatrist, within the facility. **Exs. H 54; K.** Dr. Fedus indicated he had submitted a URC request for "shoe/orthotic lift". **Exs. H 54; K.** Dr. Fedus did not indicate that he

physically saw the boots at this visit.  Knowing that the plaintiff did not have the arch supports

and was not wearing the boots at the time, Dr. Fedus prescribed only 2 tablets of 325 mg. of

Tylenol twice a day as sufficient to address the plaintiff's complaint's of pain at the time.  **Exs.**

**H 54; K.**  In his request, Dr. Fedus did not say that the boots had been destroyed, but, rather that

the boots were lost, stating, that "pt [patient] indicated that shoe gear was taken during

shakedown + presently unable to locate shoe gear per Head Nurse."  **Exs. H 720; K.**  The request

to URC did not indicate that the boots were destroyed or unwearable.  **Exs. H 720; K.**  The URC

treated the request as a "lost property claim" and referred the matter to custody on that

understanding.  **Exs. H 719; K.**  This was on September 14, 1999.  **Exs. H 719; K**.  On

September 9, 1999, Nurse Wollenhaupt had indicated in the medical record that Major Kearney

was investigating the issue of the boots.  **Exs. H 51; K.**

It is important to note that URC had previously approved requests for a boot with a lift

and internal arch supports as well as requests for maintenance when the plaintiff was at other

facilities and even later at Northern, but that URC's response was different when the plaintiff

was at Northern in Phase I in Administrative Segregation where security was paramount.  See

previous approvals.  **Exs. H 722, 723, 724, 725, 734-38; L; K.**  URC continued to approve such

requests after the plaintiff was released from the Phase Program at Northern, having successfully

completed it.  **Exs. A; H 787, 786; K.**  In addition, during this same time period, in June and July

23

of 1999, URC did approve the plaintiff's hernia surgery, which was completed in that July.  **Exs. H 813; K.**

As the plaintiff correctly notes, URC is the Utilization Review Committee, a committee made up of health care professionals who manage the care provided to inmates through Correctional Managed Health Care, a subdivision of UCONN Health Center.  **Ex. K** Physicians or physician-extenders must request any specialty consultation which requires a clinical visit outside a correctional facility as well certain procedures or medical services which can only be provided at an outside clinic.  **Ex. K.**  Request are reviewed for medical necessity and is either approved, rejected or deferred depending on the circumstances.  **Ex. K.**

In October of 1999, Dr. Fedus indicated in the medical record he was submitting a second URC request.  **Exs. H 53; K.**  Again, at this time, Dr. Fedus prescribed 325 mg. tablets of Tylenol in order to treat the plaintiff's complaints of pain.  **Exs. H 53; K.**  Another health care professional raised the plaintiff's Tylenol prescription to a stronger strength.  **Exs. H 54; K.**  During this time, medical records indicate that custody was continuing to review the situation.  **Exs. H 797; K.**

On November 4 1999, Dr. Fedus had completed the URC form seeking a "functional orthotic and heel lift" and URC had responded.  **Ex. H 716; K.**  URC responded  by stating that "if custody approves" the patient may have orthotic R foot brought in from home (URC notes the

injury is ~27 yrs. old.)"  **Ex. H 716; K.**  The form was acknowledged by Dr. Vigneron, not any of the defendants in this matter.  **Exs. H 716; K.**  On the same date, the URC denied an orthotic evaluation, instructing that the plaintiff's long-standing injury be handled by medical staff within the facility at that time.  **Exs. H 717; K.**

On November 12, 1999, about a week later, the plaintiff was seen by Dr. Fedus.  **Exs. H 52; K.**  Dr. Fedus indicated in medical records that the plaintiff reported to him at this point, three months after the shakedown, that his current boots were unwearable, but Dr. Fedus himself again did not view the lifts as they were stated to be in the plaintiff's cell.  **Exs. H 52; K.**  Dr. Fedus describes the appropriate medical plan as follows for the plaintiff on that date:  "If family or DOC can obtain from Newt. Pros. & Orthotic the orthotic /c [with] lift support I approve, as this will *assist* in relieving many of the symptoms i/m is experiencing /c ft. back **provided that custody, security approval and safety."  Exs. H 52 (emphasis added); K.**  Early in December of 1999, the issue was still not resolved, but a stronger prescription of Tylenol was considered sufficient to address for the plaintiff's complaint's of right leg pain at this time.  **Exs. H 52; K.**  The plaintiff did not complain of back pain at his December 5, 1999 medical visit, four months after the shakedown.  **Exs. H 52; K.**

On January 3, 2000, Correctional Head Nurse Wollenhaupt reported that custody was reviewing the situation, but that, at this point "URC" had denied approval of a replacement.  **Exs.**

**H 51; K.**  Three weeks later, it was noted in the chart that the Complex Administration was reviewing the issue.  **Ex. H 51.**  On January 4, 2000, the defendant Pam Shea, Health Services Administrator for Northern, indicated to the plaintiff that he could have his orthotic sent from home to be reviewed by security staff.  **Exs. H 849; K.**

On January 31, 2000, Nurse Wollenhaupt indicated that an appointment had been made for the plaintiff with "New Ortho" for heel lifts.  **Exs. H 51; K.**  It is not clear from the record where the shift had occurred, but the plaintiff alleges in his complaint that he informed those involved that there would be no help from his home or family on this issue, and then a new set provided by the State was approved.  **Exs. H; K.**  On February 7, 2000, six months after the shakedown, the plaintiff went for his appointment and "all measurements were done as needed for lift."  **Exs. H 51; K.**  The plaintiff's condition continued to be monitored, and the plaintiff was referred for medication for his reported pain.  **Exs. H 51; K.**

During all this time, no medical professional proclaimed an emergency situation or one inflicting severe pain on the plaintiff.  **Exs. H; K.**  The outside orthopedic clinic provided the boots in about one month.  **Exs. H.**

The plaintiff reports getting the orthotic lift in March of 2000.  The clinical records portion of his medical record does not indicate the exact date plaintiff received completely new orthotics.  There is an entry dated March 9, 2000, there is an entry indicating the plaintiff is

"awaiting his footwear." **Exs. H 50; K.** There is a subsequent entry on April 7, 2000, which indicates the patient is experiencing "mild soreness" with the orthotic. **Exs. H 50; K.** The next day, another provider again prescribed Tylenol. **Exs. H 50; K.**

In May of 2000, his knee was x-rayed, and the old trauma was revealed as well as joint space narrowing. **Exs. H 694; K.** No acute injury was noted, nor was any joint effusion. **Ex. H 694.** The findings of this x-ray were similar to those of an x-ray done in 1997, also showing joint space narrowing with the old fracture. **Exs. H 694, 701; K.** There was no significant deterioration to the knee during the period of time between the x-rays. **Exs. H 694, 701; K.**

As set forth above, the plaintiff's complaints to medical staff of pain were no better after April of 2000, and were often worse.

At no time during the periods which are the subject of this complaint did any doctor or other healthcare professional prescribe anything stronger for the plaintiff than Tylenol or Ibuprofen, nor did any healthcare professional note that the plaintiff's condition without the lifts he had lived without for so long prior to 1998 was a serious condition requiring an immediate change or was a serious condition inflicting severe pain. **Exs. H; K**.

3.    **Plaintiff's URC Records**

Two of the defendants, Dr. Edward Pesanti and Cheryl Malcolm, are alleged to be members of the Utilization Review Committee.  As stated above, the "URC" makes decisions regarding medical services beyond what can be provided within the medical units at facilities, and it is conceded that URC made decisions with regard to the plaintiff's orthotics and shoe lifts both generally during his period of incarceration and during the second time period that is the subject of this lawsuit.  The URC forms are available for the Court's review:  **Ex. L.**  As noted above, URC has approved orthotics and lifts for the plaintiff during his time of incarceration, and did not deny them during the periods that are the subject of this lawsuit, receiving only two requests during the second period both of which seemed more related to lost property than destroyed property.

The records show the first URC request for an orthotic when the plaintiff was at Cheshire related to a "1983" accident.  **Exs. A; L1.**  The URC responded to on June 6, 1997, denying the request "pending the review of community medical records."  **Ex. L 1.**  Ten days later, the URC approved the request for after the plaintiff was placed at a permanent facility.  **Ex. L 2.**  In May of 1998, URC notes that the orthotic was dispensed in March of 1998, and approves a request for an adjustment of the orthotic.  **Ex. L 3.**  Next, at the same time URC was allegedly being

28

deliberately indifferent to plaintiff's medical needs, URC approves a surgical consultation and then surgery to repair a hernia on the right side.  **Ex. L 4-6.**

There are no URC requests during the first, five week period after the plaintiff first arrived at Northern and did not have his orthotics.  **Ex. L.**   There is a request dated September 3, 1999, which indicates only that the plaintiff "Stated shoe gear was taken during shakedown & 'unable to locate.'"  **Ex. L 7.**   The request, submitted by Dr. Fedus, was for states, "Request shoe gear."  This request was neither denied or granted, rather, the URC response was "Please review [sic] matter to custody regarding lost property claim for report of orthotic and shoe inserts reported to be removed during shakedown."  **Ex. L 7.**   The discussion notes that the "MVA" [motor vehicle accident] was "> 12 yrs ago."  **Ex. L 7.**

Less than two months later, there was two more requests, dated October 30, 1999 and responded to on November 2, 1999.  **Ex. L 8-9.**   In these requests, the motor vehicle accident was listed as a "'72" accident.  **Ex. L 8-9.**   The first request was for an orthotic evaluation, and this request was denied "at this time."  **Ex. L 7.**   The second request was for a "functional orthotic with heel lift to decrease limb discrepancy and decrease erosion of R foot."  **Ex. L 8.**  In its response, URC "notes injury is ~27 yrs old" and states that "*if custody approves patient may have orthotic R foot brought in from home.*"  **Ex. L 8.**   The remaining URC summaries are all

after the plaintiff received the lift and beyond the time period that is the subject of this lawsuit.

**Ex. L.**

Clearly, the Utilization Review Committee did not perceive, nor should they have, any urgency to the September 1999 and November 1999 requests, nor was there any urgency or extreme degenerative condition that the Committee disregarded.  **Ex. K.**  The two requests submitted to URC for orthotics during the second time period in question and URC's responses thereto do no demonstrate deliberate indifference by any member of URC not do they demonstrate deliberate indifference by any medical care provider.  **Ex. K.**

**4.     Deprivation of Lift and Orthotic did Not Cause Extreme Pain/Complaints of Pain Not Alleviated with Lift and Orthotic**

From an objective medical viewpoint, the fact that upon plaintiff's transfer to Northern and while he was in Phases I and II of Administrative Segregation he went without his lift and orthotics for an initial period of five weeks and a subsequent period of seven months was not serious given that the plaintiff went at least 12 years without the lift and orthotics.  **Ex. K.**  The absence of the special boots should not have resulted in extreme pain to the plaintiff's knees or back to any degree significantly different than that reported by the plaintiff throughout his incarceration.  **Ex. K.**

Moreover, the plaintiff's complaints of pain must be looked at in context.  The plaintiff experiences pain in his knee and low back in a chronic fashion whether he has a lift and orthotic

or not. **Exs. H; K.** What plaintiff complains about in this lawsuit is the difference with and without the orthotic. This difference is not medically significant. **Ex. K.** The plaintiff was required to do very little walking during this time period in Administrative Segregation at Northern, and his complaints of pain in his knee and back to medical personnel did not change significantly without the orthotics, but rather, while exaggerated, seem to show a gradual worsening over time, which is to be expected with the plaintiff's condition. **Ex. K.** The plaintiff's complaints of alleged pain without as compared to with the lift and orthotic are not consistent with his history and his objective symptoms. **Ex. K.**

By his own account, the plaintiff did "quite a bit of pacing" in his cell during this time period, and voluntarily walked to smudge daily. This activity is not consistent with one experiencing "extreme pain" in his knee and back. **Ex. K.** Extreme pain in one's knee would typically cause a patient to cease unnecessary walking or pacing. **Ex. K.**

## III.   ARGUMENT

### A.   Standard of Review

Summary judgment is appropriately granted when evidentiary records show that there are no genuine issues of *material* fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(c). "The mere existence of some alleged factual dispute between

the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby,* 477 U.S. 242, 247-48 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims . . . [and] it should be interpreted in a way that allows it to accomplish this purpose." *Celotex v. Catrett,* 477 U.S. 317, 323, 324 (1986).

While the Court must view the facts presented in the light most favorable to the party opposing the motion, a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a Motion for Summary Judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir. 1986), *cert. denied,* 480 U.S. 932 (1987). Additionally, "mere conclusory allegations or denials in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir. 1990). Once the movant has met his burden, "the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor." *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir. 1995).

### B.    Plaintiff's Claim of Inadequate Medical Care Fails

#### 1.    Applicable Law

Under the Eighth Amendment, sentenced inmates are entitled only to "adequate food, clothing, shelter, sanitation, medical care and personal safety." *Wolfish v. Levi,* 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds, Bell v. Wolfish,* 441 U.S. 520 (1979); *Lareau v. Mansan*, 651 F.2d 96, 106 (2d Cir. 1981); *see also Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994) (Supreme Court noted that Eighth Amendment imposes certain duties on prison officials, to "ensure that inmates receive adequate food, clothing, shelter and medical care), quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984) and *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981) (Court held that only those conditions depriving inmates of the 'minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." ).

In order to state a cause of action for unconstitutional denial of medical care, an inmate must allege "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "A complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Id*. at 292. The conduct complained of must "shock the conscience" or constitute

a "barbarous act." *McCloud v. Delaney,* 677 F. Supp. 230, 232 (S.D.N.Y. 1988), *citing U.S. ex rel. Hyde v. McGinnis,* 429 F.2d 864 (2d Cir. 1970). A claim by an inmate against a treating physician is only cognizable if the alleged conduct is "repugnant to the conscience of mankind." *Tomarkin v. Ward*, 534 F. Supp. 1224, 1230 (S.D.N.Y. 1982), *quoting Estelle*, *supra*, 429 U.S. at 104-105. A defendant must have acted with a "sufficiently culpable state of mind." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994) *cert. denied sub nom Foote v. Hathaway*, 513 U.S. 1154 (1995).. "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows and disregards an excessive risk to inmates health or safety; the official must both be aware of facts from which the inference could be drawn that substantial risk of serious harm exist, and he must also draw the inference.'" *Id*., *quoting Farmer v. Brennan,* 511 U.S. 825, 837 (1994).

In this case, the objective test is not met. First of all, the medical records in this case do not establish that the plaintiff's condition was "sufficiently serious." Certainly, given that the plaintiff was injured at least by 1986, and possibly as early as 1972, and never used orthotic boots until he received them in June of 1998, there was not a sufficiently serious deprivation of medical care to "shock the conscience" as is required. The plaintiff went six months without the

lift and orthotics in the calendar year 1998 without claiming a constitutional violation,[2] and then seven months starting in the next calendar year, 1999 while in a place where he was required to do very little walking due to the restrictions of the Phase Program at Northern.  The absence of the lift simply does not rise to an objectively serious medical need.  This is especially the case when, as here, the desired medical device is not alleged to be "medically necessary" but rather "medically appropriate" and *undisputedly presented a safety and security concern*.  Amd. Compl. ¶¶ 17, 18, 22, 23, 27, 31.  Moreover, the plaintiff's allegations of pain are inconsistent with his objective presentation to medical personnel, and there is no evidence in his medical records to suggest that the lift alleviated his pain.

     The best evidence that the deprivation of the lift boots does not rise to the level of an objectively serious need is the fact that the plaintiff's complaints of pain did not stop with the lift, but rather increased.  Moreover, medical professionals treating the plaintiff during this time never saw fit to prescribe anything stronger than Tylenol or Motrin, the same over-the-counter medicines still prescribed for the plaintiff now and prescribed with or without the lift.

     Given that the plaintiff's injury was not objectively serious enough to form the basis for a claim of deliberate indifference, the defendants do not address the subjective elements in this motion, and do not address the behavior of each individual defendant vis-à-vis the plaintiff.

---

[2]   Indeed, the plaintiff specifically alleges that he brought no previous lawsuits regarding his

Whatever the defendants' individual or collective response to the need of the plaintiff, the medical need was simply insufficient.

Courts have granted summary judgment regarding claims of deliberate indifference in cases in which a plaintiff's claims of pain are inconsistent with his behavior or his objective presentation or both. *See, e.g., Amaker v. Coombe,* 1998 U.S.Dist. LEXIS 14523 (S.D.N.Y. 1998), attached. Moreover, a delay in providing medical treatment does not by itself violate an inmate's Eighth Amendment rights unless the delay reflects deliberate indifference "to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through prompt treatment." *Id.* at *22.[3] As the record reflects here, the "extreme pain" the plaintiff alleges was not alleviated through the provision of the sought-after lift and orthotic, and all that was ever considered necessary to treat the alleged pain during the time in question was Tylenol or Motrin.

Plaintiff's objective condition at the time in question was simply not sufficiently serious to invoke the Eighth Amendment.

---

medical treatment. Amnd. Com. ¶¶ 42-45.

[3]      Citing *Spies v. Brown,* 2002 U.S. Dist. LEXIS 4903, No. 98-CV-4708, 2002 WL 441991, at *4 (E.D.N.Y. Mar. 13, 2002), attached hereto for ease of reference by the plaintiff; *Smith v. Montefiore Med. Ctr.-Health Servs. Div.* 22 F. Supp.2d 275, 280 (S.D.N.Y. 1998); *Sonds v. St. Barnabas Hosp. Corr. Health Servx.,* 151 F. Supp.2d 303, 312 (S.D.N.Y. 2001) (noting that some delays in receiving medical treatment are common even outside the prison context).

The two URC requests demonstrate only lost or taken property, and thus cannot form the basis for a claim against the two URC defendants Pesanti or Malcolm. The custodial defendants assigned to Northern, Lt. Alderucci, Majors Lajoie and Kearney and Warden Myers are not medical personnel, and there is no evidence in the record at all to suggest that the custodial defendants were ever informed by any medical personnel that they were depriving the plaintiff of medically necessary equipment. Indeed, medical personnel seemed to leave the decision up to them, stating, "if custody approves"—signifying that this was not a medical emergency or a condition producing extreme pain or degeneration. Correctional personnel can rely not only on the care given to inmates by medical personnel, but can rely on the absence of information from actively treating medical personnel that certain care is required. *See, e.g., Waples v. Kearney,* 2001 U.S. Dist. LEXIS 9050 (D. Del. 2001), attached; *Cross v. Ayers,* 1998 U.S. Dist. LEXIS 16546 (N.D. Cal. 1998), attached; *Durmer v. O'Carroll,* 991 F.2d 64 (3d Cir. 1993). One Court has noted, "*Miltier* has stated, and common sense confirms, that [a Warden's] reliance [on medical professionals] cannot amount to deliberate indifference." *Coppage v. Mann,* 906 F. Supp. 1025 (E.D.Va. 1995). When in this district, Judge Cabranes ruled, "[A]s a prison administrator, [the] Warden … justifiably may defer to the medical expert[s] regarding treatment of inmate/patients." *Liscio v. Warren,* 718 F. Supp. 1074, 1082 (D. Conn. 1989), *reversed on other grounds,* 901 F.2d 274 (1990), *citing, McEachern v. Civiletti,* 502 F. Supp. 532, 534

(N.D.Ill. 1980)(reliance upon opinion of medical staff as to proper course of treatment insulates prison administrator from liability under the Eighth Amendment).  There is likewise insufficient evidence that the defendant Pamela Shea, the Health Services Administrator, was indifferent to a serious medical need of the plaintiff.

In considering claims such as the one at hand, the Supreme Court has reiterated time and again the deference that must be accorded to prison officials, who are uniquely familiar with the challenges of prison management, avoiding judicial management of prisons in an understanding of the momentous task assigned to prison officials.  In 1979 the Court stated, perhaps most persuasively:

> Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, … inmates ….  The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication.  Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree.  Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government.  … Courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.  Judicial recognition of that fact reflects no more than a healthy sense of realism.  *Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities*.

*Procunier v. Martinez*, 416 U.S. 396, 404-405 (1974) (emphasis added).

The Supreme Court reiterated in 1979:

[M]any of these same Courts have, in the name of the Constitution, become increasingly enmeshed in the minutiae of prison operations.  Judges, after all, are human.  They, no less than others in society, have a natural tendency to believe that their individual solutions to often intractable problems are better and more workable that those of the persons who are actually charged with and trained in the running of the particular institution under examination.  But under the Constitution, the first question to be answered is not whose plan is best, but in what branch of Government is lodged the authority to initially devise the plan.  This does not mean that constitutional rights are not to be scrupulously observed.  It does mean, however, that the inquiry of federal Courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution. . . .  The wide range of 'judgment calls' that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government.

*Bell v. Wolfish*, 441 U.S. 520, 562 (1979).

Surely no constitutional violation has been alleged or exists in this matter in which orthotic boots were not available when the plaintiff had only had them for one year in the at least 12 years since his accident.  Certainly, the plaintiff cannot prove that any of the defendants possessed a sufficiently capable mindset to constitute deliberate indifference when his complaints of pain were treated with Tylenol and Motrin and even those were sometimes considered unnecessary.  The plaintiff's complaints regarding his boot were responded to numerous times in numerous ways.  They were investigated, and custodial and medical staff worked together within their own spheres in order to appropriately respond to plaintiff's complaints.  Safety concerns were brought into play with plaintiff's medical issue, and this took

time to sort out.  If the boots were medically necessary to a degree of constitutional magnitude, surely the plaintiff would not have been in custody for 18 months previous to the boot prescription.  The defendants respectfully submit that summary judgment should enter in their favor absent a sufficiently serious medical condition.

**B.    Defendants Entitled to Qualified Immunity**

The doctrine of qualified immunity protects government officials from civil suits arising from the performance of their discretionary functions when that performance "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Lennon v. Miller,* 66 F.3d 416, 420-21 (2d Cir. 1995); *Oliveira v. Mayer,* 23 F.3d 642, 649 (2d Cir. 1994), *cert. denied,* 513 U.S. 1076 (1995).  This doctrine evolved as an accommodation between the need to provide private redress when government officials abuse their position of public trust and the need to shield officials who responsibly perform their duties from the costs of defending an action.  *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987); *Harlow v. Fitzgerald,* 457 U.S. at 814.  Assertion of the privilege should be upheld unless the "contours of the right" were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. at 640.  A government employee is also entitled to qualified immunity under circumstances in which a reasonable official in the same circumstances would not have

understood that his conduct violated the established right. *Mitchell v. Forsyth*, 472 U.S. 511 (1985).

In this case, the plaintiff's alleged issues with his orthotic boots not only fail to rise to a constitutional violation in and of themselves, but they most certainly fail to rise to such a well-established right for the plaintiff that a reasonable correctional official would have been aware of it. Indeed, the Seventh Circuit has held that failure to repair or replace orthotic footwear for a double amputee does not rise to the level of a constitutional violation. *Bohannon v. Edwards,* 1999 U.S. App. LEXIS 19885 (7th Cir. 1999), attached.[4] Certainly, there is no clearly established right to orthotics that were not even prescribed while the plaintiff was outside of a correctional facility nor when he was incarcerated for the first 18 months. It is worth repeating that the complaint in this case does not allege that the orthotics the plaintiff requested were medically necessary, only that they were "medically appropriate". A number of courts have held that deprivation of special shoe inserts are not sufficiently serious to constitute a serious medical need. *McKinnis v. Williams,* 2001 U.S. Dist. LEXIS 10979 (S.D.N.Y. 2001), attached; *Veloz v. New York,* 35 F. Supp.2d 305, 311-12 (S.D.N.Y. 1999); *Williams v. Keane,* 940 F. Supp. 566 (S.D.N.Y. 1996); *Cole v. Scully,* 1995 U.S. Dist. LEXIS 5127 (S.D.N.Y. 1995), attached, *aff'd,*

---

[4]     *See also, Nana v. Castro,* 1999 U.S. App. LEXIS 5959 (10th Cir. 1999) (Disagreement about the necessity of orthotic devices—no constitutional violation).

89 F.3d 826 (2d Cir. 1995). The law is not so clearly established that a reasonable person would know that his behavior constituted a constitutional violation, and thus, even were a constitutional violation to lie in the facts as alleged in the complaint, all of the defendants are entitled to qualified immunity.

Moreover, the specific facts of this case dictate that all defendants be entitled to qualified immunity. Reasonable medical and correctional officials could disagree as to whether or not the law required them to provide lifts and orthotics in Phase I and II at Northern given the restricted movement at Northern, the security issues at Northern and the fact that non-standard footwear is not typically allowed, and the relatively minor medical issue the plaintiff had.

III. **CONCLUSION**

For all the foregoing reasons, the defendants respectfully urge the Court to grant summary judgment in their favor.

DEFENDANTS,
Warden Myers, et al.

RICHARD BLUMENTHAL
ATTORNEY GENERAL


BY:___/s/_____
Lynn D. Wittenbrink
Assistant Attorney General
110 Sherman Street
Hartford, CT  06105
Federal Bar No. ct08575
E-Mail:  lynn.wittenbrink@po.state.ct.us
Tel: (860) 808-5450
Fax: (860) 808-5591

## <u>CERTIFICATION</u>

I hereby certify that a copy of the foregoing was mailed  to the following on this 13th day

of April, 2005 to:

Lanny Marden, Inmate No. 181275
Osborn Correctional Institution
P.O. Box 100
Somers, CT 06071

                                   ____/s/_____

                                   Lynn D. Wittenbrink
                                   Assistant Attorney General