## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LANNY MARDEN | : | PRISONER |
| *Plaintiff* | : | CIVIL NO. 3:02CV570 (RNC) (WIG) |
| V. | | |
| WARDEN LARRY MYERS, ET AL. | | |
| *Defendants* | : | JULY 13, 2005 |

### LOCAL RULE 56(a)2 STATEMENT

Pursuant to D. Conn. L. Civ. R. 56(a)2, the plaintiff submits the following response to Defendants' Local Rule 56(a)1 Statement. The numbered paragraphs correspond to the paragraphs in the defendants' statement. The plaintiff also has submitted Exhibits 1 through 15, which are referenced throughout this statement.

1.  The plaintiff admits that he seeks monetary damages for physical pain and suffering. The plaintiff denies that he does not seek damages for emotional or psychological distress. (Plaintiff's Exhibit 1, Para. 3; Plaintiff's Exhibit 2, P.4 (No. 8) and P. 10 (No. 15)).

2.  The plaintiff denies that the first period in which he was deprived of orthotics lasted for only five weeks. (Plaintiff's Exhibit 1, Para. 37, 45). The remainder of this paragraph is admitted.

3.   The plaintiff admits that he had an accident in his youth in which he injured his right leg and that, as a result, there is a disparity in the length of his legs. The plaintiff denies this paragraph to the extent that it suggests lack of clarity regarding the type or date of the accident. (Plaintiff's Exhibit 1, Para. 7-17; Defendants' Exhibit H, P. 898-905).

4.   Admitted.

5.   The plaintiff denies that the first period of time in which he was entirely without the boots and prescribed orthotics lasted for only five weeks. ( Plaintiff's Exhibit 1, Para. 37, 45). The plaintiff admits that he was left without arch supports after prison staff members confiscated the arch support and linings of the boots during a shakedown on August 14, 1999. The plaintiff admits that he did not wear the boots during the second time period of seven months because without the arch support and linings the boots could not be worn and could not be used for their intended purpose.

6.   The plaintiff denies that he was treated with Tylenol and Motrin only during the time periods that are the subject of this lawsuit. (Defendants' Exhibit H, P. 427, 431, 432, 435, 443, 452, 457-459, 461-463, 469, 471, 485, 510, 514, 519, 520, 533, 534, 916, 924, 1114, 1116-1119, 1124, 1125, 1127-1132, 1144, 1150, 1160, 1161, 1164, 1168, 1170, 1172, 1173). The plaintiff admits that he was seen by various medical staff within corrections prior to 1998. The plaintiff admits that he had a family physician on the outside. The plaintiff admits that

none of those medical professionals prescribed a lift for him prior to 1998.

7.   Admitted.

8.   Admitted.

9.   Admitted.

10.   Admitted.

11.   Admitted.

12.   Admitted.

13.   Admitted.

14.   The plaintiff admits he was placed into the Administrative Segregation Program at Northern after the slashing incident. The plaintiff admits that the second part of this paragraph accurately quotes a portion of a letter from Cheshire Warden George K. Wezner dated May 12, 1999.

15.   Admitted.

16.   Admitted.

17.   Admitted.

18.   Admitted.

19.   Admitted.

20.   Admitted.

21. Admitted.

22. The first sentence of this paragraph is admitted. The second sentence of this paragraph is denied. (Plaintiff's Exhibit 1, Para. 83-85).

23. Admitted.

24. Admitted.

25. Admitted.

26. Admitted.

27. Denied. The deposition pages cited by the defendants do not mention any type of injury to the plaintiff's ankle. (Defendants' Exhibit G, P. 34-35.)

28. As stated in paragraph 27, supra, the plaintiff denies that he claimed in his deposition that he sprained in ankle during one of the time periods that are the subject of this suit. (Defendants' Exhibit G, P. 34-35). The plaintiff admits that an ankle sprain was not treated or formally diagnosed during those time periods, because he did not sustain an ankle sprain during those time periods and never claimed that he did.

29. The plaintiff admits that he was born in 1971. The plaintiff admits that as a minor he sustained a fracture of the right femur, the large bone in his leg, and that he is permanently injured as a result. The plaintiff denies this paragraph to the extent that it implies that the date of the injury is uncertain. (Plaintiff's Exhibit 1, Para. 7-17; Defendants' Exhibit H, P. 899-905).

4

30.   In regard to the first sentence of this paragraph, the plaintiff admits that during his deposition he attributed his injury to a dirt bike accident that occurred in his early teens. He further admits that his injury, in fact, was the result of a dirt bike accident that occurred in his early teens. In regard to the second sentence of this paragraph, the plaintiff admits that his prison medical records contain varying accounts regarding the date of the fracture, but he denies this sentence to the extent that it suggests he is responsible for the varying accounts. (Plaintiff's Exhibit 1, Para. 7-17; Defendants' Exhibit H, P. 898-905).

31.   The plaintiff admits that the medical-record pages cited by the defendants refer to the accident taking place in 1972. The plaintiff further admits that 1972 was the year of his first birthday. The plaintiff denies this paragraph to the extent that it suggests that he claimed the accident took place in 1972 or that he claimed the accident took place when he was 1 or 2 years old. (Plaintiff's Exhibit 1, Para. 7-17; Defendants' Exhibit H, P. 898-905).

32.   The plaintiff admits that his right leg is shorter than his left. He also admits that he estimated the disparity to be somewhere between 2 5/8 and 3 inches, an estimate that is consistent with his correctional medical records. The plaintiff denies this paragraph to the extent that it suggests that the disparity is solely the result of an improperly healed fracture. (Plaintiff's Exhibit 1, Para. 19).

33.   The plaintiff admits that he has a deformed right knee. The plaintiff denies that the deformity to his right knee is mild. In fact, in the Clinical Record dated April 14, 1997, a prison doctor described the deformity as "obvious." (Defendants' Exhibit H, P. 102), and on May 10, 2000, a doctor wrote that the plaintiff's  knee and lower leg were "visibly deformed." (Defendants' Exhibit H, P. 49). The plaintiff admits that he walks with a limp. He further admits that a Clinical Record entry dated June 16, 2001, a single page in the hundreds of pages of medical records offered by the defendants, describes that limp as "minimal." The plaintiff admits that he has been described as having "cruciate ligament and patella instability."

34.   The plaintiff denies that his medical records contain no notations regarding any injury to his feet. (Defendants' Exhibit H, P. 52, 716, 737-738).

35.   Admitted.

36.   Denied. (Plaintiff's Exhibit 1, Para. 7-17; Defendants' Exhibit H, P. 898-905).

37.   In regard to the first sentence of this paragraph, the plaintiff admits that he did not have a lift between August 27, 1984, when the dirt bike accident occurred, until June of 1998, when he received a lift from correctional medical staff. The second sentence of this paragraph is admitted.

38.   Admitted.

39.   Admitted.

40.   The first sentence of this paragraph is admitted. In regard to the second sentence of this paragraph, the plaintiff admits that the exhibits cited by the defendants make no mention of the plaintiff having orthotics prior to June of 1998 because, in fact, he did not have orthotics prior to June of 1998.

41.   In regard to the first sentence of this paragraph, the plaintiff admits that he was prescribed Motrin for knee pain in December of 1996. In regard to the second sentence of this paragraph, the plaintiff admits that his knee was X-rayed in May 1997, after he complained of knee pain. He denies this sentence to the extent that it suggests that neither the plaintiff nor medical staff had suggested a lift or arch supports prior to May 1997. (Plaintiff's Exhibit 1, Para. 23-24; Defendants' Exhibit H, P. 102).

42.   Admitted.

43.   Admitted.

44.   Denied. The plaintiff denies that his objective symptoms fell short of his subjective complaints. (Plaintiff's Exhibit 1, Para. 87-143; Defendants' Exhibit H, P. 50-54, 80, 102, 107, 113, 115, 169, 325, 716-718, 747-750, 752, 753, 864, 906, 909, 1058, 1075; Defendants' Exhibit L, P. 8).

45.   The plaintiff admits that this paragraph accurately quotes an entry in the  Clinical

Record dated August 17, 2002, but he denies that the information contained in the entry is

accurate. (Plaintiff's Exhibit 1, Para. 126-130; Plaintiff's Exhibit 4, P. 33-38; Defendants'

Exhibit H, P. 1138).

46.   The plaintiff admits that, while not exactly quoting an entry in the Clinical Record

dated August 24, 2000, this paragraph essentially conveys the meaning of that entry. But he

denies the accuracy of the information contained in the entry. (Plaintiff's Exhibit 1, Para. 125).


47.   The plaintiff admits that this paragraph accurately quotes the two entries cited by the

defendants, but he denies that the information contained in the entries is accurate. (Plaintiff's

Exhibit 1, Para. 125).

48.   The first sentence of this paragraph is admitted. In regard to the second sentence of

this paragraph, the plaintiff denies that he complained about discomfort in his back prior to the

time period complained of in this lawsuit. (Plaintiff's Exhibit 1, Para. 136-143; Defendants'

Exhibit H, P. 36, 37, 79, 80, 82, 85, 88, 91, 92, 102, 106, 107, 113-115, 120, 307, 325,

352, 654, 656, 752, 909). The plaintiff admits that he complained about discomfort in his leg

both before, during and after the time period complained of in this lawsuit, and that he has

complained about discomfort in his back both during and after the time period complained of in

this lawsuit.

49. Admitted.

50. Admitted.

51. Denied. This paragraph misquotes the Clinical Record entry dated May 23, 2000, in that the entry mentions "increasing pain," rather than "increased pain." (Defendants' Exhibit H, P. 48).

52. Admitted.

53. Admitted.

54. Denied. (Plaintiff's Exhibit 1, Para. 113-117; Defendants' Exhibit H, P. 50, 864).

55. Admitted.

56. Admitted.

57. Admitted.

58. Denied. (Plaintiff's Exhibit 1, P. 106; Defendants' Exhibit H, P. 795-802; 804-809, 822,828, 830-831, 833, 836-843, 845, 848, 850, 852, 857-859).

59. Admitted.

60.   The plaintiff admits that in his deposition he was unable to state when he first experienced knee or back pain. Upon further reflection following the deposition, he now states that knee pain was present prior to the time at which orthotics were prescribed, but his back pain began only after the prescribed orthotics were taken from him. (Plaintiff's Exhibit 1, Para. 139-143; Defendants' Exhibit H, P. 79, 80, 82, 85, 88, 91, 92, 102, 106, 107, 113-115, 120, 307, 325, 352, 654, 656, 752, 909).

61.   The plaintiff admits that in his deposition he was unable to state when he first experienced knee or back pain. Upon further reflection following the deposition, he now states that knee pain was present prior to the time at which orthotics were prescribed, but his back pain began only after the prescribed orthotics were taken from him. (Plaintiff's Exhibit 1, Para. 139-143; Defendants' Exhibit H, P. 79, 80, 82, 85, 88, 91, 92, 102, 106, 107, 113-115, 120, 307, 325, 352, 654, 656, 752, 909).

62.   The plaintiff admits that the first sentence of this paragraph accurately lists the periods in which he has been incarcerated. The plaintiff admits that he testified that he did not know if he ever sought treatment for his back pain when he was not incarcerated.

63.   Admitted.

64.   The plaintiff denies that he did not need more significant medication to alleviate his pain when he did not have a lift. (Defendants' Exhibit H, P. 822, 828). The remainder of this

paragraph is admitted.

65.  Admitted.

66.  The plaintiff admits that in a single entry in the hundreds of pages of medical records submitted by the plaintiff (an entry in the Clinical Record dated May 24, 1997) a single individual characterized him as displaying "drug seeking behavior." The plaintiff denies the implication that he was seeking pain medication for a possible narcotic effect, rather than to alleviate the pain caused by the injuries described in his amended complaint. (Plaintiff's Exhibit 1, Para. 118-125; Plaintiff's Exhibit 9; Defendants' Exhibit H, P. 102, 1058, 1075). The plaintiff admits that exercises are frequently recommended to him.

67.  Admitted.

68.  Admitted.

69.  Admitted.

70.  Admitted.

71.  Admitted.

72.  Admitted.

73.  The plaintiff denies that the date on which his boots were ripped was August 14, 1998. (Plaintiff's Exhibit 1, Para. 47-51; Plaintiff's Exhibit 5). The remainder of this paragraph is admitted.

11

74.   Denied. (Defendant's Exhibit H, P. 53, 717, 718, 720).

75.   The plaintiff admits that he was left with the lift with the boots. The plaintiff denies that only the arch support was removed in the shakedown. (Plaintiff's Exhibit 1, Para. 51).

76.   Admitted.

77.   The plaintiff admits that in his complaint of August 16, 1999, he did not indicate that his boots were destroyed and did not specifically say that the lift alone could not assist his alignment. The plaintiff denies the implication that, after the shakedown, the boots could have been worn for their intended purpose. (Plaintiff's Exhibit 1, Para. 54-55; Defendants' Exhibit H, P. 718, 720).

78.   The first sentence of this paragraph is admitted. The second sentence of this paragraph is denied. In the exhibit cited by the defendants, the plaintiff clearly stated that "my inserts to my boots were thrown away," not that the boots had been thrown away. (Defendants' Exhibit H, P. 822).

79.   Admitted.

80.   Denied. The plaintiff never claimed that his boots were gone, but rather that the inserts to the boots were gone. (Defendants' Exhibit H, P. 822).

81.   Admitted.

82.  Denied. (Plaintiff's Exhibit 1, Para. 55-61; Defendants' Exhibit H, P. 718, 720).

83.  The plaintiff admits that this paragraph accurately characterizes the content of P. 807 of Defendants' Exhibit H.

84.  Admitted.

85.  The plaintiff admits that the Clinical Record of September 3, 1999, does not note that Dr. Fedus saw the boots, but he denies the implication that Dr. Fedus did not see the boots. (Plaintiff's Exhibit 1, Para. 58). The plaintiff admits that Dr. Fedus prescribed two tablets of 325 mg. Tylenol twice a day.

86.  Denied. (Plaintiff's Exhibit 1, Para. 55-58; Defendants' Exhibit H, P. 720).

87.  The first sentence of this paragraph is denied. (Defendants' Exhibit H, P. 720). In regard to the second sentence of this paragraph, the plaintiff admits that the URC determination dated September 14, 1999, states: "Please review matter to custody regarding lost property claim for report of orthotic and shoe inserts reported to be removed during shakedown." The plaintiff denies that the URC "referred the matter to custody on [the] understanding" that it was a lost property claim. (Plaintiff's Exhibit 11, P. 3-4, No. 8).

88.  Admitted.

89.   The plaintiff admits that prior to September 1999 the URC had approved some requests for treatment and would in the future approve some requests, but he denies that all such request were approved. (Defendants' Exhibit L, P. 1, 8, 9,10, 13, 17, 19). The plaintiff denies that the URC's decision to deny needed treatment in September 1999 was based upon security concerns. (Plaintiff's Exhibit 1, Para. 62-64).

90.   The plaintiff admits that he successfully completed the phase program at Northern. The plaintiff admits that the URC approved some requests after his release from the phase program, but he denies that all such requests were approved. Defendants' Exhibit L, P. 13, 17, 19).

91.   Admitted.

92.   Admitted.

93.   Admitted.

94.   Admitted.

95.   Admitted.

96.   Admitted.

97.   Admitted.

98.   Admitted.

99.   This paragraph is admitted except to the extent that it implies that the plaintiff's injury was 27 years old. (Plaintiff's Exhibit 1, Para. 8; Defendants' Exhibit H, P. 904).

100.   Admitted.

101.   Admitted.

102.   This paragraph is admitted except to the extent that it implies that Dr. Fedus never saw the boots after the shakedown. (Plaintiff's Exhibit 1, Para. 58).

103.   Admitted.

104.   The plaintiff admits that he was given a stronger prescription of Tylenol in December 1999, but he denies that he complained of only right leg pain during that period. (Defendants' Exhibit H, P. 52).

105.   The plaintiff admits that the Clinical Record entry dated December 5, 1999, does not mention a complaint about back pain.

106.   Admitted.

107.   Admitted.

108.   Admitted.

109.   The plaintiff denies that it is not clear from the record when the shift occurred. (Plaintiff's Exhibit 4, P. 29). The remainder of this paragraph is admitted.

110.   Admitted.

111.   The first sentence of this paragraph is denied. (Defendants' Exhibit H, P. 718, 720). The second sentence of this paragraph is admitted.

112.   The plaintiff admits that the Clinical Records portion of his medical records does not indicate the exact date he received his orthotics. However, he denies that other portions of the records do not contain that information. (Defendants' Exhibit H, P. 828.) The plaintiff admits there is an entry dated March 9, 2000, indicating that the plaintiff is "awaiting his footwear."

113.   The first sentence of this paragraph is denied in that it implies that the plaintiff reported only soreness in his foot on April 7, 2000. The entry in the Clinical Record of April 7, 2000, also notes pain in the right hip and right knee. (Defendants' Exhibit H, P. 50). The second sentence of this paragraph is admitted.

114.   Admitted.

115.   Admitted.

116.   Denied. (Defendants' Exhibit H, P. 53, 717-718, 720).

117.   The first sentence of this paragraph is denied to the extent that it implies that Dr. Edward Pesanti and Cheryl Malcolm were not or may not have been members of the Utilization Review Committee at the time of the events that gave rise to this suit. (Plaintiff's Exhibit 11, P. 3, No. 6). The remainder of this paragraph is admitted.

16

118.   The plaintiff admits that the URC has approved orthotics and lifts during his time of incarceration. The remainder of this paragraph is denied. (Defendants' Exhibit L, P. 7-9).

119.   The plaintiff denies that he was housed at Cheshire on June 9, 1997, when the URC denied the request for an orthotic. (Defendants' Exhibit A; Defendants' Exhibit L, P.1). The remainder of this paragraph is admitted.

120.   Admitted.

121.   Admitted.

122.   Admitted.

123.   In regard to the first sentence of this paragraph, the plaintiff admits that there were no URC requests during the first six-week period that he was denied access to prescribed orthotics. There would be no need for such a request because the plaintiff had a fully functional orthotic and heel lift, which he was denied access to by custodial staff. The second sentence of this paragraph is denied in that it incorrectly states that the request dated September 3, 1999, indicated "only that the plaintiff 'Stated shoe gear was taken during shakedown & unable to locate' " The request also stated that the plaintiff had a discrepancy in the length of his limbs and that he complaining about knee and back pain. (Defendants' Exhibit L, P. 7).

124.   The first sentence of this paragraph is denied as incomplete in that the request

submitted by Dr. Fedus was for "shoe gear with 2 ½- 2 5/8 heel lift on outside of shoe &

orthotic." (Defendants' Exhibit L, P. 7). In regard to the second sentence of this paragraph, the

plaintiff denies that the request was neither granted not denied. (Defendants' Exhibit L, P. 7).

125.   Admitted.

126.   The paragraph is admitted except to the extent that it implies that the accident

occurred in 1972. (Plaintiff's Exhibit 1, Para. 8; Defendants' Exhibit H. P. 904).

127.   Admitted.

128.   The paragraph is admitted except to the extent it implies that the injury was 27 or

more years old. (Plaintiff's Exhibit 1, Para. 8; Defendants' Exhibit H, P. 904).

129.   Admitted.

130.   Denied.  (Defendants' Exhibit H, P. 718, 720).

131.   Denied.  (Defendants' Exhibit H, P. 718, 720).

132.   Denied. (Defendants' Exhibit H, P. 36, 51-53, 717-718, 720, 795-802, 804-809,

822, 828-831, 833, 836-843, 845, 848, 850, 852, 857-859; Plaintiff's Exhibit 1, Para. 106,

134-143; Plaintiff's Exhibit 10).

133.   Denied. (Defendants' Exhibit H, P. 720).

134.   This paragraph is denied in that it implies that the plaintiff's pain was no worse

during the period in which he was deprived of the prescribed orthotics. (Plaintiff's Exhibit 1,

Para. 106, 139-143; Defendants' Exhibit H, P. 795-802, 804-809, 822, 828, 830-831, 833,

836-843, 845, 848, 850, 852, 857-859).

135.   Denied. (Plaintiff's Exhibit 1, Para. 106, 139-143; Defendants' Exhibit H, P. 795-

802, 804-809, 822, 828, 830-831, 833, 836-845, 848, 850, 852, 857-859).

136.   The plaintiff admits that his condition would be expected to worsen over time. The

remainder of this paragraph is denied. (Plaintiff's Exhibit 1, Para. 79-86, 106, 139-143;

Defendant's Exhibit A; Defendant's Exhibit B, Judgment Mittimus dated August 31, 1999;

Defendants' Exhibit H, P. 795-802, 804-809, 822, 828, 830-831, 833, 836-843, 845, 848,

850, 852, 857-859).

137.   Denied. (Plaintiff's Exhibit 1, Para. 106, 125-130, 139-143; Defendants' Exhibit

H, P. 718, 720).

138.   The first sentence of this paragraph is admitted. The second sentence of this

paragraph is denied. (Plaintiff's Exhibit 1, Para. 66-78; Plaintiff's Exhibit 7; Defendants' Exhibit

H, P. 56, 59, 885-886).

139.   Denied. This paragraph is denied in that it implies that the plaintiff's walking or

pacing was unnecessary. (Plaintiff's Exhibit 1, Para 66-78; Plaintiff's Exhibit 7; Defendants'

Exhibit H, P. 56, 59, 885-886).

## DISPUTED ISSUES OF MATERIAL FACT

1.   The dirt bike accident in which the plaintiff fractured his right femur occurred on August 27, 1984, when the plaintiff was 13 years old. (Plaintiff's Exhibit 1, Para. 7-8; Defendants' Exhibit H, P. 904-905).

2.   After the accident and a subsequent re-injury, the plaintiff received treatment at Rockville General Hospital. (Plaintiff's Exhibit 1, Para. 10; Defendants' Exhibit H, P. 899-905).

3.   On December 11, 1997, the plaintiff signed a release form at the request of prison medical personnel to allow them to obtain copies of his records from Rockville General Hospital. (Plaintiff's Exhibit 1, Para. 11; Defendants' Exhibit H, P. 898).

4.   The records were received from Rockville General Hospital and are part of the plaintiff's prison medical file. (Plaintiff's Exhibit 1, Para. 12, 14; Defendants' Exhibit H, P. 899-905).

5.   The records from Rockville General Hospital clearly indicate that the dirt bike accident occurred on August 27, 1984. (Defendants' Exhibit H, P. 904-905).

6.   The plaintiff has no control over his prison medical file and is not responsible for maintaining the accuracy of the file. That responsibility rests with prison medical personnel. (Plaintiff's Exhibit H, Para. 16).

7.   Prison medical personnel are responsible for any inconsistencies in the file regarding the date of the dirt bike accident. (Plaintiff's Exhibit 1 Para. 17; Defendants' Exhibit H, P. 904-905).

8.   The discrepancy in the length of the plaintiff's legs was caused, at least in part, by the fact he was still growing at the time he fractured his femur. (Plaintiff's Exhibit 1, Para. 19).

9.   The plaintiff did not know that an orthotic could help alleviate the pain associated with his leg length discrepancy until he was told that it could. (Plaintiff's Exhibit 1, Para. 21).

10.   Prior to the time he came to prison, no doctor suggested to the plaintiff that he needed an orthotic. (Plaintiff's Exhibit 1, Para. 22).

11.   At some point prior to April 14, 1997, it came to the plaintiff's attention that he might benefit from a "lift."

12.   On April 14, 1997, when he was housed at Corrigan Correctional Institution, the plaintiff asked a prison doctor for a "lift" for his shoe." (Plaintiff's Exhibit 1, Para. 24; Defendants' Exhibit A; Defendants' Exhibit H, P. 102).

13.   The deformity to the plaintiff's right knee is obvious. (Defendants' Exhibit H, P. 102).

14.   The plaintiff's right knee is extremely unstable. (Defendants' Exhibit H, P. 749-750).

15.   On many occasions prior to April 14, 1997, the plaintiff complained about right knee pain and/or instability of the right knee. (Plaintiff's Exhibit 1, Para. 25; Defendants' Exhibit H, P. 106-107, 113-115, 120, 307, 325, 352, 654, 656, 752, 909).

16.   Between his request for a lift on April 14, 1997, and the date he received an orthotic, the plaintiff continued to complain about right knee pain and/or instability. (Plaintiff's Exhibit 1, Para. 26; Defendants' Exhibit H, P. 79-80, 82, 85, 88, 91, 92, 102).

17.   The plaintiff's right knee gave out and/or he injured it numerous times prior to receiving his first pair of orthotic boots in 1998. (Plaintiff's Exhibit 1, Para. 87-96; Defendants' Exhibit H, P. 80, 102, 107, 113, 115, 325, 749-750, 753, 906, 909).

18.   Prior to his receipt of prescribed orthotics in 1998, the discrepancy in the length of his legs caused the plaintiff to walk on his tip toes. (Defendants' Exhibit H, P. 737-738).

19.   The orthotic, which consisted of a lift on the outside of the right boot and a long arch support on the inside of the boot, was designed to balance the plaintiff's pelvis and reduce stress on his right knee. (Defendants' Exhibit H, P. 733).

20.   After his transfer to Northern Correctional Institution on May 18, 1999, a nurse at an intake health screening told the plaintiff that he was not allowed to have the prescribed

orthotics because of safety and security concerns. (Defendants' Exhibit H, P. 61).

21.   The medical unit told the plaintiff that he needed to address the matter with the

warden, Larry J. Myers, because this was a safety and security issue. (Defendants' Exhibit H,

P. 815).

22.   The plaintiff wrote requests to Warden Myers dated June 1 and June 14, 1999.

(Plaintiff's Exhibit 4, P. 1-2).

23.   In his requests, the plaintiff informed Warden Myers that his right leg is

approximately 3 inches shorter than his left, that he has a deformed knee and that he was in a

lot of pain. (Plaintiff's Exhibit 4, P. 1-2).

24.   The plaintiff informed Warden Myers that he had medical prescription boots in his

property, and he asked that the boots be returned to him. (Plaintiff's Exhibit 4, P. 1-2).

25.   The plaintiff informed Warden Myers that there was no metal in the boots and that

the boots posed no threat. (Plaintiff's Exhibit 4, P. 1).

26.   In addition to sending written requests, the plaintiff also spoke with Warden Myers,

who referred him back to the medical unit. (Plaintiff's Exhibit 1, Para. 40).

27.   The prescribed orthotic boots did not present a safety or security problem.

(Plaintiff's Exhibit 1, Para. 41-43; Plaintiff's Exhibit 3, P. 2, No. 4; Plaintiff's Exhibit 15;

Defendants' Exhibit H, P. 716).

28.    The lift on the outside of the boot was made of rubber. (Plaintiff's Exhibit 1, Para. 42).

29.    The arch support was made of rubber or some type of plastic. (Plaintiff's Exhibit 1, Para. 43).

30.    The custodial staff at Northern had no major objection to the plaintiff's request for boots and considered it a medical issue. (Plaintiff's Exhibit 3, P. 2, No. 4).

31.    The boots containing the prescribed orthotics were returned to the plaintiff on or about June 29, 1999, six weeks after they were taken away. (Plaintiff's Exhibit 1, Para. 45).

32.    A search, or shakedown, of the plaintiff's housing unit at Northern was conducted on August 14, 1999. (Plaintiff's Exhibit 1, Para. 46-49; Plaintiff's Exhibit 5).

33.    During the shakedown, the plaintiff was placed in a shower. He was not allowed to wear his boots at the time. (Plaintiff's Exhibit 1, Para. 49-50).

34.    When he returned to his cell, the plaintiff found that the arch support and linings had been ripped from his boots. The arch support and linings were missing. (Plaintiff's Exhibit 1, Para. 51).

35.    After the shakedown, the plaintiff tried to wear the damaged boots, but they hurt his knee, leg, back and feet. (Plaintiff's Exhibit 1, Para. 54).

36.    If the damaged boots could still have been used for their intended purpose, Dr. Henry Fedus would not have had to submit a request to the Utilization Review Committee ("URC") on September 3, 1999, for a heel lift and orthotic. (Defendants' Exhibit H, 720).

37.    Before Dr. Fedus submitted the request to the URC on September 3, 1999, the plaintiff showed him the boots that had been damaged in the shakedown. (Plaintiff's Exhibit 1, Para. 58).

38.    In his request, Dr. Fedus wrote that the plaintiff's "shoe gear" had been taken during the shakedown. "Shoe gear" referred to the linings and arch support, not the boots themselves. (Plaintiff's Exhibit 1, Para. 57-58).

39.    Dr. Fedus knew that the boots had not been taken because he had seen the boots. (Plaintiff's Exhibit 1, Para. 58).

40.    Other members of the prison medical staff also saw the boots. (Plaintiff's Exhibit 1, Para. 52-53; Plaintiff's Exhibit 6).

41.    The plaintiff's cell mate, Joseph A. Mollo, witnessed the plaintiff's unsuccessful effort to give the damaged boots to a prison nurse or medic named Reggie. (Plaintiff's Exhibit 6).

42.    Knee and back pain is common with an increase in limb discrepancy. (Defendants' Exhibit H, P. 720).

43.  The damaging of his prescribed boots on August 14, 1999, increased the plaintiff's limb discrepancy and caused him to experience knee and back pain. (Defendants' Exhibit H, P. 720).

44.  On October 30, 1999, Dr. Fedus asked the URC to provide the plaintiff with a functional orthotic and heel lift. After the shakedown on August 14, 1999, the plaintiff's boots were not functional because the arch support and linings were missing. (Plaintiff's Exhibit 1, Para. 59-61; Defendants' Exhibit H, P. 718).

45.  The functional orthotic and heel lift were needed to decrease limb length discrepancy and decrease erosion of the plaintiff's right foot. (Defendants' Exhibit H, P. 718).

46.  Following the shakedown on August 14, 1999, custodial and medical personnel argued with each other about who would pay to repair or replace the plaintiff's boots. (Plaintiff's Exhibit 1, Para. 62).

47.  If the disappearance of the linings and arch support was considered a lost property claim, the DOC would be responsible for paying for the new boots. (Plaintiff's Exhibit 1, Para. 62-63).

48.  On the other hand, if the problem was treated as a medical issue, the cost of new orthotics would be borne by Correctional Managed Health Care. (Plaintiff's Exhibit 1, Para.

62, 64).

49.  During the period following the shakedown, the plaintiff had numerous conversations

and/or wrote requests to Major Neal Kearney, Major Michael Lajoie, Lt. Marc Alderucci and

Pamela Shea in an attempt to get approval for repair or replacement of the boots. (Plaintiff's

Exhibit 1, Para. 65).

50.  Defendants Kearney, Lajoie, Alderucci and Shea participating in the decision-

making process regarding whether the plaintiff would be provided with replacement orthotics.

(Plaintiff's Exhibits 13, 14, 15; Defendants' Exhibit H, P. 54).

51.  In a report dated November 12, 1999, defendant Alderucci falsely stated that the

medical unit had "already ordered a replacement heel support" and that the issue had been

resolved to the plaintiff's satisfaction. (Plaintiff's Exhibit 13).

52.  Replacement orthotics had not been ordered at that point. In fact, as late as January

3, 2000, a nurse provided the following response to a request submitted by the plaintiff: "There

is no way we can order you lifts since URC has not approved them." (Plaintiff's Exhibit 4, P.

25).

53.  A new heel lift could not have been ordered prior to February 7, 2000, since the

measurements for the lift were not taken until that day. (Defendants' Exhibit H, P. 51).

54.    After he was told he could have an orthotic sent from home, the plaintiff informed prison personnel that he did not "have a home of the street" or "family support on this issue." (Plaintiff's Exhibit 4, P. 29).

55.    On August 11, 1999, the plaintiff was advised by medical personnel to exercise his leg to improve strength and flexibility. (Defendants' Exhibit H, P. 56).

56.    Some of the pain in the plaintiff's leg at that time might have been caused by his inability to exercise because of recent abdominal surgery. (Plaintiff's Exhibit 1, Para. 68-69; Defendants' Exhibit H, P. 56).

57.    Even though it hurt to walk, the plaintiff had to exercise because medical personnel were encouraging him to do so and, in fact, were telling him that some of his pain may have been due to a lack of exercise. (Plaintiff's Exhibit 1, Para. 70; Defendants' Exhibit H, P. 56, 885-886).

58.    That is one of the reasons the plaintiff paced in his cell. (Plaintiff's Exhibit 1, Para. 70).

59.    The plaintiff also paced because he was very distressed about what was happening in his life at the time. (Plaintiff's Affidavit, Para. 71).

60.    Pacing would be expected, given the fact that the plaintiff suffers from attention

deficit hyperactivity disorder. (Defendants' Exhibit H, P. 381, 394).

61.    In late 1999, the plaintiff filed a request to be affiliated with the Native American religion. The request was approved by Northern's religious coordinator on December 23, 1999. (Plaintiff's Exhibit 7).

62.    The plaintiff signed an Individual Smudging Agreement on February 17, 2000. (Plaintiff's Exhibit 7).

63.    The plaintiff began to smudge at some point subsequent to the time that medical personnel advised him to exercise to strengthen his leg. (Plaintiff's Exhibit 1, Para. 73-75; Plaintiff's Exhibit 7; Defendants' Exhibit H, P. 56).

64.    Smudging is a common practice in the Native American religion for the cleansing of energy through the burning of sage, tobacco and sweetgrass. (Plaintiff's Exhibit 1, Para. 76).

65.    Smudging plays a role in traditional healing ceremonies because it is believed that once negative energies are cleared out, a sense of peace and relaxation takes over, putting spiritual difficulties to rest. (Plaintiff's Exhibit 1, Para. 77).

66.    The plaintiff felt the need to smudge daily because he was in such emotional distress

about being in Northern and being denied proper treatment for his injured leg. He felt that smudging was the only thing holding him together at that time. (Plaintiff's Exhibit 1, Para. 78).

67.   There is a medical screening room in each unit at Northern and a medical department for the entire facility. (Plaintiff's Exhibit 1, Para. 83).

68.   The medical screening room was only utilized at certain times. (Plaintiff's Exhibit 1, Para. 84).

69.   At other times, the plaintiff had to go to the medical department for examination or treatment, which necessitated walking down the long main corridor of the prison while fully shackled. (Plaintiff's Exhibit 1, P. 79-85).

70.   The plaintiff was going to court during the period when he was without the prescribed orthotics. (Plaintiff's Exhibit 1, Para. 86; Defendants' Exhibit A; Defendants' Exhibit B, Judgment Mittimus dated August 31, 1999).

71.   During the period when he was able to utilize fully functional orthotics, the plaintiff's knee did not give out on him. (Plaintiff's Exhibit 1, Para. 97).

72.   His knee began to give out again after the arch support and linings were ripped from his boots. (Plaintiff's Exhibit 1, Para. 98-101; Defendants' Exhibit H, P. 51, 53, 717-718).

73.   The orthotic was expected to assist in relieving the plaintiff's pain. It was not expected to eliminate the pain by itself. (Plaintiff's Exhibit 1, Para. 104-105; Defendants'

Exhibit H, P. 52).

74.    The knee pain the plaintiff experienced at Northern when he was deprived of the

prescribed orthotics was much more severe than the knee pain he experienced prior to that

when he had the orthotics. (Plaintiff's Exhibit 1, Para. 106; Defendants' Exhibit G, P. 63, Line

18; Defendants' Exhibit H, P. 795-802, 804-809, 822, 828, 830-831, 833, 836-843, 845,

848, 850, 852, 857-859).

75.    On December 5, 1999, the plaintiff received a stronger prescription of Tylenol, but

it did not alleviate his pain. (Plaintiff's Exhibit 1, Para. 133-135; Defendants' Exhibit H, P. 52,

828-831, 833, 836, 840, 842-843, 848, 850, 852; Defendants' Exhibit L. P. 8).

76.    There is an adjustment period of between two and six weeks for new orthotics.

(Plaintiff's Exhibit 8).

77.    During the adjustment period, the orthotics may cause pain to other parts of the

body. (Plaintiff's Exhibit 8).

78.    When new orthotics were provided to the plaintiff in March 2000, his pain

medication was discontinued. (Defendants' Exhibit H, P. 864).

79.    In a response to an Inmate Request Form dated April 7, 2000, a nurse wrote that

Dr. Fedus anticipated "minimal soreness" with adjustment to the orthotic." (Defendants' Exhibit H, P. 864).

80. The reference to "minimal soreness" appears in an entry in the plaintiff's medical records dated April 7, 2000. (Defendants' Exhibit H, P. 50).

81. At that time, Dr. Fedus was referring to pain caused by adjustment to the orthotic. He was not talking about the plaintiff's knee and back pain. (Defendants' Exhibit H, P. 50).

82. Dr. Fedus did not say that pain medication was not necessary. Instead, he said that a prescription for pain medication "should come from primary physician as Podiatry is licensed up to ankle," meaning that the plaintiff's pain was in an area above the ankle. (Defendants' Exhibit H, P. 50).

83. The plaintiff has sought medication to alleviate the pain caused by his medical condition. He has never sought pain medication for its possible narcotic effect. (Plaintiff's Exhibit 1, Para. 118).

84. The plaintiff has told medical personnel that he does not want to take narcotics or other addictive drugs because he is a drug addict. (Plaintiff's Exhibit 1, Para. 119-121; Defendants' Exhibit H, P. 1058, 1075).

85. While in prison, the plaintiff has never failed a urine test for the presence of illegal

drugs. (Plaintiff's Exhibit 1, Para. 123).

86.  The plaintiff has completed both Tier I and Tier II substance abuse programs. (Plaintiff's Exhibit 9).

87.  The plaintiff's pain medication was not discontinued after a nurse insinuated, on August 17, 2002, that he was faking his complaints about pain. (Plaintiff's Exhibit 1, Para. 126-130; Defendants' Exhibit H, P. 1138).

88.  On May 24, 1997, when a staff member wrote that the plaintiff was engaging in "drug seeking behavior," the plaintiff had requested Motrin, which is not a narcotic.

89.  Long-term usage of muscle relaxants, like Flexeril, is unhealthy. (Plaintiff's Exhibit 1, Para. 132).

90.  Prior to July 17, 2001, the plaintiff had not been diagnosed as suffering from lumbar scoliosis. (Plaintiff's Exhibit 1, Para. 137).

91.  The plaintiff's prison medical records prior to July 17, 2001, contain no mention of lumbar scoliosis. (Plaintiff's Exhibit 1, P. 138; Defendants' Exhibit H).

92.  Scoliosis is a musculoskeletal disease in which there is a sideways curvature of the spine, or backbone. (Plaintiff's Exhibit 10).

93.   Scoliosis may develop in the upper back (the thoracic area) or lower back (lumbar), but most commonly it develops in the area between the thoracic and lumbar area (thoracolumbar area). (Plaintiff's Exhibit 10).

94.   Mild scoliosis, defined as a curvature less than 20 degrees, is not serious and requires no treatment other than monitoring. (Plaintiff's Exhibit 10).

95.   If the curvature exceeds 70 degrees, however, the severe twisting of the spine can cause the ribs to press against the lungs, restrict breathing and reduce oxygen levels. (Plaintiff's Exhibit 10).

96.  Eventually, if the curve reaches over 100 degrees, both the lungs and the heart can be injured. (Plaintiff's Exhibit 10).

97.   An untreated discrepancy in leg length is one of the causes of lumbar scoliosis. (Plaintiff's Exhibit10).

98.   By not providing orthotics to compensate for the discrepancy in the length of his legs, the defendants exposed the plaintiff to an unreasonable risk of continuing to suffer severe pain and of sustaining more permanent damage. (Defendants' Exhibit H, P. 718, 720; Plaintiff's Exhibit 10).

99.   The plaintiff did not have back pain until the prescribed orthotics were taken from him at Northern. (Plaintiff's Exhibit 1, Para. 139-143).

100.   The plaintiff's prison medical records prior to his arrival at Northern contain no complaints about back pain, although they contain many complaints about right knee pain and instability of the right knee. (Defendants' Exhibit H, P. 79-80, 82, 85, 88, 91-92, 102, 106-107, 113-115, 120, 307, 325, 352, 654, 656, 752, 909).

101.   Since March 30, 2000, the plaintiff's orthopedic boots have often been in a state of disrepair, which has contributed to his continuing complaints of pain. The URC has been slow to approve repair of the boots when necessary. (Plaintiff's Exhibit 1, Para. 147, Defendants' Exhibit H, P. 1019; Defendants' Exhibit L. P. 17).

THE PLAINTIFF


/s/Lanny Marden
Lanny Marden, Pro Se
Inmate #181275
Willard-Cybulski Correctional Institution
391 Shaker Road
Enfield, CT 06082




Although not appearing herein, the undersigned
assisted in the preparation of this statement:


/s/Richard P. Cahill
Richard P. Cahill, Esq.
Schulman & Associates
Inmates' Legal Assistance Program
78 Oak Street, P.O. Box 260237
Hartford, CT 06126-0237
Tel: (860) 246-1118
Fax: (860) 246-1119

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed, postage prepaid, on this 15th day of July, 2005, to the following counsel and pro se parties of record:

Lynn D. Wittenbrink, Esq.
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105

/s/Lanny Marden
Lanny Marden