**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

LANNY MARDEN : PRISONER
*Plaintiff* : CIVIL NO. 3:02CV570 (RNC) (WIG)

V.

WARDEN LARRY J. MYERS, ET AL.
*Defendants* : JULY 13, 2005

<u>**AFFIDAVIT OF LANNY MARDEN**</u>

1.  I am older than the age of 18, and I understand and believe in the obligations of an oath.

2.  I am the plaintiff in the above-entitled action.

3.  In addition to damages for physical pain and suffering, I am seeking damages for emotional injury. The defendants are aware that I am seeking damages for emotional injury. (Plaintiff's Exhibit 2, Plaintiff's Response to Defendants' Interrogatories and Requests for Production, P. 4 (No. 8) and P. 10 (No. 15)).

4.  I am an inmate sentenced to the custody of the Connecticut Department of Correction ("DOC") and currently housed at Willard-Cybulski Correctional Institution in Enfield, Connecticut.

1

5.    At the time of the events addressed in my complaint, I was housed at Northern

Correctional Institution ("Northern") in Somers.

6.    In conjunction with their motion for summary judgment, the defendants filed numerous

exhibits. One of those exhibits, Exhibit H, consists of 1,174 pages of my prison medical

records.

7.    I was born on August 15, 1971.

8.    On August 27, 1984, shortly after I turned 13 years old, I fractured my right femur in

a dirt bike accident.

9.    During my deposition, I was unable to recall my exact age at the time of the accident.

I testified that at the time of the accident "I was approximately 11 or 12" or "maybe even

13."(Defendants' Exhibit G, P. 31, Lines 15-19).

10.   After the accident and after a subsequent re-injury to my leg, I received treatment at

Rockville General Hospital.

11.   On December 11, 1997, I signed a release form at the request of prison medical

personnel so they could obtain copies of my medical records from Rockville General Hospital.

(Defendants' Exhibit H, P. 898).

12.   The records were received from Rockville General Hospital. They are contained in

my prison medical file and are among the documents submitted by the defendants as part of

2

their Exhibit H. (Defendants' Exhibit H, P. 899-905).

13.   The records clearly indicate that my dirt bike accident occurred on August 27,

1984. (Defendants' Exhibit H, P. 904-905).

14.   The records from Rockville General Hospital were part of my prison medical file at

the time of the events outlined in my complaint.

15.   Prison medical personnel had access to the file and, therefore, access to the

information establishing that the accident occurred on August 27, 1984.

16.   I have no control over my prison medical file and am not responsible for maintaining

the accuracy of the file. That responsibility rests with medical personnel.

17.   Therefore, prison medical personnel are responsible for any inconsistencies in the

file regarding the date of my accident. To get the date correct, all they had to do was look at

the records from Rockville General Hospital, which were contained in the file.

18.   The dirt bike accident resulted in a discrepancy in the length of my legs, with my

right leg being shorter than my left.

19.   It is my understanding that the discrepancy in the length of my legs was caused, at

least in part, by the fact that I was still growing at the time I fractured my femur.

20.   My current period of incarceration began on January 16, 1996, and I have been in

the custody of the DOC continuously since that date. (Defendants' Exhibit A).

21.   I am not a doctor, so I did not know that an orthotic could help alleviate the pain associated with my leg length discrepancy until I was told that it could.

22.   I do not recall any doctor, prior to my coming to prison, suggesting that I needed an orthotic.

23.   At some point prior to April 14, 1997, it came to my attention that I might benefit from a "lift."

24.   On April 14, 1997, while I was housed at Corrigan Correctional Institution in Uncasville, I was examined by a prison doctor. The doctor noticed an "obvious deformity to my right knee and noted that I was complaining about pain in my right knee. At that time, I requested Motrin for pain and "a lift" for my shoe. (Defendants' Exhibit H, P. 102).

25.   On many occasions prior to April 14, 1997, I had complained about right knee pain and/or the instability of my right knee. (Defendants' Exhibit H, P. 106, 107, 113-115, 120, 307, 325, 352, 654, 656, 752, 909).

26.   Between my request for a lift on April 14, 1997, and the date I finally received an orthotic, I continued to complain about right knee pain and/or instability. (Defendants' Exhibit H, P. 79, 80, 82, 85, 88, 91, 92, 102).

27.   On June 2, 1997, a prison physician submitted a request to Correctional Managed

4

Health Care's Utilization Review Committee ("URC"), asking that I be provided with an orthotic. (Defendants' Exhibit H, P. 737-738).

28. The request noted that my right leg was shorter than my left, which caused me to walk on my tip toes. (Defendants' Exhibit H, P. 737-738).

29. On June 6, 1997, the URC denied the request "pending review of community medical records." (Defendants' Exhibit H, P. 737).

30. After a subsequent request, I was fitted for an orthotic at Newington Orthotics. At the fitting, I was found to have a 2 5/8 [inch] leg length discrepancy with flat feet contributing to [right] genu-valgus/rotary deformity." (Defendants' Exhibit H, P. 733).

31. The orthotic was received in March 1998. (Defendants' Exhibit H, P. 725).

32. The orthotic was in need of adjustment. On May 20, 1998, the URC approved a request for the adjustment, noting that "there is no charge for orthotic adjustment by Newington Orthotic." (Defendants' Exhibit H, P. 725).

33. The boots containing the adjusted orthotic were received by me on June 16, 1998. (Defendants' Exhibit H, P. 75).

34. The orthotic consisted of a lift on the outside of the right boot and a long arch support on the inside of the boot. (Defendants' Exhibit H, P. 733).

35. The orthotic was designed to balance my pelvis and reduce stress on my right knee.

(Defendants' Exhibit H, P. 733).

36.   The total cost of the orthotic was $217. (Defendants' Exhibit H, P. 732, 736).

37.   When I was transferred to Northern on May 18, 1999, a nurse at an intake health screening told me that I was not allowed to have the boots containing the prescribed orthotics because of safety and security concerns. (Defendants' Exhibit H, P.  61).

38.   I wrote requests to the medical unit, asking that the boots be returned to me. The medical unit responded by telling me that I needed to write to the warden, Larry J. Myers, because this was a safety and security issue. (Defendants' Exhibit H, P. 815).

39.   I wrote requests to Warden Myers, informing him about my medical problem and the fact that I was in a lot of pain without the prescribed orthotics. (Plaintiff's Exhibit 4, P. 1-2).

40.   I also spoke with Warden Myers, who referred me back to the medical unit.

41.   My prescribed orthotics did not present a safety or security problem.

42.   The lift on the outside of the boot was made of rubber.

43.   To the best of my recollection, the arch support was made of rubber or some type of plastic.

44.   One of the defendants, Major Neal Kearney, has admitted that the boots did not present a safety and security concern. In his response to interrogatories, defendant Kearney testified "that custody had no major objection to plaintiff's requests for boots and considered it

6

a medical issue." (Plaintiff's Exhibit 3, Kearney Response to Interrogatories, P. 2, No. 4).

45.   The boots containing the prescribed orthotics were returned to me on or about  June 29, 1999, six weeks after they were taken away.

46.   At that time, I was housed in the 1 East housing unit at Northern.

47.   On August 13, 1999, a pair of handcuffs were missing from the 1 West housing unit at Northern. (Plaintiff's Exhibit 5, Connecticut Department of Correction Incident Report).

48.   When the cuffs could not be found, a search of the cells in my housing unit, also called a shakedown, was conducted the following day, August 14, 1999. (Plaintiff's Exhibit 5).

49.   At Northern, inmates do not remain in their cells during a shakedown.

50.   During the shakedown of my cell on August 14, 1999, I was placed in the shower. I was not allowed to wear my boots at the time.

51.   When I returned to my cell, I found that the arch support and linings had been ripped from my boots. The arch support and linings were missing.

52.   After the shakedown, I still had the boots. Members of the prison medical staff saw the boots.

53.   On one occasion, my cell mate, Joseph A. Mollo, witnessed me unsuccessfully attempting to give the boots to a prison medic named Reggie. (Plaintiff's Exhibit 6, Affidavit of Joseph A. Mollo dated May 22, 2000).

54.    I tried to wear the boots after they were damaged in the shakedown, but they hurt my knee, leg, back and feet.

55.    If the damaged boots still could have been used for their intended purpose, Dr. Henry Fedus would not have had to submit a request to the URC on September 3, 1999, for a heel lift and orthotic. (Defendants' Exhibit H, P. 720).

56.    In his request to the URC dated September 3, 1999, Dr. Fedus mentioned that "knee and back pain ... is common [with] an [increase] in limb discrepancy." (Defendants' Exhibit H, P. 720).

57.    In the same request, Dr. Fedus noted that I had told him that my "shoe gear was taken during shake down." (Defendants' Exhibit H, P. 720).

58.    "Shoe gear" referred to the arch support and linings of my boots. Dr. Fedus knew that the boots themselves had not been taken because I showed him the boots.

59.    In a subsequent request to the URC dated October 30, 1999, Dr. Fedus requested a "functional orthotic" with heel lift. (Defendants' Exhibit H, P. 718).

60.    After the shakedown on August 14, 1999, my orthotic was not functional. I still had the boot with the heel lift, but the boot was missing the arch support that went with it.

61.    Dr. Fedus requested a "functional orthotic" on October 30, 1999, because the boots that I had were not functional without the linings and the prescribed arch support.

62.   A captain named DeGray told me at the time that medical and custodial personnel were arguing about who would pay to fix or replace my boots.

63.   If the disappearance of the linings and arch support during the shakedown of August 14, 1999, was characterized as a lost property claim, the DOC would be responsible for paying for new orthotics.

64.   On the other hand, if the problem was treated as a medical issue, the cost of the new orthotics would be borne by CMHC.

65.   During the period following the shakedown in which my boots were damaged, I had numerous conversations with and/or wrote requests to Major Neal Kearney, Major Michael Lajoie, Lt. Marc Alderucci and Pamela Shea in an attempt to get approval for repair or replacement of the boots.

66.   An entry in my medical records dated  August 11, 1999, noted that I was "encouraged to exercise leg as tolerated"  to improve strength and flexibility. (Defendants' Exhibit H, P. 56).

67.   At some point, I was given sheets outlining exercises designed to strengthen my back and rehabilitate my knee. (Defendants' Exhibit H, P. 885-886).

68.   I underwent same-day surgery for repair of an inguinal hernia on July 27, 1999. The surgery took place at the University of Connecticut ("UConn") Health Center in Farmington.

9

(Defendants' Exhibit H, P. 59).

69.   The entry in my medical records dated August 11, 1999, indicated that some of the pain in my leg at that time might be attributed to my "inability to exercise fully because of recent abdominal surgery." (Defendants' Exhibit H, P. 56).

70.   Even though it hurt to walk, I had to exercise because medical personnel were encouraging me to do so and, in fact, were telling me that some of my pain may have been due to a lack of exercise. (Defendants' Exhibit H, P. 56, 885-886). That is one of the reasons I paced in my cell.

71.   In addition, I paced because I was very distressed about what was happening in my life at the time.

72.   I have tried a few religions while incarcerated in an attempt to find spiritual peace.

73.   In late 1999, I filed a request to be affiliated with the Native American religion. My request was approved by Northern's religious coordinator on December 23, 1999. (Plaintiff's Exhibit 7, Request for Religious Affiliation and Individual Smudging Agreement).

74.   After approval of my request to be affiliated with the Native American religion, I signed an Individual Smudging Agreement on February 17, 2000. (Plaintiff's Exhibit 7).

75.   I began to smudge at some point subsequent to the time that medical personnel advised me to exercise to strengthen my leg. (Defendants' Exhibit H, P. 56; Plaintiff's Exhibit

7).

76.   Smudging is a common practice in the Native American religion for the cleansing of energy through the burning of sage, tobacco and sweetgrass.

77.   Smudging plays a central role in traditional healing ceremonies because it is believed that once negative energies are cleared out, a sense of peace and relaxation takes over, putting spiritual difficulties to rest.

78.   I felt a need to smudge daily because I was in such emotional distress about being in Northern and being denied proper treatment for my injured leg. I felt that smudging was the only thing holding me together at that time.

79.   In Phase I at Northern, every time an inmate moves anywhere out of his cell he is placed in handcuffs and leg irons. (Defendants' Exhibit J, P. 5).

80.   The handcuffs and leg irons were attached with a tether chain, which made it very difficult to walk.

81.   Whenever I had to go to the medical department or to court, I had to walk down the long main corridor of the prison, with my legs shackled, my hands cuffed behind my back and a tether chain going from my ankles to the handcuffs in the back.

82.   I was required to make this long walk numerous times during the periods when I was deprived of the prescribed orthotics.

11

83.    There is a medical screening room in each unit at Northern and a medical department for the entire facility.

84.    The medical screening room was only utilized at certain times.

85.    At other times, I had to go to the medical department for examination or treatment, which necessitated walking down the long main corridor of the prison while fully shackled.

86.    I was going to court during this period because of charges resulting from the slashing incident that led to my placement at Northern. I was sentenced on the new charges on August 31, 1999, which was during the period after the arch support and linings were ripped from my boots and before I was provided with replacement orthotics. (Defendants' Exhibit A; Defendants' Exhibit B, Judgment Mittimus dated August 31, 1999).

87.    My knee gave out and/or I injured it numerous times prior to me receiving my first pair of orthotic boots in 1998.

88.    On May 4, 1994, I felt a pop in my knee while getting down from my top bunk. (Defendants' Exhibit H, P. 753).

89.    In a Utilization Review Request dated May 9, 1994, an APRN named Bruce Patterson described my knee as "extremely unstable." (Defendants' Exhibit H, P. 749, 750).

90.    On November 29, 1994, I fell from my top bunk and onto my right knee. (Defendants' Exhibit H, P. 325).

91.   On September 9, 1995, I reported that my knee had "almost popped out of joint." (Defendants' Exhibit H, P. 115).

92.   On January 17, 1996, I fell in the day room at the Hartford Correctional Center and felt something pop in my knee. (Defendants' Exhibit H, P. 113).

93.   On December 10, 1996, I hurt my knee when I slipped off the bunk rails while climbing to my top bunk. (Defendants' Exhibit H, P. 909).

94.   An entry in my medical records dated December 10, 1996, notes that I had complained that my knee was "popping out." (Defendants' Exhibit H, P. 107).

95.   On May 24, 1997, I heard and felt a popping in my right knee when I got off my bed. (Defendants' Exhibit H, P. 102, 906).

96.   On December 12, 1997, I hurt my knee when I slipped and fell while climbing down from my bunk. (Defendants' Exhibit H, P. 80).

97.   During the periods when I was able to utilize fully functional orthotics, my knee never gave out on me.

98.   My knee began to give out again after the arch support and linings were ripped from my boots.

99.   In an entry in my records dated October 19, 1999, Dr. Fedus noted that I had reported that "during ambulation knee anterior displaces." (Defendants' Exhibit H, P. 53).

100.   In his request to the URC dated October 30, 1999, Dr. Fedus noted "internal, external displacement" of my knee. (Defendants' Exhibit H, P. 717-718).

101.   On December 10, 1999, I reported to medical personnel that my knee had "popped out." (Defendants' Exhibit H, P. 51).

102.   On November 2, 1999, when the URC denied a request for a functional orthotic with heel lift, the URC noted that the orthotic was needed to "decrease limb length discrepancy & decrease erosion of [right] foot." (Defendants' Exhibit H, P. 716).

103.   An entry in my medical records dated December 5, 1999, mentions a history of foot pain. (Defendants' Exhibit H, P. 52).

104.   In an entry in my medical records dated November 12, 1999, Dr. Fedus said an orthotic and lift would "assist in relieving" many of the symptoms I was experiencing. (Defendants' Exhibit H, P. 52).

105.   Since Dr. Fedus said an orthotic and heel lift would only assist in relieving my symptoms and not completely eliminate those symptoms, it is not surprising that I continued to experience pain after new orthotics were provided to me in 2000.

106.   The knee pain I experienced at Northern during the periods when I was deprived of the prescribed orthotics was much more severe than the knee pain I experienced prior to that when I had the orthotics.

107.   I was given an instruction sheet with the new orthotics. (Plaintiff's Exhibit 8).

108.   The instruction sheet indicated that there is an adjustment period of between two and six weeks. (Plaintiff's Exhibit 8).

109.   It further indicated that during the adjustment period the orthotics may cause discomfort to other parts of the body. (Plaintiff's Exhibit 8).

110.   I was instructed to wear the new orthotics "for up to one hour the first day, two hours the second day, three hours the third day, etc." (Plaintiff's Exhibit 8).

111.   Based upon the instructions, I expected some pain at first.

112.   During this period, my pain medication had been discontinued. (Defendants' Exhibit H, P. 864).

113.   In a response to an Inmate Request Form dated April 16, 2000, a nurse wrote that Dr. Fedus anticipated "minimal soreness" with adjustment to the orthotic. (Defendants' Exhibit H, P. 864).

114.   The reference to "minimal soreness" appears in an entry in my medical records dated April 7, 2000. (Defendants' Exhibit H, P. 50).

115.   At that time, Dr. Fedus was referring to foot soreness caused by the orthotic itself. He was not talking about my knee and back pain. (Defendants' Exhibit H, P. 50).

116.   Dr. Fedus did not say that pain medication was not necessary. Instead, he said that a prescription for pain medication "should come from primary physician as Podiatry is licensed up to ankle," meaning that my pain was in an area above the ankle. (Defendants' Exhibit H, P. 50).

117.   I sought pain medication from my primary prison physician, and a prescription for Tylenol was provided on April 8, 2000. (Defendants' Exhibit H, P. 50).

118.   I have sought medication to alleviate the pain caused by my medical condition. I have never sought pain medication for its possible narcotic effect.

119.   In fact, I have told medical personnel that I do not want to take narcotics because I am a drug addict.

120.   An entry in my medical records dated March 4, 2003, noted that I had told medical personnel that I was feeling like I wanted to "crawl out of my skin." I attributed the "bizarre" feeling to Tylenol with codeine, which I was prescribed after repair of an inguinal hernia. (Defendants' Exhibit H, P. 1058).

121.   On March 19, 2002, I said that I only wanted to take medication "that will not cost me too much when I get out," that is "non-addictive" and that has "no side effects." (Defendants' Exhibit H, P. 1075).

122.   I had a substance abuse problem prior to coming to prison. I have a history of

16

alcohol, cocaine and marijuana abuse. (Defendants' Exhibit H, P. 169).

123.   While in prison, I have never failed a urine test for the presence of illegal drugs.

124.   I have completed both the Tier I and Tier II substance abuse programs. (Plaintiff's Exhibit 9, Tier I and Tier II certificates).

125.   At no time in my dealings with prison medical personnel have I ever  exaggerated my symptoms.

126.   In an entry in my medical records dated August 17, 2002, when I requested stronger pain medication, a nurse claimed that I was "ambulating [without] any difficulty" and "on + off exam table [without] any obvious problem." (Defendants' Exhibit H, P. 4).

127.   The nurse who made the entry dated August 17, 2002, was named Diane Levesque.

128.   I filed a grievance complaining about the way Nurse Levesque treated me on August 17, 2002. (Plaintiff's Exhibit 4, P. 33-38).

129.   In my experience, if a inmate does not get along with a particular staff member, that staff member may fail to document pertinent facts or document facts in a way that is prejudicial to the inmate. In my grievance complaining about Nurse Levesque, I requested that medical personnel not lie in my medical files. (Plaintiff's Exhibit 4, P. 34).

17

130.   Although Nurse Levesque insinuated that I was faking my complaints about pain, my pain medication was not discontinued at that time. (Defendants' Exhibit H, P. 1138).

131.   On September 21, 1999, during the period at Northern when I was deprived of the prescribed orthotics, I requested that Flexeril be prescribed. On October 5, 1999, my request was denied by a prison doctor, who prescribed Tylenol instead. (Defendants, Exhibit H, P. 54).

132.   I was told by a prison doctor that long-term usage of muscle relaxants, like Flexeril, is extremely unhealthy.

133.   On December 5, 1999, I received a stronger prescription of Tylenol after I complained about pain in both my leg and my lower back. (Defendants' Exhibit H, P. 52).

134.   The stronger prescription did not alleviate my pain. I continued to complain about pain in my knee and lower back. (Defendants' Exhibit H, P. 828-831, 833, 836, 840, 842-843, 848, 850, 852).

135.   The pain and instability of my knee were so bad that Dr. Fedus submitted a request to the URC for an orthopedic evaluation of my knee. The request was denied. (Defendants' Exhibit L, P. 8).

136.   In an entry in my medical records dated July 17, 2001, a prison physician, Dr. Ganpat S. Chouhan, noted that I suffer from lumbar scoliosis. (Defendants' Exhibit H, P. 36).

137.   To the best of my recollection, prior to July 17, 2001, no physician had diagnosed me as suffering from lumbar scoliosis.

138.   To the best of my knowledge, my prison medical records prior to July 17, 2001, contain no mention of lumbar scoliosis.

139.   In my deposition, I was unable to answer questions regarding when I first began to experience back pain.

140.   After further reflection, I can state that I did not have back pain until the prescribed orthotics were taken from me at Northern.

141.   My prison medical records prior to my arrival at Northern contain no complaints about back pain, although they contain many complaints about right knee pain and instability of the right knee. (Defendants' Exhibit H, P. 79, 80, 82, 85, 88, 91, 92, 102, 106, 107, 113-115, 120, 307, 325, 352, 654, 656, 752, 909).

142.   An entry in my medical records dated May 15, 2001, notes that I reported at that time that I had had back pain for two years. (Defendants' Exhibit H, P. 37).

143.   I was transferred to Northern on May 18, 1999, almost exactly two years prior to when I reported a two-year history of back pain on May 15, 2001. (Defendants' Exhibit A).

144.  In my amended complaint, I alleged that I received the new orthotic and heel lift on March 9, 2000. (Amended Complaint, Para 36).

145.   Since the filing of my amended complaint, it has come to my attention that the March 9 date was not correct. According to the response to an Inmate Request Form dated March 29, 2000, I received the new boots on March 30, 2000. (Defendants' Exhibit H, P. 828).

146.   I had requested medical personnel to contact the outside orthopedic clinic to get the boots quicker, but my requests were ignored. (Defendants' Exhibit H, P. 837-839).

147.   Since March 30, 2000, my orthopedic boots have often been in a state of disrepair. The URC has been slow to approve repair of the boots when necessary. (Defendants' Exhibit L, P. 17; Defendants' Exhibit H, P. 1019).

I, Lanny Marden, do hereby swear that the contents of the foregoing affidavit are true and accurate to the best of my knowledge and belief.

/s/Lanny Marden
Lanny Marden

Subscribed and sworn to before me this 13th day of July, 2005.

/s/Richard P. Cahill
Richard P. Cahill,
Commissioner of the Superior Court

THE PLAINTIFF


/s/Lanny Marden
Lanny Marden
Inmate #181275
Willard-Cybulski Correctional Institution
391 Shaker Road
Enfield, CT 06071


Although not appearing herein, the undersigned
assisted in the preparation of this affidavit:


/s/Richard P. Cahill
Richard P. Cahill, Esq.
Schulman & Associates
Inmates' Legal Assistance Program
78 Oak Street
P.O. Box 260237
Hartford, CT 06126-0237
Tel: (860) 246-1118
Fax: (860) 246-1119