## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LANNY MARDEN | : | PRISONER |
| | : | NO. 3:02CV570(RNC) |
| VS. | : | |
| | : | |
| WARDEN LARRY MYERS | : | APRIL 13, 2006 |

### LOCAL RULE 56(a)(1) STATEMENT

1.      The plaintiff seeks monetary damages for physical pain and suffering he alleges but has not alleged and does not at this time seek damages for any emotional or psychological distress.  **Ex. G**, **Pl. Dep. 21-25.**

2.      Plaintiff's entire case rests on the undisputed deprivation of arch supports and, for purposes of this motion, orthotics for two time periods, five weeks in 1999 and 7 months spanning portions of 1999 and 2000.

3.      The plaintiff had a some sort of accident in his youth somewhere between 1972 and 1986 in which he hurt his right leg and left a length disparity between his legs.

4.      All parties agree that in 1998, the plaintiff received his first "lift" orthotics while in the custody of the Commissioner of Correction, and that the lift shoes/boots were entirely taken away from him when he came to Northern after receiving a Disciplinary Report for slashing another inmate with a weapon fashioned of tape and razor blades.

5.     The plaintiff was first without the shoes/boots entirely for 5 weeks while in Phase I of Administrative Segregation at Northern, and then he was left without arch supports in the boots and claims he did not wear them for a second time period of seven months while custody and medical staff evaluated the situation.

6.     The plaintiff was treated with Tylenol and Motrin only during the time periods that are the subject of this lawsuit, and spent at least 12 years prior to 1998 without any lift at all despite the injury to his leg and despite being seen by various medical staff within corrections and having a family physician on the outside.  **Exs H; G 38.**

7.     The plaintiff was seen by medical staff often during the time period without the lift or during the time period he claims the lift was unwearable.

8.     The plaintiff has been in and out if the custody of the State of Connecticut Commissioner  of Correction several times since his first admission in 1989.  **Ex. A RT 60.** Prior to his current sentence, the plaintiff was incarcerated in Connecticut's custody from 1993 until November of 1995.  **Ex. A**.  He was returned to custody in January of 1996 and has remained in custody since that time.  **Ex. A**.

9.     The plaintiff has been convicted of the following felonies:  Assault in the First Degree, Possession of a Weapon in an Institution, two counts of Robbery in the Second Degree,

Possession of Narcotics, Larceny in the Second Degree, and Burglary in the Third Degree.  **Ex. B, Portions of Inmate Master File.**

10.   The plaintiff was convicted of both Possession of a Weapon in an Institution and Assault in the First Degree for conduct engaged in while incarcerated on the Robbery conviction when the plaintiff assaulted and severely slashed another inmate's face and head with a weapon he constructed out of tape and four razor blades.  **Exs. B; C RT 67 Discipline History.**

11.   The plaintiff's victim received 21 sutures from his forehead to the top of his chin as a result of the plaintiff's assault.  **Ex. B**.  This incident occurred on May 3, 1999.  **Exs. B; C.**

12.   During his time as an inmate over the years, the plaintiff has incurred 29 Disciplinary Reports while incarcerated, including but not limited to Causing a Disruption, Threats, Assault, Fighting, Insulting Language or Behavior, and Contraband.  **Exs. B; C.**

13.   The plaintiff has been housed at Northern for only 17 months out of his approximately 11 years incarcerated thus far.  **Ex. A.**

14.   The plaintiff was placed at Northern in the Administrative Segregation Program after the slashing incident, as at that point in time, May of 1999, the Warden at Cheshire Correctional Institution (hereinafter "Cheshire") felt that the plaintiff was "a serious management problem.  If allowed to remain in General Population, he will continue to be a threat to the safety and security of this facility."  **Ex. B**.

15.    Prior to his permanent placement at Northern, the plaintiff was given an Administrative Segregation Hearing.  **Ex. B**.  The plaintiff received notice of the hearing, a choice of advocates, and an opportunity to be heard and present witnesses as to "whether or not [his] presence in general population represent[ed] a threat to the safety and security of the institutional community."  **Ex. B**.  After his hearing, the plaintiff was placed in Administrative Segregation at Northern.  **Ex. B.**

16.    Northern was then and is now the designated restrictive housing facility for the Connecticut Department of Correction, managing those inmates who have demonstrated a serious inability to adjust to confinement in prison and pose a serious threat to the safety and security of a correctional facility.  **Exs. D Northern website description; F Rose Aff.**

17.    Placement in the Administrative Segregation Program at Northern both in 1999 and since then comes after a hearing, and the decision of the Hearing Officer may be appealed. **Exs. E; F**.

18.    Since 1999, the Administrative Segregation Program has consisted of a three phase program.  **Exs. E AS description; F.**  The Administrative Segregation Program "operates on the basic assumption that inmates who engage in aggressive, violent, disruptive behavior, or who pose an imminent risk … require a highly structured and secure environment."  **Exs. E; F**.

19.    In Phase I, which lasts for at least four months if an inmate is discipline free, or longer if not, inmates are allowed very little time out of their cells.  **Exs. E; F**.

20.    Meals are eaten in the cells; inmates are restricted to three showers and five hours of recreation per week.  **Exs. E; F**.  Phase I inmates are precluded from any work assignments. **Exs. E; F**.

21.    Recreation in Phase I is provided for one hour per day five days per week, but is entirely voluntary.  **Exs. F; G Plaintiff dep. tr. 92.**  The religious service of "smudging", a Native American religious activity, was provided within the living unit on a daily basis in 1999 and 2000 for Phase I inmates, but was of course entirely voluntary.  **Exs. F; G 93-95.**

22.    The distance for the plaintiff to walk when he was in Phase I at Northern if he wanted to smudge was "very, very short; not very long at all" as it was "just right within the unit." **Ex. G 94-95.**  Medical care was primarily provided within the unit, and the only time the plaintiff would have to walk outside the unit was to go to an "outside" medical appointment to a specialty clinic or hospital, or to go to court.  **Exs. F; G 91-92.**

23.    So, to summarize, the only required walking the plaintiff had to do in Phase I at Northern Correctional Institution in 1999 from May until at least the end of August was to go to court or a medical appointment, but the plaintiff could walk within his cell to recreate, or to smudge at his own discretion.  Nonetheless, the plaintiff testified in his deposition that during

that time period he did choose to smudge on a near daily basis and, moreover, did "a lot of pacing in the cell." **Ex. G 90, see also 92.**

24.    When asked in his deposition if he was ever forced while in prison to participate in any physical activities, the plaintiff responded that he did not know. **Ex. G 9-12.**

25.    The plaintiff was in Phase II of Administrative Segregation when the boots were returned to him. **Ex. G 75.**

26.    The Northern Inmate Handbook given to inmates entering Northern during the time period in question has a specific clause entitled "Arch Supports/ Special Shoes" which states, "Not routinely prescribed due to limited out of cell activity." **Ex. J. 14.**

27.    The plaintiff claimed in his deposition for the first time that he sprained his ankle during one of the time period that is the subject of this suit. **Ex. G 34-35.**

28.    If the plaintiff sprained his ankle during this time period, he did it without any treatment or formal diagnosis, as there is no mention of this in his medical records. **Ex. H.**

29.    The plaintiff was born in 1971. **Ex. H, Health Record 23.**  At some point during his youth, he sustained a fracture of the  right femur, the large bone in the leg, as a minor, which did not heal properly. **Ex. H 23.**

30.    In his deposition, plaintiff attributed the injury to a dirt bike accident when he was somewhere in his early teens. **Ex. G 31.**    There are varying accounts in his medical records

regarding the date of the fracture, which is sometimes claimed to be something that happened when he was a teenager, 11, 12 or 19 years old, and sometimes said to have happened in 1972 or in 1986.  **Exs. H 23, 25, 27, 36, 37, 48; K.**

31.     A reference to the accident taking place in 1972, when the plaintiff would have been one or at the most two years old, is common throughout his records.  **Exs. H 620, 707, 713, 717, 872; K.**

32.     As a result of the improperly healed fracture, one leg is longer than the other;  the plaintiff estimates the disparity to be somewhere between 2 5/8 and 3 inches.  **Exs. G 42; H; K**. This estimate is consistent with plaintiff's correctional medical records.  **Exs. H; K.**

33.     The plaintiff has also been diagnosed as having a "deformed right knee" with the deformity noted to be mild.  **Exs. H 25, 27; K.**   The plaintiff walks with a "minimal limp."  **Exs. H 36; K.**   More specifically, the plaintiff has been described as having "Cruciate ligament and patella instability."  **Exs. H 46; K.**

34.     There is no note in plaintiff's medical record regarding any injury to his feet. **Exs. H; K.**   The plaintiff himself was unaware if he suffered any injury to any part of his body other than his leg in the accident.  **Ex. G 31.**

35.     As stated above, the plaintiff last entered the custody of the Commissioner of Correction in January of 1996. **Ex. A.** The plaintiff never had a lift until he received a lift from the Department of Correction two and one-half years later, in June of 1998. **Exs. G 36; H 75; K.**

36.     This is remarkable as the plaintiff's records frequently indicate that his accident occurred one year after his birth, in 1972, making it a possible 26 years that he went without an orthotic prior to receiving it, with much of this time being spent *not* in the custody of the Commissioner of Correction. **Exs. H 620, 707, 713, 717, 872; K.**

37.     Even if the accident was as recent as 1986, the plaintiff went at least twelve years since the time of his accident until receiving a lift from correctional medical staff in 1998. **Exs. H; K.** The plaintiff testified in his deposition that after the leg was injured, he went through a period of traction and immobilization, then physical therapy, and then he was able to walk unassisted without a lift. **Ex. G 34.**

38.     During a previous period of incarceration, from December 1993 until November 1995, the plaintiff was seen by correctional medical staff for leg pain, receiving Motrin. **Exs. H 114, 115; K.**

39.     Every time the plaintiff was newly admitted to the custody of the Commissioner of Correction and often upon transfer to a new facility within the Department of Correction, an Inmate Medical Screening Form or a Transfer Summary is completed. **Exs. H 620-667; K.**

40.    At no time prior to his receiving the orthotics in June of 1998 for his childhood injury did the plaintiff ever state that he had in the past had an orthotic lift or arch supports until after he received them.  **Exs. H 620-667, 908; K.**  He consistently did not mention, and denied, any orthotics until June of 1998.  **Exs. H 627, 620-667, 908; K.**

41.    In December of 1996, the plaintiff was prescribed Motrin for knee pain.  **Exs. H 106; K.**  In May 1997, while at Radgowski Correctional Institution, the plaintiff's knee was x-rayed due to his complaints of pain, but with no mention by either the plaintiff or medical staff of a lift  or arch supports.  **Exs. H 92-93; K.**

42.    The x-ray showed "mild degenerative changes with no recent fracture or joint effusion."  **Exs. H 92-93; K.**

43.    The plaintiff was at that time prescribed Ibuprofen for his complaints of knee pain.  **Exs. H 93; K.**

44**.**    At various times in his medical record, medical staff notes in the plaintiff's record that his objective symptoms fall short of his subjective complaints.  **Exs. H 4, 10, 36, 47; K.**

45.    One note states in 2002, when the plaintiff had his orthotic but was seeking stronger pain medication, that the plaintiff is "ambulating /s [without] any difficulty" and "on + off exam table s/ [without] any obvious problem".  **Exs. H 4; K.**

46.     Another note, made about five months after the lift shoes were returned to the plaintiff the second time and when the plaintiff was complaining of pain, states: "Able to ambulate in medical screening room /c [with] steady gait; able to propel self in + out of chairs /s [without] difficulty;….No obvious acute S/S [signs or symptoms] discomfort; As inmate exited medical screening room he asked the C/O [Correctional Officer] to attend rec [recreation] this afternoon." **Exs. H 47; K.**

47.     On  June 9, 2002, medical staff noted, in response to plaintiff's complaints of pain, "In NAD [no apparent distress].  Able to amb[ulate] and get up on exam table s/ [without] difficulty." **Ex. H 10, see also p. 37** "No obvious distress."

48.     The crux of the plaintiff's allegations in this case is that staff at Northern and other defendants deprived him of his orthotic lift and arch supports and that this allegedly caused him severe pain.  ***Even with the lift and orthotics, however, and for years before and  after the time period complained of in this lawsuit and after the lift and arch supports were returned to him, the plaintiff complains of "a lot of discomfort" and pain in his knee and back.*** **Exs. H 31, 3, 47, 954, 1048, 1064, 4, 34, 46, 48, 49, 50, 580, 590, 603, 861, 862, 864, 870, 872, 874, 1003; K.**

49**.**     While the plaintiff initially reported upon receipt of his lift and arch support at the end of the longer period that is the subject of this lawsuit that "many of his symptoms in R ft

[right foot], lower extremity" were lessened, **ex. H 50,** the plaintiff's satisfaction soon waned, and within three weeks of initially reporting improvement, he started complaining of pain, and admits that he continues to complain of severe pain in his back and knee to this very day. **Exs. H 4, 31, 34, 46, 48, 49, 50, 580, 590, 603, 861, 862, 864, 870, 872, 874 954, 1003, 1048, 1064; G 52; K**.

50.    One entry made after the plaintiff received the lifts at Northern, "Pain *constant despite lift*….pain is in lower back" **Exs. H 46 (emphasis added) ; K.**

51.    One entry, made two months after new boots were provided the plaintiff after the second period without them as the subject of this lawsuit, states: "Getting about better on lift now but having *increased* pain in R [right] knee." **Exs. H 48; K.**

52.    Another note made four months after he received the lift states, "R knee and Lo Back chronic worsening pain problems *despite the special shoe and lift*." **Exs. H 48; K.**

53.    One month after the plaintiff received his orthotics in March of 2000, he complained he still needed  pain medication, and complained that his Tylenol prescription had been discontinued. **Exs. H 864; K.**

54.    Medical records indicate the podiatrist had anticipated "minimal soreness" with the adjustment to the shoe orthotic and felt even Tylenol was unnecessary. **Exs. H 864; K.**

Again the plaintiff's complaints of pain were far in excess of what medical specialists expected from his objective condition.

55.    Two months after the plaintiff received the orthotics, he reported no alleviation of his symptoms, stating, "There is still something seriously wrong with my R knee.  I'm still in sever[e] pain."  **Exs. H 861; see also 862; K.**

56.    The plaintiff continued seeking pain medication thereafter, up to the present.  **Exs. H 4, 31, 34, 46, 48, 49, 50, 580, 590, 603, 861, 862, 864, 870, 872, 874 954, 1003, 1048, 1064; G 52-58; K.**

57.    The plaintiff has also been diagnosed with "mild R [right] lumbar scoliosis." **Exs. H 36; K.** Even with the lift and orthotic arch support, the plaintiff has likewise been diagnosed with "chronic back pain" secondary to his motor vehicle accident injuries. **Exs. H 37; K.**

58.    Indeed, a review of plaintiff's complaints of pain in his knee and back both before and after he received his lift and arch supports shows no qualitative difference between the reported amount of pain or the frequency with which such complaints occur.  **Exs. H 31, 3, 47, 954, 1048, 1064, 4, 34, 46, 48, 49, 50, 580, 590, 603, 861, 862, 864, 870, 872, 874, 1003; K.**

59.    In his deposition, the plaintiff claimed the return of the lifts alleviated his pain, but concedes that the pain continues even with the lift and orthotic arch support.  **Ex. G 52, 63.**

60.     In his deposition, the plaintiff was unable to state when he first started experiencing knee or back pain in his life other than to refer to a document listing five periods of incarceration, some as short as a day, and stating that he experienced pain consistent with his periods of incarceration and could not recall feeling any pain while outside of the Department of Correction.  **Exs. G 52-58; A.**

61.     The plaintiff reiterated this at another point in his deposition, stating that he knows his pain has been sometime during time frames that he has been in the Department of Correction, but that he does not know if he ever experienced pain on the outside, although he conceded that it's possible he felt pain before he was incarcerated.  **Ex. G 60, 65.**

62.     This is noteworthy as his five periods of incarceration are as follows:  one day April 22, 1989, from September 1992 until July 1993, December 1993 until November 1995, and then January 1996 until the present.  **Ex. A.**  The plaintiff testified he did not know if he ever sought treatment for his back pain when he was not incarcerated.  **Ex. G 61-62.**

63.     Tylenol and Motrin have frequently been prescribed for the plaintiff to address is complaints of pain related to his knee and/or back, although he frequently seeks stronger medication.  **Exs. H 4, 31, 35, 46, 49, 580, 590, 603; K.**

64.     Tylenol and Motrin, or Ibuprofen, generically, have been prescribed for plaintiff's complaints of knee or back pain both before the plaintiff had lifts or arch supports, and

afterwards, no more significant medication has been needed to alleviate this pain when the plaintiff did not have a lift. **Exs. H 4, 31, 35, 46, 49, 580; K.**

65.    One professional indicated the plaintiff should use "Motrin only PRN [as needed] and noted that the plaintiff had "no ROM [range of motion] defects" as of August of 2001. **Exs. H 34; K.**

66.    Plaintiff's medical records indicate that at least once his behavior has been considered "drug seeking behavior". **Exs. H 102; K.** Exercises are also frequently recommended to the plaintiff. **Exs. H 46, 50, 884-886; K.**

67.    The plaintiff has also received Flexeril, a muscle relaxant, but not for any extended period of time, and not during the periods of time he was without his lift or his arch supports which periods are the subject of this complaint. **Exs. H 39; K.** The Flexeril was discontinued as "not indicated" for the plaintiff's level of pain. **Exs. H. 35; K.**

68.    In 2001, the plaintiff had an x-ray of his back completed. **Exs. H 693; K.** No acute fracture was noted, although an old fracture was possibly indicated. **Exs. H 693; K.**

69.    Aside from the orthotic issues, the plaintiff was seen and treated by health staff for myriad issues during the time he spent at Northern, as well as elsewhere within the Department of Correction. **Exs. H; K.**

70.     Upon his arrival at Northern on May 18, 1999, after slashing the head and face of the other inmate, the plaintiff was seen at the medical unit at 2:00 p.m.  **Exs. H 61; K.**  The plaintiff was noted to have various medical issues, including a hernia, which was repaired surgically two months later in July of 1999.  **Exs. H 61; K.**

71.     The nurse noted, "i/m has lifts-shoes in property.  I/M was told about Level 5 security issues and this author did not promise he would receive those non-issued NCI footwear. Will refer to MD for eval."  **Exs. H 61; K.**   The plaintiff was seen in the medical unit on June 16, 1999, at which time the plaintiff asked about his boots and the medical personnel indicated they would check with custody.  **Exs. H 60; K.**

72.     Over a month after the lift support boots were replaced after the first, month-long period that is the subject of this lawsuit, the plaintiff reported to sick call on August 11, 1999, with the boots, reporting "serious pain".  **Exs. H 56, 57; K.**

73.     Six days after the boots were allegedly ripped on August 14, 1998, commencing the second period of alleged deprivation that is the subject of this lawsuit, when the arch supports were removed, the plaintiff saw Dr. Fedus, the podiatrist, who indicated that *if* the plaintiff *were* able to have the shoe with the orthotic, "I see it as medically approp.  for this patient."  **Exs. H 56; K.**

74.     Dr. Fedus  did not indicate that it was medically necessary, and the plaintiff has no expert opinion that the orthotic or the lift were or are in fact "medically necessary." **Exs. H 56; K.**

75.     the plaintiff was left with the lift with the boots-- only his arch support was removed in the security shakedown. **Ex. G 72.**

76.     On August 16, 1999, the plaintiff wrote, "During shake down my inserts to my boots were thrown away, they are gone, they had special insert things for my knee alignment." **Exs. H 822; K.**

77.     The plaintiff did not indicate in his written internal complaint of August 16, 1999, that the boots were destroyed or that the lift alone could not assist his alignment.  **Exs. H 822; K.**

78.     The plaintiff also claims that the boots were in such a state that "medical staff told [him] that [he] couldn't wear them."  **Ex. G 73.**  This is not borne out by the medical records, however, as medical staff make no note of having seen the boots, which are considered to have been "thrown away." **Exs. H 822; K.**

79.     The plaintiff testified in his deposition that he could not wear the boot with the lift that was in his possession because without the arch supports "was like unbearably hard."  **Ex. G 75.**

16

80.    Despite claiming in his  that the boots were gone, the plaintiff now claims that he "tried to give them to medical personnel, to custodial personnel" but admits that the boots were in his possession initially.  **Ex. G 76-77**.

81.    On August 25, 1999, the plaintiff was seen by Nurse Wollenhaupt, who wrote in his chart, "Placed on Podiatry List for 9/2/99 to discuss what specific arch supports are needed." **Exs. H 55; K.**

82.    At this point, there is no note in the chart that the lifts or boots themselves are unwearable, nor is there any point in the medical records which indicates that this is the case. **Exs. H; K.**

83.    Indeed, the plaintiff did not initially report to medical staff that the boots were destroyed or unwearable, or that he could not use the lift, but rather that the arch supports were no longer present.  **Ex. H 807.**

84.    On September 3, 1999, a couple of weeks after the shakedown, the plaintiff was seen by Dr. Fedus, a podiatrist, within the facility.  **Exs. H 54; K.**  Dr. Fedus indicated he had submitted a URC request for "shoe/orthotic lift".  **Exs. H 54; K.**

85.    Dr. Fedus did not indicate that he physically saw the boots at this visit.  Knowing that the plaintiff did not have the arch supports and was not wearing the boots at the time, Dr.

Fedus prescribed only 2 tablets of 325 mg. of Tylenol twice a day as sufficient to address the plaintiff's complaint's of pain at the time.  **Exs. H 54; K.**

86.    In his request, Dr. Fedus did not say that the boots had been destroyed, but, rather that the boots were lost, stating, that "pt [patient] indicated that shoe gear was taken during shakedown + presently unable to locate shoe gear per Head Nurse."  **Exs. H 720; K.**

87.    The request to URC did not indicate that the boots were destroyed or unwearable. **Exs. H 720; K.**  The URC treated the request as a "lost property claim" and referred the matter to custody on that understanding.  **Exs. H 719; K.**

88.    This was on September 14, 1999.  **Exs. H 719; K**.  On September 9, 1999, Nurse Wollenhaupt had indicated in the medical record that Major Kearney was investigating the issue of the boots.  **Exs. H 51; K.**

89.    URC had previously approved requests for a boot with a lift and internal arch supports as well as requests for maintenance when the plaintiff was at other facilities and even later at Northern, but that URC's response was different when the plaintiff was at Northern in Phase I in Administrative Segregation where security was paramount.  See previous approvals. **Exs. H 722, 723, 724, 725, 734-38; L; K.**

90.    URC continued to approve such requests after the plaintiff was released from the Phase Program at Northern, having successfully completed it.  **Exs. A; H 787, 786; K.**

18

91.     In addition, during this same time period, in June and July of 1999, URC did approve the plaintiff's hernia surgery, which was completed in that July. **Exs. H 813; K.**

92.     URC is the Utilization Review Committee, a committee made up of health care professionals who manage the care provided to inmates through Correctional Managed Health Care, a subdivision of UCONN Health Center. **Ex. K.**

93.     Physicians or physician-extenders must request any specialty consultation which requires a clinical visit outside a correctional facility as well certain procedures or medical services which can only be provided at an outside clinic. **Ex. K.**

94.     Request are reviewed for medical necessity and is either approved, rejected or deferred depending on the circumstances. **Ex. K**.

95.      In October of 1999, Dr. Fedus indicated in the medical record he was submitting a second URC request. **Exs. H 53; K.**  Again, at this time, Dr. Fedus prescribed 325 mg. tablets of Tylenol in order to treat the plaintiff's complaints of pain. **Exs. H 53; K.**

96.     Another health care professional had mildly differed with the Tylenol prescription of Dr. Fedus at some point in this period of time, raising the plaintiff's Tylenol prescription to a stronger strength. **Exs. H 54; K.**

97.     During this time, medical records indicate that custody was continuing to review the situation. **Exs. H 797; K.**

98.    On November 4 1999, Dr. Fedus had completed the URC form seeking a "functional orthotic and heel lift" and URC had responded.  **Ex. H 716; K.**

99.    URC responded  by stating that "if custody approves" the patient may have orthotic R foot brought in from home (URC notes the injury is ~27 yrs. old.)"  **Ex. H 716; K.**

100.    The form was acknowledged by Dr. Vigneron, not any of the defendants in this matter.  **Exs. H 716; K.**  On the same date, the URC denied an orthotic evaluation, instructing that the plaintiff's long-standing injury be handled by medical staff within the facility at that time.  **Exs. H 717; K.**

101.    On November 12, 1999, about a week later, the plaintiff was seen by Dr. Fedus.  **Exs. H 52; K.**

102.    Dr. Fedus indicated in medical records that the plaintiff reported to him at this point, three months after the shakedown, that his current boots were unwearable, but Dr. Fedus himself again did not view the lifts as they were stated to be in the plaintiff's cell.  **Exs. H 52; K.**

103.    Dr. Fedus describes the appropriate medical plan as follows for the plaintiff on that date:  "If family or DOC can obtain from Newt. Pros. & Orthotic the orthotic /c [with] lift support I approve, as this will *assist* in relieving many of the symptoms i/m is experiencing /c ft. back **provided that custody, security approval and safety." Exs. H 52 (emphasis added); K.**

104.    Early in December of 1999, the issue was still not resolved, but a stronger prescription of Tylenol was considered sufficient to address for the plaintiff's complaint's of right leg pain at this time.  **Exs. H 52; K.**

105.    The plaintiff did not complain of back pain at his December 5, 1999 medical visit, four months after the shakedown.  **Exs. H 52; K.**

106.    On January 3, 2000, Correctional Head Nurse Wollenhaupt reported that custody was reviewing the situation, but that, at this point "URC" had denied approval of a replacement.  **Exs. H 51; K.**  Three weeks later, it was noted in the chart that the Complex Administration was reviewing the issue.  **Ex. H 51.**

107.    On January 4, 2000, the defendant Pam Shea, Health Services Administrator for Northern, indicated to the plaintiff that he could have his orthotic sent from home to be reviewed by security staff.  **Exs. H 849; K.**

108.    On January 31, 2000, Nurse Wollenhaupt indicated that an appointment had been made for the plaintiff with "New Ortho" for heel lifts.  **Exs. H 51; K.**

109.    It is not clear from the record where the shift had occurred, but the plaintiff alleges in his complaint that he informed those involved that there would be no help from his home or family on this issue, and then a new set provided by the State was approved.  **Exs. H; K.**

110.    On February 7, 2000, six months after the shakedown, the plaintiff went for his appointment and "all measurements were done as needed for lift."  **Exs. H 51; K.**  The plaintiff's condition continued to be monitored, and the plaintiff was referred for medication for his reported pain.  **Exs. H 51; K.**

111.    During all this time, no medical professional proclaimed an emergency situation or one inflicting severe pain on the plaintiff.  **Exs. H; K.**  The outside orthopedic clinic did not rush the order, but provided the boots in about one month.  **Exs. H; K.**

112.    The clinical records portion of his medical record does not indicate the exact date plaintiff received completely new orthotics.  There is an entry dated March 9, 2000, there is an entry indicating the plaintiff is "awaiting his footwear."  **Exs. H 50; K.**

113.    There is a subsequent entry on April 7, 2000, which indicates the patient is experiencing "mild soreness" with the orthotic.  **Exs. H 50; K.**   The next day, another provider again prescribed Tylenol.  **Exs. H 50; K.**

114.    In May of 2000, his knee was x-rayed, and the old trauma was revealed as well as joint space narrowing.  **Exs. H 694; K.**  No acute injury was noted, nor was any joint effusion.  **Ex. H 694.**

115.    The findings of this x-ray were similar to those of an x-ray done in 1997, also showing joint space narrowing with the old fracture.  **Exs. H 694, 701; K.**   There was no

significant deterioration to the knee during the period of time between the x-rays.  **Exs. H 694, 701; K.**

116.    At no time during the periods which are the subject of this complaint did any doctor or other healthcare professional prescribe anything stronger for the plaintiff than Tylenol or Ibuprofen, nor did any healthcare professional note that the plaintiff's condition without the lifts he had lived without for so long prior to 1998 was a serious condition requiring an immediate change or was a serious condition inflicting severe pain.  **Exs. H; K**.

117.    Two of the defendants, Dr. Edward Pesanti and Cheryl Malcolm, are alleged to be members of the Utilization Review Committee.  As stated above, the "URC" makes decisions regarding medical services beyond what can be provided within the medical units at facilities, and it is conceded that URC made decisions with regard to the plaintiff's orthotics and shoe lifts both generally during his period of incarceration and during the second time period that is the subject of this lawsuit.  The URC forms are available for the Court's review:  **Ex. L.**

118.    URC has approved orthotics and lifts for the plaintiff during his time of incarceration, and did not deny them during the periods that are the subject of this lawsuit, receiving only two requests during the second period both of which seemed more related to lost property than destroyed property.

119.    The records show the first URC request for an orthotic related to a "1983" accident made when the plaintiff was at Cheshire.  **Exs. A; L1.**  The URC responded to on June 6, 1997, denying the request "pending the review of community medical records."  **Ex. L 1.**

120.    Ten days later, the URC approved the request for after the plaintiff was placed at a permanent facility.  **Ex. L 2.**

121.    In May of 1998, URC notes that the orthotic was dispensed in March of 1998, and approves a request for an adjustment of the orthotic.  **Ex. L 3.**

122.    Next, at the same time URC was allegedly being deliberately indifferent to plaintiff's medical needs, URC approves a surgical consultation and then surgery to repair a hernia on the right side.  **Ex. L 4-6.**

123.    There are no URC requests during the first, five week period after the plaintiff first arrived at Northern and did not have his orthotics.  **Ex. L.**    There is a request dated September 3, 1999, which indicates only that the plaintiff "Stated shoe gear was taken during shakedown & 'unable to locate.'"  **Ex. L 7.**

124.    The request, submitted by Dr. Fedus, was for states, "Request shoe gear."  This request was neither denied or granted, rather, the URC response was "Please review [sic] matter to custody regarding lost property claim for report of orthotic and shoe inserts reported to be removed during shakedown."  **Ex. L 7.**

125.    The discussion notes that the "MVA" [motor vehicle accident] was "> 12 yrs ago." **Ex. L 7.**

126.    Less than two months later, there was two more requests, dated October 30, 1999 and responded to on November 2, 1999. **Ex. L 8-9.** In these requests, the motor vehicle accident was listed as a "'72" accident. **Ex. L 8-9.**

127.    The first request was for an orthotic evaluation, and this request was denied "at this time." **Ex. L 7.** The second request was for a "functional orthotic with heel lift to decrease limb discrepancy and decrease erosion of R foot." **Ex. L 8.**

128.    In its response, URC "notes injury is ~27 yrs old" and states that "*if custody approves patient may have orthotic R foot brought in from home.*" **Ex. L 8.**

129.    The remaining URC summaries are all after the plaintiff received the lift and beyond the time period that is the subject of this lawsuit. **Ex. L.**

130.    the Utilization Review Committee did not perceive any urgency to the September 1999 and November 1999 requests, nor was there any urgency or extreme degenerative condition that the Committee disregarded. **Ex. K.**

131.    The two requests submitted to URC for orthotics during the second time period in question and URC's responses thereto do no demonstrate deliberate indifference by any member of URC not do they demonstrate deliberate indifference by any medical care provider. **Ex. K.**

132.     From an objective medical viewpoint, the fact that upon plaintiff's transfer to Northern and while he was in Phases I and II of Administrative Segregation he went without his lift and orthotics for an initial period of five weeks and a subsequent period of seven months was not serious given that the plaintiff went at least 12 years without the lift and orthotics. **Ex. K.**

133.     The absence of the special boots should not have resulted in extreme pain to the plaintiff's knees or back to any degree significantly different than that reported by the plaintiff throughout his incarceration.     **Ex. K.**

134     The plaintiff experiences pain in his knee and low back in a chronic fashion whether he has a lift and orthotic or not.  **Exs. H; K.**

135.     What plaintiff complains about in this lawsuit is the difference with and without the orthotic.  This difference is not medically significant.  **Ex. K.**

136.     The plaintiff was required to do very little walking during this time period, and his complaints of pain in his knee and back to medical personnel did not change significantly without the orthotics, but rather seem to show a gradual worsening over time, which is to be expected with the plaintiff's condition.  **Ex. K.**

137.     The plaintiff's complaints of alleged pain without as compared to with the lift and orthotic are not consistent with his history and his objective symptoms.  **Ex. K.**

138.    By his own account, the plaintiff did "quite a bit of pacing" in his cell during this time period, and voluntarily walked to smudge daily.  This activity is not consistent with one experiencing "extreme pain" in  his knee and back.  **Ex. K.**

139.    Extreme pain in one's knee would typically cause a patient to cease unnecessary walking or pacing.    **Ex. K.**

DEFENDANTS,
Warden Myers, et al.

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY:____/s/_____
Lynn D. Wittenbrink
Assistant Attorney General
110 Sherman Street
Hartford, CT  06105
Federal Bar No. ct08575
E-Mail:  lynn.wittenbrink@po.state.ct.us
Tel: (860) 808-5450
Fax: (860) 808-5591

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed  to the following on this 13th day

of April, 2006 to:

Lanny Marden, Inmate No. 181275
Osborn Correctional Institution
335 Bilton Road, PO Box 100
Somers, CT 06071


        /s/
        Lynn D. Wittenbrink
        Assistant Attorney General

28