## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LANNY MARDEN | : | PRISONER |
| *Plaintiff* | : | CIVIL NO. 3:02CV570 (RNC) (WIG) |
| V. | | |
| WARDEN LARRY MYERS, ET AL. | | |
| *Defendants* | : | MAY 2, 2006 |

## MEMORANDUM OF LAW
## IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

The plaintiff submits this memorandum of law in opposition to Defendants' Motion for Summary Judgment dated April 13, 2006. In addition to this memorandum, the plaintiff has submitted exhibits and a Local Rule 56(a)2 Statement.

## I.   FACTS

The right leg of the plaintiff, Lanny Marden, is somewhere between 2 5/8 inches and 3 inches shorter than his left leg. The discrepancy is the result of a dirt bike accident that occurred on August 27, 1984, two weeks after the plaintiff's thirteenth birthday. (Plaintiff's Exhibit 1, Para. 7-8; Defendant's Exhibit H, P. 904-905). The plaintiff fractured his right femur, which is the long bone of the thigh. His leg was placed into traction for four to five weeks and then into a long cast. He subsequently re-fractured the femur in a fall on November 5, 1984. (Id., P. 904). As a result of the accident, the plaintiff's right knee is obviously deformed. (Id. P. 102).

The plaintiff has a history of psychiatric problems and has had at least four psychiatric hospitalizations. (Id., P. 169). Among his mental health problems is attention deficit hyperactivity disorder. (Id., P. 171). He also has a history of alcohol, cocaine and opiate abuse. (Id.). His substance abuse and mental health problems led him to prison. Between April 22, 1989, when he first came into the custody of the Connecticut Department of Correction (hereinafter "DOC") and November 13, 1995, he was in and out of prison several times. (Defendants' Exhibit A). He returned to prison on January 16, 1996, and has remained in DOC custody since that date.(Id.).

The right knee of the plaintiff is "extremely unstable" (Defendants' Exhibit H, P. 749-750), and it has given out on him and/or he has injured it several times in prison. (Id., P. 80, 102, 107,113, 115, 325, 906, 909). For a time when he was in DOC custody, the plaintiff walked with a cane. (Id., P. 654). On many occasions, the plaintiff complained to prison medical personnel about right knee pain and/or instability of the knee. (Id., P. 106, 107, 113-115, 120, 307, 325, 352, 654, 656, 752, 909). He received medication for the pain, but prior to 1998 the discrepancy in the length of his legs went untreated. To the best of the plaintiff's recollection, no physician who treated him outside of prison ever suggested that he could benefit from an orthotic to compensate for the discrepancy. (Plaintiff's Exhibit 1, Para. 22). At some point after he came back to prison, someone suggested that a "lift" might help, and the plaintiff requested a "lift" on April 14, 1997,

when he was housed at Corrigan Correctional Institution in Uncasville. (Id., Para. 23-24).

On June 2, 1997, Dr. Heller, a prison physician, submitted a request for an orthotic to Correctional Managed Health Care's Utilization Review Committee (hereinafter "URC"). (Defendants' Exhibit H, P. 737-738). The request noted that the difference in the length of the plaintiff's legs forced him to walk on his tip toes. (Id.). On June 6, 1997, the URC denied the request, pending receipt of the plaintiff's outside medical records (Id., P. 737). At that time, the plaintiff was housed at MacDougall-Walker Correctional Institution in Suffield. (Defendants' Exhibit A). Following receipt of the records, the URC approved the request for an orthotic and said an appointment would be scheduled after the plaintiff's transfer to another prison. (Defendants' Exhibit H, P. 734). The transfer occurred on July 11, 1997, when the plaintiff was sent to Cheshire Correctional Institution. (Defendants' Exhibit A).

The plaintiff was fitted for an orthotic by an outside contractor on February 2, 1998. (Defendants' Exhibit H, P. 733). The orthotic, which was fitted to a pair of boots, consisted of a 2-inch heel sole lift on the outside of the right boot and a glued long arch support on the inside of the boot. (Id.). The lift was designed to balance the plaintiff's pelvis, and the purpose of the arch support was to reduce stress on the knee. (Id.). The boots containing the orthotic were received in March 1998. The orthotic was in need of an adjustment, which was approved by the URC. (Id., P. 725).

3

After the adjustment, the plaintiff received the boots on June 16, 1998. (Id., P. 75).

On May 18, 1999, the plaintiff was transferred to Northern Correctional Institution (hereinafter "Northern") in Somers. Northern is Level 5 "Supermax" prison, the most restrictive form of confinement in the Connecticut prison system. When he arrived at Northern, a nurse at an intake health screening told him that he might not be allowed to have the orthopedic footwear at Northern because of security issues. (Id., P. 61).

There are seven defendants remaining in this case – Larry J. Myers, Neal Kearney; Michael Lajoie, Marc Alderucci, Pamela Shea, Dr. Edward Pesanti and Cheryl Malcolm. About two weeks after the intake health screening, the plaintiff began to write requests to the medical unit, reporting a lot of pain in his knee and lower back and requesting access to the boots containing the prescribed orthotics. (Id., P. 815, 819). On June 9, 1999, the medical unit responded by saying that the plaintiff needed to write to the warden, defendant Myers, because "this is a safety/security issue." (Id., P. 815). The plaintiff already had addressed the issue with Warden Myers, through an Inmate Request Form dated June 1, 1999. (Plaintiff's Exhibit 4, P. 1). The plaintiff informed Warden Myers that his right leg was approximately 3 inches shorter than his left, that he had a deformed knee and that he was in a lot of pain. He requested access to his prescription boots, which he said had "no metal in them" and posed "no threat." (Id.). The plaintiff sent a second request to Warden Myers on June 14, 1999. (Id., P. 2). He also spoke to

4

defendant Myers, who referred him back to the medical unit. (Plaintiff's Exhibit 1, Para. 40). On

June 14, 1999, the plaintiff sent another request to the medical unit, saying he had "waited long

enough" for his prescription boots. (Defendants' Exhibit H, P. 814). He also filed grievances

dated June 17 and June 22, 1999. (Plaintiff's Exhibit 4, P. 3-4). On or about June 29, 1999, six

weeks after they had been taken, the boots were returned to the plaintiff.

Less than two months later, on August 13, 1999, it was discovered that a pair of handcuffs

was missing from the 1 West housing unit at Northern. (Plaintiff's Exhibit 5). When the cuffs

could not be found, a search of cells, also called a shakedown, was conducted the following

day, August 14, in the plaintiff's housing unit, 1 East. (Plaintiff's Exhibit 1, Para. 46-48; Plaintiff's

Exhibit 5). While his cell was searched, the plaintiff was placed into the shower area. He was not

allowed to wear his boots. (Plaintiff's Exhibit 1, Para. 49-50). When he returned to his cell, the

plaintiff found that the arch support had been ripped from his right boot. The arch support was

missing, as were the linings of the boots. (Id., Para. 51).

On August 20, 1999, six days after the shakedown, the plaintiff was examined by a prison

podiatrist, Dr. Henry Fedus. (Defendants' Exhibit H, P. 56). Dr. Fedus concluded that an

orthotic was "medically appropriate" and that it would help relieve the plaintiff's knee and back

pain. (Id.).

The plaintiff wrote numerous requests to the medical unit and filed grievances,

saying he was in pain and asking, often "begging," that his boots be repaired. (Id., P. 785, 796-802, 804-808, 822; Plaintiff's Exhibit 4, P. 5-10). The answer to one his requests, dated October 18, 1999, said the matter had been referred to a major to investigate and "at this point it is in custody's hands." (Defendants' Exhibit H, P. 797). The plaintiff was examined again by Dr. Fedus on September 3, 1999. (Id., P. 54). Dr. Fedus submitted a request to the URC for "shoe gear with 2 1/2 - 2 5/8 heel lift on outside of shoe & orthotic." (Defendants' Exhibit L, P. 7). The URC response, dated September 14, 1999, said that the issue should be reviewed with custody. (Id.). On September 9, 1999, the issue was referred to defendant Kearney, who held the rank of major at Northern. (Defendants' Exhibit H, P. 54). An assistant attorney general also contacted the custodial staff about the issue, at the request of an attorney from Inmates' Legal Assistance Program. (Plaintiff's Exhibit 12). On October 19, 1999, Dr. Fedus submitted another request to the URC, in which he noted "displacement" of the plaintiff's right knee. (Defendants' Exhibit H, P. 718).  He asked for an orthopedic evaluation and a functional orthotic and heel lift to "[decrease] limb length discrepancy and [decrease] erosion of [right foot]." (Id.). The request was denied by the URC on November 2, 1999, in favor of "continued conservative management." (Id., P. 717). In a second decision dated the same day, the URC again offered "conservative management," but added that the plaintiff could have an orthotic "brought in from home" if "custody approves." (Id., P. 716).

6

The investigation that had been referred to defendant Kearney was conducted by defendant Alderucci, who was a lieutenant on the custodial staff at Northern. In a report dated November 12, 1999, defendant Alderucci confirmed that the linings had been removed from the boots. (Plaintiff's Exhibit 13). But he falsely stated that a "replacement heel support" had already been ordered by the medical unit and that the issue had been resolved to the plaintiff's satisfaction. (Id.). Despite the fact that he is not a physician, defendant Alderucci concluded that the boots were "fully functional" and recommended that no further action be taken. (Id.).

The plaintiff continued to make requests and file grievances. (Defendants' Exhibit H, P. 795, 856-859; Plaintiff's Exhibit 4, P. 11-32). In one of the requests, the plaintiff noted that he had discussed the issue with defendant Lajoie, who then held the rank of major at Northern. (Defendants' Exhibit H, P. 856). In a response to a request dated January 1, 2000, a nursing supervisor, Pat Wollenhaupt, wrote: "I have again referred your complaint to custody. There is no way we can order you lifts since URC has not approved them." (Plaintiff's Exhibit 4, P. 25). In a memo to the plaintiff two days later, Nurse Wollenhaupt wrote that there was "nothing further the Medical Unit can do." She said the matter had been referred to defendant Kearney and to defendant Shea, CMHC's regional administrator for Northern. (Plaintiff's Exhibit 14). On January 4, 2000, defendant Shea sent a memo to the plaintiff in which she stated that she had discussed the issue with custody staff and had decided that the plaintiff could have an orthotic

sent from home. (Plaintiff's Exhibit 15). Copies of the memo were sent to defendants Kearney

and Lajoie. (Id.). In a grievance dated January 5, 2000, the plaintiff informed staff that he did not

"have a home on the street nor do I have family support on this issue." (Plaintiff's Exhibit 4, P.

29).

On February 7, 2000, the plaintiff was fitted for an orthotic and heel lift by an outside

contractor. (Defendants' Exhibit H, P. 51). The plaintiff received boots containing the orthotic

and heel lift on March 30, 2000, more than seven months after his old pain of boots were ruined

during the shakedown. (Id., P. 828).

Further facts will be asserted elsewhere in this memorandum.

## II.    STANDARD FOR DECIDING MOTION FOR SUMMARY JUDGMENT

A party against whom a claim is asserted "may, at any time, move with or without

supporting affidavits for a summary judgment in the party's favor as to all or any part thereof."

Fed. R. Civ. P. 56 (b). "Summary judgment is appropriate only when there are no genuine

issues of material fact and the movant is entitled to judgment as a matter of law." Abdu-Brisson

v. Delta Air Lines, 239 F.3d 456, 465 (2d Cir. 2001). "When determining whether there is a

genuine issue of fact to be tried, the court must resolve all ambiguities and draw all reasonable

inferences in favor of the party against whom summary judgment is sought." Winter v. United

States, 196 F.3d 339, 346 (2d Cir. 1999). "A motion for summary judgment must be rejected

'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.' "
Abdu-Brisson, 239 F.3d at 465, (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986)). When ruling upon a motion for summary judgment, a Court is not required to make
findings of fact. "The inquiry performed is the threshold inquiry of determining whether there is a
need for trial –  whether, in other words, there are any genuine factual issues that properly can
be resolved only by a finder of fact because they may reasonably be resolved in favor of either
party." Anderson, 477 U.S. at 250.

## III.   ARGUMENT

### A.   THE DEFENDANTS HAVE OFFERED NO EVIDENCE TO SHOW THAT THE PLAINTIFF'S MEDICALLY PRESCRIBED ORTHOTICS PRESENTED A SAFETY AND SECURITY PROBLEM

A recurring theme in the defendants' argument is that they were justified in first confiscating
and later refusing to replace the plaintiff's orthotics because he was housed at Northern, a
Supermax prison. At such a prison, the defendants' argue, "security was paramount."
(Defendants' memorandum, P. 21). The defendants' have presented hundreds of pages of
evidence to support their motion for summary judgment, including 1,174 pages of the plaintiff's
medical records. Those hundreds of pages of evidence are most noteworthy for what they do
not contain. The defendants have not offered one scintilla of evidence suggesting why the
plaintiff's orthotics presented a safety or security problem. Instead, they make broad assertions

that the prescribed orthotics "undisputedly presented a safety and security concern." (Id., P. 31).

The asserted matter is far from undisputed. The lift on the outside of the plaintiff's boot was

made of rubber. (Plaintiff's Exhibit 1, Para. 42). To the best of the plaintiff's recollection, the

arch support on the inside of the boot was made of rubber or some type of plastic. (Id., Para.

43). The plaintiff denies that the orthotics presented any type of security problem (Id., Para. 41).

There is no question that safety and security are "central to all other correctional goals."

Pell v. Procunier, 417 U.S. 817, 823 (1974). However, it is equally clear that "[p]rison walls do

not form a barrier separating prison inmates from the protections of the Constitution." Turner v.

Safley, 482 U.S. 78, 84 (1987). Therefore, prison officials "cannot merely brandish the words

'security' and 'safety' and expect that their actions will automatically be deemed constitutionally

permissible conduct." Campos v. Coughlin, 854 F. Supp. 194, 207 (S.D.N.Y. 1994). This is

especially true in regard to medical treatment, because "the State's responsibility to provide

inmates with medical care ordinarily does not conflict with competing administrative concerns. "

Hudson v. McMillian, 503 U.S. 1, 6 (1991). In what way could the plaintiff's orthotics conflict

with concerns about safety and security? The question is certainly a legitimate one.

Unfortunately, the reams of evidence submitted by the defendants do not even hint at an answer.

The defendants' contention that the boots presented a safety and security problem is

belied by their own words and actions. If something about the boots jeopardized safety and

security, why were the original boots returned to the plaintiff in June 1999? And months after the

shakedown in which that pair of boots was ruined, why was the plaintiff told that he could have

new orthotics sent in from home? Items sent to inmates from family members present obvious

safety and security problems because those items could be used to sneak weapons, drugs or

other contraband into the prison. If the real concern of the defendants was safety and security,

they surely would have preferred that the orthotic be purchased by them from a contractor

rather than be sent into Northern by the plaintiff's family.

      It is the plaintiff's understanding that the medical and custodial staffs were arguing with

each other about who would be responsible for paying for the new orthotics. If the

disappearance of the boot linings and arch support during the shakedown was characterized as a

lost property claim, the DOC would be responsible for paying for new orthotics. On the other

hand, if the problem was treated as a medical issue, CMHC would have to pay. (Plaintiff's

Exhibit 1, Para. 62-64). One of the defendants, Major Kearney, has admitted that "custody had

no major objection to plaintiff's requests for boots and considered it a medical issue." (Plaintiff's

Exhibit 3, P. 2, No. 4). While the defendants were giving lip service to safety and security, the

real issue was money. But budgetary concerns are not a valid reason for interfering with medical

judgment. Jones v. Johnson, 781 F.2d 769, 771 (9th Cir. 1986). In a suit by a plaintiff alleging

11

denial of medical care while housed in a city jail, the Fifth Circuit stated: "Although financial

considerations may reasonably concern a municipality, such concerns may not trump the

constitutional rights of individuals who are left at the mercy of the municipality." Scott v. Moore,

85 F.3d 230, 236 (5th Cir. 1996).

> **B.  THE MATERIAL SUBMITTED IN SUPPORT OF AND IN
>     OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT
>     DEMONSTRATES THAT NUMEROUS ISSUES OF MATERIAL FACT
>     ARE IN DISPUTE**

The defendants' memorandum contains several factual misstatements and omissions that

must be addressed before proceeding to the substance of the defendants' argument.

The defendants allege that "[t]he plaintiff claimed in his deposition for the first time that he

sprained his ankle during one of the time period [sic] that is the subject of this suit." (Defendants'

memorandum, P. 11). In support of this allegation, they cite pages 34 and 35 of the transcript of

the plaintiff's deposition, which is defendants' Exhibit G. However, the word "ankle" does not

even appear on either of those two pages, or anywhere else in the transcript, as far as the

plaintiff can tell. The cited pages include the following exchange:

Q      Did you ever significantly hurt your right leg again?

A      I never re-broke any bones.

Q      Did you sprain it?

A    Yes.

Q    When?

A    When I was at Northern.

(Defendants' Exhibit G, P. 34, Lines 18-24).

The plaintiff was asked whether he had ever sprained his leg, not his ankle. He answered in the affirmative, because he understood the question to deal with his knee, the part of his body that is deformed. The plaintiff was housed at Northern from May 18, 1999, to October 5, 2000. (Defendants' Exhibit A). The plaintiff's medical records support his testimony that he re-injured his knee during the period he was at Northern. On October 19, 1999, Dr. Fedus noted that the plaintiff had reported that "during ambulation knee anterior displaces." (Defendants' Exhibit H, P. 53). In a request to the URC dated October 30, 1999, Dr. Fedus noted "internal, external displacement" of the plaintiff's knee. (Id., P. 717, 718). On December 10, 1999, the plaintiff reported to medical personnel that his knee had "popped out." (Id., P. 51).

The plaintiff's right femur was fractured in a dirt bike accident. The defendants point out that the medical records contain "varying accounts ... regarding the date of the fracture, which is sometimes claimed to be something that happened when he was a teenager, 11, 12 or 19 years old, and sometimes said to have happened in 1972 or in 1986." (Defendants' memorandum, P. 11). It is not clear why these varying accounts are significant, since the defendants do not dispute

that the plaintiff fractured his right femur and as a result has a discrepancy in the length of his

legs. (Id. P. 2). The defendants' emphasis on the date of the fracture might be related to their

spurious suggestion that the older the medical problem, the less they are obligated to treat it.

(See, e.g., Defendants' Exhibit L, P. 9 ("URC notes injury is ... 27 years old")). Or the

defendants simply could be attempting to call the plaintiff's credibility into question. However,

any inaccuracies regarding the date of the accident are the fault of prison medical personnel, not

of the plaintiff. On December 11, 1997, long before the events that gave rise to this suit, the

plaintiff signed a release form to allow prison medical personnel to obtain copies of his medical

records from Rockville General Hospital. (Plaintiff's Exhibit 1, Para. 11; Defendants' Exhibit H,

P. 898). The records were obtained and are part of the medical file submitted by the defendants.

(Plaintiff's Exhibit 1, Para. 12; Defendants' Exhibit H, P. 899-905). The records from Rockville

General Hospital clearly document the fact that the dirt bike accident occurred on August 27,

1984. (Id., P. 904-905). The plaintiff was 13 years old at the time. (Plaintiff's Exhibit 1, Para. 7-

8. At his deposition, the plaintiff was unable to recall his exact age at the time of the accident.

(Id., Para. 9). But he accurately testified that the accident occurred when he "was approximately

11 or 12" or "maybe even 13." (Defendants' Exhibit G, P. 31, Lines 15-19). The plaintiff is not

responsible for maintaining the accuracy of his prison medical file; that responsibility rests with

prison medical personnel. To maintain a consistent record regarding the date of the plaintiff's accident, all prison medical personnel had to do was refer to the records from Rockville General Hospital, which were contained in the file. (Plaintiff's Exhibit 1, Para. 16-17).

The defendants claim that "[t]here is no note in plaintiff's medical record regarding any injury to his feet." (Defendants' memorandum, P. 12). The plaintiff does not claim that he injured his feet in the dirt bike accident. But his medical records do document foot problems related to the discrepancy in the length of his legs. When a prison physician first submitted a request to the URC for an orthotic for the plaintiff, the request noted that the discrepancy in leg length caused the plaintiff to walk on his tip toes. (Defendants' Exhibit H, P. 737, 738). In fact, on November 2, 1999, when the URC denied a request for a functional orthotic, it noted that one of the reasons for the orthotic was to "decrease erosion of [right] foot." (Id., P. 716).

The defendants state: "In May 1997, while at Radgowski Correctional Institution, the plaintiff's knee was x-rayed due to his complaints of pain, but with no mention by either the plaintiff or medical staff of a lift or arch supports." (Defendants' memorandum, P. 13). Actually, the plaintiff had already requested an orthotic by that time. An entry in the Clinical Record indicates that the plaintiff asked for "a lift" for his shoe on April 14, 1997. (Defendants' Exhibit H, P. 102).

The defendants claim that "[a]t various times in his medical record, medical staff

15

notes ... that his objective symptoms fall short of his subjective complaints." (Defendants'

memorandum, P. 13). In support of this claim they cite entries on four pages of the 1,174 pages

of medical records they have submitted to the court. They mention an entry in the Clinical

Record dated August 17, 2002, when a nurse insinuated that the plaintiff was faking his

complaints about pain. (Defendants' Exhibit H, P. 4). It should be noted that the nurse's

observation was made more than two years after the events that gave rise to this suit. It should

further be noted that despite the nurse's conclusion that the plaintiff was not in any discomfort,

no prison doctor saw fit to discontinue the plaintiff's pain medication at that time. (Plaintiff's

Exhibit 1, Para. 130; Defendants' Exhibit H, P. 1,138). The plaintiff filed a grievance to

complain about the nurse's attitude, and in that grievance he raised the possibility that the nurse

would falsify his records to retaliate against him. (Id., Para. 127-129; Plaintiff's Exhibit 4, P. 33-

38).

      The defendants argue the plaintiff's "medical records indicate that at least once his

behavior has been considered 'drug seeking behavior.' " (Defendants' memorandum, P. 17).

The reference is included in an entry in the plaintiff's Clinical Record dated May 24, 1997 – a

single entry in 1,174 pages of medical records covering more than a decade. (Defendants'

Exhibit H, P. 102). The plaintiff denies that he sought pain medication for its narcotic effect.

(Plaintiff's Exhibit 1, Para. 118). On May 24, 1997, the only medication he requested was

16

Motrin. (Defendants' Exhibit H, P. 102). The plaintiff acknowledges that he had a problem with

drug addiction prior to coming to prison. (Id., Para. 119, 122). But he has completed both the

Tier I and Tier II substance abuse programs, and while in prison has never failed a urine test for

the presence of illegal drugs. (Id., Para. 123-124; Plaintiff's Exhibit 9). He has told medical

personnel that he only wants medication that is "non-addictive." (Defendants' Exhibit H, P.

1,075). After repair of an inguinal hernia in March 2003, he was prescribed a narcotic, Tylenol

with codeine. He complained to medical personnel that he did not like the "bizarre" feeling he

got from the drug, which made him feel like he wanted to "crawl out of my skin." (Plaintiff's

Exhibit 1, Para. 120; Defendants' Exhibit H, P. 1,058). It can reasonably be assumed that if the

plaintiff was motivated by a desire for drugs, he would not have complained when a strong

narcotic was provided to him.

   After being without prescribed orthotics for seven months following the shakedown in

August 1999, the plaintiff finally received new orthotics on March 30, 2000. (Id., P. 828). The

defendants claim that "the podiatrist had anticipated 'minimal soreness' with the adjustment to

the shoe orthotic and felt even Tylenol was unnecessary," which they claim shows that "the

plaintiff's complaints of pain were far in excess of what medical specialists expected from his

objective condition." (Defendant's memorandum, P. 15). The defendants misstate what was said

by the podiatrist, Dr. Fedus, or at the least, selectively quote from him to suit their purposes. On

17

April 7, 2000, Dr. Fedus noted "very mild [soreness] in area of orthotic" and mild soreness in the plaintiff's right hip and knee." (Defendants' Exhibit H, P. 50). Dr. Fedus did <u>not</u> say that pain medication such as Tylenol was unnecessary. Instead, he wrote the following: "Analgesics for relief of symptoms of knee, hip should come from primary physicians as Podiatry is licensed up to ankle. The minimal soreness that is accompanied [with] getting used to orthotic does not need [treatment]." (Id.). In other words, the plaintiff did not need medication for the minimal soreness to his feet associated with adjustment to the orthotic. But that did not mean that he did not need medication for the pain in his leg or back. As Dr. Fedus suggested, the plaintiff requested pain medication from his primary prison physician, and a prescription for Tylenol was provided on April 8, 2000. (Plaintiff's Exhibit 1, Para. 117; Defendants' Exhibit H, P. 50).

It is unquestioned that after that the shakedown on August 14, 1999, the plaintiff still had the boots and the right boot retained the outside heel lift. But the defendants are wrong when they claim that "the plaintiff admits ... that only his arch support was removed in the security shakedown." (Defendants' memorandum, P. 19). They cite page 72 of the transcript of the plaintiff's deposition. That page clearly notes that the plaintiff testified that not only was the arch support gone, but the "linings of the boots were completely tore [sic] out of them." The loss of the linings left a "real hard, terrible surface on the inside of the boots after that, and like just all like rough material." (Defendants' Exhibit G, P. 72, Lines 2-6). Contrary to the defendants'

suggestion, there was no inconsistency when the plaintiff testified at his deposition that the boots were "destroyed." Without the linings and arch support, the boots could not be worn because all that remained was a rough surface on the interior of the boot. The defendants argue that in his first request after the shakedown the plaintiff "did not indicate ... that the boots were destroyed or that the lift alone could not assist his alignment." (Defendants' memorandum, P 19). The plaintiff is not a doctor. (Plaintiff's Exhibit 1, Para. 21). Therefore, at that point he would have no way of knowing whether the lift alone could have assisted his alignment. What he did know was that a doctor had prescribed an arch support and a lift, in combination, to assist his alignment. Dr**.** Fedus apparently also believed that both the arch support and lift were necessary to correct the plaintiff's imbalance, since he submitted two requests to the URC after the shakedown in which he asked for both things. (Defendants' Exhibit H, P. 718, 720). Dr. Fedus requested a "functional othotic" (Id., P. 718), because the boots in the plaintiff's possession were not functional without the linings and arch support.

The defendants claim that medical staff never saw the boots after the shakedown. The plaintiff disputes that claim. According to the defendants, "Dr. Fedus did not say that the boots had been destroyed, but, rather that the boots were lost, stating, that 'pt [patient] indicated that shoe gear was taken during shakedown + presently unable to locate shoe gear per Head Nurse.' " (Defendants' memorandum, P. 20). Dr. Fedus wrote that the "shoe gear," the linings and arch supports, were taken during the shakedown, not that the shoes themselves had been

19

taken. Dr. Fedus knew that the plaintiff still had the boots themselves, because the plaintiff

showed him the boots. (Plaintiff's Exhibit 1, Para. 58). The plaintiff also showed the boots to

other members of the prison medical staff. The plaintiff's cell mate witnessed him attempting to

give the boots to a medic or nurse named Reggie, who replied that the medical unit did not want

the boots. (Plaintiff's Exhibit 6).

The above discussion and that in the following section point up why this case is particularly

ill-suited for summary judgment. There are many disputes regarding issues of material fact, which

can only be resolved by the fact-finder at trial. "Credibility determinations, the weighing of the

evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of

a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."

Anderson, 477 U.S. at 255. As the movants in regard to the summary judgment motion, the

defendants have the burden to show that no genuine factual dispute exists. Adickes v. S.H.

Kress & Co., 398 U.S. 144, 157 (1970). They have failed to meet their burden.

### C.  THE PLAINTIFF'S  MEDICAL NEED IS SUFFICIENTLY SERIOUS TO MERIT CONSTITUTIONAL PROTECTION

Deliberate indifference to the serious medical needs of sentenced inmates constitutes cruel

and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

20

<u>Estelle v. Gamble</u>, 429 U.S. 97 (1976).[1] The deliberate indifference standard includes both

subjective and objective components, as follows:

> First, the alleged deprivation must be, in objective terms, "sufficiently serious." <u>Hathaway v. Coughlin</u>, 37 F.3d 63, 66 (2d Cir. 1994) (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." <u>Id</u>. An official acts with the requisite deliberate indifference when that official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." <u>Farmer v. Brennan</u>, 511 U.S. 837, 128 L. Ed. 2d 811, 114 S. Ct. 1970 (1994).

<u>Chance v. Armstrong</u>, 143 F.3d 698, 702 (2d Cir. 1998).

The defendants argue that "the medical records in this case do not establish that the

plaintiff's condition was 'sufficiently serious.' " (Defendants' memorandum, P. 30). The

plaintiff's medical need was not sufficiently serious in the defendants' eyes, in part because he

"was required to do very little walking" when he was in Phase I of the Administrative

Segregation program at Northern. (Defendants' memorandum, P. 27-28). Phase I inmates are

precluded from work assignments, and they eat meals in their cells. (Defendants' Exhibit F,

Para. 8). The defendants note that recreation is Phase I is provided for one hour per day five

days per week, "but is entirely voluntary." (Defendants' memorandum, P. 10). They further note

that the Native American religious activity of smudging was provided in Phase I on a daily basis,

---

[1]

The Eighth Amendment's ban on cruel and unusual punishment is made applicable to the states through the Fourteenth Amendment. <u>Robinson v. California</u>, 370 U.S. 660, 666 (1962).

"but was of course entirely voluntary." (Id.). The distance for the plaintiff to walk in order to

smudge was "very, very short; not very long at all." Moreover, the defendants argue, "medical

care was primarily provided within the unit, and the only time the plaintiff would have to walk

outside the unit was to go to an 'outside' medical appointment to a specialty clinic or hospital, or

to go to court. (Id.). In summary, the defendants state that "the only walking the plaintiff had to

do in Phase I at Northern Correctional Institution ... was to go to court or a medical

appointment, but the plaintiff could walk within his cell to recreate, or to smudge at his own

discretion. Nonetheless, the plaintiff testified in his deposition that during that time period he did

choose to smudge on a near daily basis and, moreover, did 'a lot of pacing in his cell.' " (Id.).

    Prison conditions violate the Eighth Amendment's ban on cruel and unusual punishment if

they amount to "unquestioned and serious deprivations of basic human needs" or of the

"minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347

(1981). Exercise is one of the basic human needs protected by the Eighth Amendment.  Wilson

v. Seiter, 501 U.S. 294, 304 (1991). The Second Circuit has "described the right to exercise in

unequivocal terms, stating that 'courts have recognized that some opportunity to exercise must

be afforded to prisoners.' " Williams v. Greifinger, 97 F.3d 699, 704 (2d Cir. 1996) (quoting

Anderson v. Coughlin, 757 F.2d 33, 35 (2d Cir. 1985)). Despite the human need for exercise,

the defendants' argument suggests, the plaintiff could have or should have eliminated all or most

physical activity in order to spare himself the pain associated with their withholding of the

prescribed orthotics. Inmates in Phase I are locked in their cells all the time, except for one-hour

recreation periods five days a week. It certainly is true that the plaintiff could have refused the

one-hour recreation periods and stayed in his cell 24 hours a day, seven days a week. He also

could have laid in his bunk for the entire time, except to use the toilet facilities and to get his

meals at the door of the cell. But it hardly seems as though such a lifestyle would have been

beneficial to the plaintiff's physical or mental well-being.

It is true that the plaintiff testified that he did a lot of pacing in his cell. He paced in part

because he was very distressed at the time. (Plaintiff's Exhibit 1, Para. 71). The plaintiff has

been treated for a variety of mental health issues, including attention deficit hyperactivity

disorder. (Defendants' Exhibit H, P. 394). His medical records note a history of hyperactivity.

(Id., P. 381). Given the plaintiff's diagnosis of a hyperactivity problem, it is not surprising that he

paced in his cell. In addition, medical personnel were encouraging the plaintiff to exercise and, in

fact, were telling him that some of the pain in his leg may have been due to a lack of exercise.

(Plaintiff's Exhibit 1, Para. 66-70; Defendants' Exhibit H, P. 56, 885-886). The defendants

concede that "[e]xercises are ... frequently recommended to the plaintiff." (Defendants'

memorandum, P. 17). The plaintiff  complied with that recommendation, and the defendants now

attempt to use his compliance against him by arguing that it shows he was not really in very much

pain.

The plaintiff has tried a few religions while incarcerated in an attempt to find spiritual peace. (Plaintiff's Exhibit 1, Para. 72). In late 1999, during the period when he was without the prescribed orthoics at Northern, he filed a request to be affiliated with the Native American religion. After his request was approved, the plaintiff signed an Individual Smudging Agreement on February 17, 2000. (Plaintiff's Exhibit 1, Para. 73-74; Plaintiff's Exhibit 7). Smudging is a common practice in the Native American religion for the cleansing of energy through the burning of sage, tobacco and sweetgrass. (Plaintiff's Exhibit 1, Para. 76). The practice plays a central role in traditional healing ceremonies because it is believed that once negative energies are cleared out, a sense of peace and relaxation takes over, putting spiritual difficulties to rest. (Id., Para. 77). The plaintiff felt the need to smudge daily because he was in such emotional distress about being at Northern and being denied treatment for his injured leg. He felt that smudging was the only thing holding him together at that time. (Id., Para. 78). It should also be noted that the plaintiff began smudging subsequent to the time when medical personnel advised him to exercise more to strengthen his leg. (Id., Para. 75; Plaintiff's Exhibit 7; Defendants' Exhibit H, P. 56). There is no inconsistency between the plaintiff's complaints of pain and the fact that he walked to the smudging area every day. The defendants' argument to the contrary, an inmate should not be forced to choose between practicing his religion and minimizing his pain.

24

The defendants argue that "the best evidence that the deprivation of the lift boots does not rise to the level of an objectively serious need is the fact that the plaintiff's complaints of pain did not stop with the lift, but rather increased." (Defendants' memorandum, P. 31). But at the same time, the defendants concede that "a gradual worsening over time ... is to be expected with the plaintiff's condition." (Id., P. 28). If the plaintiff's condition is expected to degenerate over time, it should also be expected that he would continue to experience pain at times, even with the orthotics. In fact, it was never claimed that the orthotics would eliminate the plaintiff's pain. In an entry in the Clinical Record dated November 12, 1999, Dr. Fedus wrote that an orthotic and heel lift would "assist in relieving" the plaintiff's symptoms, not eliminate the symptoms by themselves. (Defendants' Exhibit H, P. 52) (emphasis added).

The plaintiff has testified that the knee pain he experienced at Northern during the period when he was deprived of the prescribed orthotics was much more severe than the knee pain he experienced prior to that when he had the orthotics. (Plaintiff's Exhibit 1, Para. 106). At his deposition, the plaintiff testified that when he was without the boots at Northern the pain "was unbearable, ridiculous." (Defendants' Exhibit G, P. 63, Line 18). This testimony is consistent with the plaintiff's complaints at the time. In a series of Inmate Request Forms contained in his medical records, the plaintiff continually reported "serious" or "terrible" pain in his knee. (Defendants' Exhibit H, P. 795-802, 804-809, 822, 828, 830-831, 833, 836-843, 845, 848,

25

850, 852, 857-859). He reported that his "right knee feels like its ready to snap." (Id., P. 798). He continually "begged" for repair or replacement of his boots. (Id., P. 795-797, 799-800, 802, 805, 830, 848, 852, 857, 859). The plaintiff's medical records prior to March 18, 1999, the date on which he was first deprived of his boots, do not contain any such desperate pleas for relief from pain. The defendants argue that the pain medications the plaintiff was prescribed did not vary significantly during the periods when he had or did not have the prescribed orthotics. But his complaints from the period when he was without the orthotics indicate that the medication was not effective during those periods, which would suggest that the pain was greater at those times than during the periods when he had the orthotics. In his first request to the medical unit following the shakedown, the plaintiff wrote: "The Tylenol isn't helping me with the pain I am experiencing." (Id., P. 822). On March 29, 2000, right before he received the new pair of boots, the plaintiff asked for something stronger than Tylenol. (Id., P. 828).

There is another difference in the pain the plaintiff experienced subsequent to March 18, 1999. The plaintiff began to experience pain in his back only <u>after</u> the prescribed orthotics were taken from him at Northern. (Plaintiff's Exhibit 1, Para. 139-140). His prison medical records prior to his arrival at Northern contain no complaints about back pain, although they contain many complaints about right knee pain and instability of the right knee. (Plaintiff's Exhibit 1, Para. 141; Defendants' Exhibit H, P. 79, 80, 82, 85, 88, 91, 92, 102, 106, 107, 113-115, 120,

26

307, 325, 654, 656, 752, 909). An entry in the medical records dated May 15, 2001, indicates

that the plaintiff reported at that time that he had had back pain for about two years. (Id., P. 37).

He had come to Northern almost exactly two years earlier, on May 18, 1999. (Defendants'

Exhibit A).

     The plaintiff has now been diagnosed as suffering from lumbar scoliosis. (Defendants'

Exhibit H, P. 36). Scoliosis is a musculoskeletal disease in which there is a sideways curvature of

the spine, or backbone. (Plaintiff's Exhibit 10, Para. 6). Scoliosis may develop in the upper back

(the thoracic area) or lower back (lumbar), but most commonly it develops in the area between

the thoracic and lumbar area (thoracolumbar area). (Id., Para. 7). Mild scoliosis, defined as a

curvature less than 20 degrees, is not serious and requires no treatment other than monitoring.

(Id., Para. 8). If the curvature exceeds 70 degrees, however, the severe twisting of the spine can

cause the ribs to press against the lungs, restrict breathing and reduce oxygen levels. (Id., Para.

9 ). Eventually, if the curve reaches over 100 degrees, both the lungs and the heart can be

damaged. (Id., Para. 10). An untreated discrepancy in leg length is one of the causes of lumbar

scoliosis. (Id., Para. 11).

     The plaintiff did not develop lumbar scoliosis until after the prescribed boots were taken

from him and he was left without treatment for his leg-length discrepancy. (Defendants' Exhibit

H, P. 36; Plaintiff's Exhibit 1, Para. 136-138).  The Second Circuit has recognized that "an

Eighth Amendment claim may be based on a defendant's conduct in exposing an inmate to an unreasonable risk of future harm and that actual physical injury is not necessary in order to demonstrate an Eighth Amendment violation." <u>Smith v. Carpenter</u>, 316 F.3d 178, 188 (2003). By depriving the plaintiff of the prescribed orthotics, the defendants exposed him to the risk of developing lumbar scoliosis. He now has developed that condition, and he faces the possibility that it will progress to a more serious stage at some point in the future.

As stated above, it is not surprising that the plaintiff continues to experience pain, given that his condition is a degenerative one and that the orthotics by themselves were never expected to eliminate his pain. The defendants argue that the plaintiff's complaints show "no qualitative difference between the reported amount of pain or the frequency with which such complaints occur." (Defendants' memorandum, P. 15). But the evidence does not support their proposition. For example, the defendants point out that on August 11, 1999, during the interval at Northern when the plaintiff had his prescribed footwear, he

reported "serious pain." (Id., P. 18). This was approximately two weeks after the plaintiff

underwent surgery for repair of an inguinal hernia. (Defendants' Exhibit H, P. 59). The

defendants fail to mention that the medical staff member who examined the plaintiff on August

11, 1999, concluded that he "may be experiencing some arthritis due to his inability to exercise

fully because of recent abdominal surgery." (Id., P. 56). The plaintiff was encouraged to exercise

his leg as tolerated to help alleviate the pain. (Id.). In other words, there was an independent

reason for the pain reported by the plaintiff on August 11, 1999, even though he had orthotics at

the time.

　　　　Boots containing fully functional orthotics were provided to the plaintiff in March 2000.

He has continued to experience pain at times since then, in part because his boots are often in a

state of disrepair. (Plaintiff's Exhibit 1, Para. 147). For example, on March 18, 2003, a prison

doctor asked the URC for approval to send the plaintiff's boots out for repair, noting that

"bottom portion of lift almost completely unglued; held together with tape." Instead, the URC

said Dr. Fedus should try to fix the boots. (Defendants' Exhibit L, P. 17). Finally, Dr. Fedus

gave up trying to keep the boots together. He and another prison doctor submitted a request to

the URC dated April 17, 2003, in which they wrote that they did not have the proper tools to fix

the boot containing the orthotic, which was in such bad shape that four fingers could be put

through a hole in it. The doctors also wrote the following: "this decrepit shoe adds to [patient's]

dysfunction & aggravates hip/neck/back pain – He needs new shoes." (Defendants' Exhibit H, P. 1,019). The URC has failed to keep the plaintiff's orthotics fully functional at all times since March 2000, contributing to the plaintiff's continuing complaints of pain.

The Second Circuit has identified factors relevant to an inquiry into whether a medical condition is a serious one. These include, but are not limited to, "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." Chance, 143 F.3d at 702. Certainly, the plaintiff's condition is one that a reasonable doctor or patient would find worthy of comment or treatment. In fact, a prison doctor prescribed treatment – an arch support and heel lift – for the plaintiff in 1998, and Dr. Fedus concurred that the treatment was appropriate. It is important to note that since orthotics were first prescribed in 1998, no doctor has said that the plaintiff does not need them. This case, therefore, does not involve a disagreement about what form of treatment is proper. The evidence cited above shows that the plaintiff was in substantial pain during the period he was deprived access to the prescribed orthotics. As stated above, the defendants have conceded that the plaintiff's condition is a degenerative one and, in fact, his condition has degenerated to the point that he now suffers from lumbar scoliosis. The seriousness of his medical condition has been shown through each of the factors cited by the Court in Chance.

30

Case 3:02-cv-00570-WIG    Document 76    Filed 05/05/2006    Page 31 of 41

**D.    THE PLAINTIFF HAS SATISFIED THE SUBJECTIVE COMPONENT
OF THE DELIBERATE INDIFFERENCE STANDARD**

In ruling upon a motion to dismiss filed by the defendants, the Court held that the amended

complaint sufficiently alleged the personal involvement of the seven remaining defendants in the

violation of his constitutional rights. In the memorandum supporting their motion for summary

judgment, the defendants say they "do not address the subjective elements in this motion and do

not address the behavior of each individual defendant vis-a-vis the plaintiff." (Defendants'

memorandum, P. 32). But at various points in the memorandum, the defendants do exactly that.

(Id., P. 27, 33). Because it is not clear whether the defendants are conceding their role in the

events outlined in the plaintiff's amended complaint, it is necessary to briefly address the

subjective component of the deliberate indifference standard.

When the plaintiff arrived at Northern, he was told by a nurse that he could not have the

orthopedic boots that had been prescribed by a prison doctor. (Defendants' Exhibit H, P. 61).

He was told that he needed to write to Warden Myers about return of the boots because they

presented a safety and security issue. (Id., P. 815). From these facts, a reasonable inference

could be drawn that Warden Myers created a policy or custom that resulted in the contravening

of a  physician's order allowing the plaintiff use of the orthopedic boots, or that he allowed the

continuation of such a policy or custom. In fact, the Northern Inmate Handbook documents such

a policy or custom when it states: "Arch Supports/ Special Shoes: Not routinely prescribed due to limited out of cell activity." (Defendants' Exhibit J, P. 14). The plaintiff informed Warden Myers that his right leg was approximately 3 inches shorter than his left, that he had a deformed knee, that he was in a lot of pain and that he had been denied access to "medical boots" previously prescribed by a DOC physician. (Plaintiff's Exhibit 4, P. 1-2). Even though Warden Myers was promptly informed of the seriousness of the plaintiff's medical need, the prescribed boots were not returned to the plaintiff for six weeks.

The other custodial defendants – Major Kearney, Major Lajoie and Lt. Alderucci – were directly involved in deciding whether the plaintiff would be provided with orthotics following the shakedown on August 14, 1999. On September 9, 1999, the matter was referred to defendant Kearney for investigation. (Defendants' Exhibit H, P. 54). Defendant Alderucci conducted the investigation. (Plaintiff's Exhibit 13). In a memo dated January 4, 2000, defendant Shea informed the plaintiff that she and members of Northern's "custody staff" had decided that he could have an orthotic sent from home. She sent copies of her memo to defendants Kearney and Lajoie. (Plaintiff's Exhibit 15). From this, the reasonable inference can be drawn that defendants Kearney and Lajoie were among the members of the custody staff involved in deciding whether the plaintiff would be allowed to have the prescribed orthotics.

Defendants Kearney, Lajoie and Alderucci are correction officers. They are not qualified

to make medical judgments. Despite the lack of such qualifications, defendant Alderucci

concluded that the damaged boots were fully functional and recommended that no further action

be taken. (Plaintiff's Exhibit 13). Defendants Kearney and Lajoie participated in deciding

whether the recommendation would be followed. The making of medical judgments by custodial

staff can constitute deliberate indifference. Casey v. Lewis, 834 F. Supp. 1477, 1545 (D.Ariz.

1993).

Eventually, the matter was referred to defendant Shea, the regional health services

administrator for Northern. (Plaintiff's Exhibit 14). It was she, in conjunction with the custodial

staff at Northern, who decided if and when the plaintiff could receive new orthotics. (Plaintiff's

Exhibit 15).

The memorandum in support of summary judgment says that two of the defendants, Dr.

Edward Pesanti and Cheryl Malcolm, "are alleged to be members" of the URC. (Defendants'

memorandum, P. 25). In fact, there is no dispute that they were members of the URC at the time

of the events that gave rise to this suit. (Plaintiff's Exhibit 11, P. 3, No. 6), and Dr. Pesanti has

conceded that "[t]he entire committee takes responsibility for the decision" to allow custodial

staff to decide whether the plaintiff would receive the prescribed orthotics. (Id., P. 3-4, No. 8).

The defendants' claim that the URC "did not perceive, nor should they have, any urgency to the

September 1999 and November 1999 requests, nor was there any urgency or extreme

degenerative condition that the Committee disregarded." (Defendants' memorandum, P. 27).
The issue is not whether the plaintiff's medical need was "urgent," but rather whether it was
sufficiently serious to merit constitutional protection. Dr. Pesanti and Ms. Malcolm knew from
Dr. Fedus' requests that the plaintiff had a limb length discrepancy and displacement of the knee.
(Defendants' Exhibit H, P. 718). They further knew that, in Dr. Fedus' opinion, an orthotic and
heel lift were needed to decrease the limb length discrepancy and decrease erosion of the
plaintiff's right foot. (Id.). They also knew that the plaintiff was suffering from knee and back
pain and that, in Dr. Fedus' opinion, the functional orthotic and heel lift would help relieve that
pain. (Id., P. 720). One "may infer the existence of [the] subjective state of mind from the fact
that the risk of harm is obvious." Hope v. Pelzer, 536 U.S. 730, 738 (2002). In this case, the
risk of harm was obvious. Dr. Fedus informed the URC that the plaintiff was in pain and that a
functional orthotic and heel lift were needed to help relieve the pain. By not approving the
functional orthotic and heel lift, Dr. Pesanti and Ms. Malcolm exposed the plaintiff to the risks of
continued pain and permanent damage to his knee and back.

      In response to Dr. Fedus' request of October 30, 1999, the URC approved only
"conservative management" and said that if custody approves the plaintiff may have an orthotic
sent from home. (Defendants' Exhibit L, P. 8-9). The defendants claim that these requests
"seemed more related to lost property than destroyed property."

(Defendants' memorandum, P. 25). However, when asked the reasons for the decision, Dr.

Pesanti did not mention that the URC treated Dr. Fedus' requests to involve lost property.

Instead, he testified: "The approval of custodial staff was necessary for safety and security at

Northern Correctional Institution." (Plaintiff's Exhibit 11, P. 3-4, No. 8). This delegation of a

medical decision to non-medical personnel constitutes deliberate indifference. See <u>Weeks v.</u>

<u>Chaboudy</u>, 984 F.2d 185, 189 (6th Cir. 1993) (prison doctor's failure to allow paralyzed inmate

to reside in area where wheelchairs were allowed cannot be excused by a claim of reliance upon

others, including security personnel).

### E.    THE DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

"Qualified immunity is the doctrine that shields government officials performing

discretionary functions from being held liable for civil damages arising from their actions which

do 'not violate clearly established statutory or constitutional rights of which a reasonable person

would have known.' " <u>P.C. v. McLaughlin</u>, 913 F.2d at 1033, 1039 (2d Cir. 1990) (quoting

<u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). The Second Circuit has held that a defendant

is entitled to qualified immunity when "(a) the defendant's action did not violate clearly

established law, or (b) it was objectively reasonable for the defendant to believe that his action

did not violate such law." <u>Poe v. Leonard</u>, 282 F.3d 123, 132-33 (2d Cir. 2002) (quoting

<u>Tierney v. Davidson</u>, 133 F.3d 189, 196 (2d Cir. 1998)).

35

The defendants argue that the events addressed in the plaintiff's complaint "most certainly fail to rise to such a well-established right for the plaintiff that a reasonable correctional officer would have been aware of it." (Defendants' memorandum, P. 37). This is the same argument made by the defendants in a motion to dismiss dated May 1, 2003. In a ruling dated February 2, 2004, the Court rejected that argument, but indicated that the defendants may renew it in a motion for summary judgment or at trial. The defendants now make virtually the identical argument. They once again cite Bohannon v. Edwards, 1999 U.S. App. LEXIS 19885 (7th Cir. 1999)[2], in which they claim the Seventh Circuit held "that failure to repair or replace orthotic footwear for a double amputee does not rise to the level of a constitutional violation." (Id.). As the plaintiff pointed out at the time he filed his response to the motion to dismiss, the defendants misstate the holding of Bohannon.

Bohannon involved an inmate whose toes and the balls of both feet had been amputated. He was fitted for a new pair of orthotic shoes after his old pair became worn out. In response to the inmate's complaints, the new shoes were adjusted several times. When the new shoes continued to cause problems and his request to have them replaced was denied, the inmate filed suit. The court found that doctors had told the inmate that it would take time for his feet to adjust

---

[2]

This decision and the other unpublished decisions are attached to the defendants' memorandum.

to the new shoes, but the inmate had disregarded those instructions. The court held that the facts did not show deliberate indifference, but rather that a decision had been made to treat the inmate's serious medical need in a particular manner. The court did <u>not</u> hold that the inmate's medical needs were not sufficiently serious to merit constitutional protection.

The instant case is clearly distinguishable. Dr. Heller prescribed orthopedic footwear for the plaintiff in 1998. The appropriateness of that decision was confirmed by Dr. Fedus following the plaintiff's transfer to Northern. No doctor reached an opposite conclusion about the plaintiff's need for orthotics. Unlike <u>Bohannon</u>, this case does not involve a disagreement about the type of treatment that was appropriate. Rather, it involves the defendants' interference with the prescribed treatment, which constitutes deliberate indifference.

The other cases cited by the defendants involve an unspecified toe injury (<u>McKinnis v. Williams</u>, 2001 U.S. Dist. LEXIS 10979 (S.D.N.Y. 2001) ); pain in the left great toe (<u>Veloz v. New York</u>, 35 F. Supp. 2d 305 (S.D.N.Y. 1999) ); fallen arches (<u>Williams v. Keane</u>, 940 F. Supp. 566 (S.D.N.Y. 1996) ); and bunions (<u>Cole v Scully</u>, 1995 U.S. Dist. LEXIS 5127 (S.D.N.Y. 1995) ).  As the plaintiff stated in his response to the motion to dismiss, it is nothing short of absurd to compare his medical problem to conditions such as bunions or fallen arches. The plaintiff's medical problem is a fractured femur and a resulting discrepancy in the length of his legs. The prescribed orthotics were designed to alleviate pain caused by the discrepancy and

to prevent permanent damage to the plaintiff's knee and back.

The deliberate indifference standard in cases involving inmate medical care was established in Estelle, a Supreme Court case decided more than twenty years before the actions that gave rise to the instant suit. The constitutional right was clearly established, whether or not there was a published decision whose facts mirrored those of this case. As the Second Circuit has stated: "[I]n ascertaining whether the right was clearly established with respect to a given situation, a court must consider 'not what a lawyer would learn or intuit from researching case law, but what a reasonable person in [the government actor's] position should know' about the appropriateness of his conduct under federal law." Johnson v. Newburgh Enlarged School District, 239 F.3d 246, 251 (2d Cir. 2001) (quoting Young v. County of Fulton, 160 F.3d 899, 903 (2d Cir. 1998)).

In Hope, supra, the Supreme Court rejected the notion that in order to meet the "clearly established law" test the facts of previous cases must be "materially similar" to the plaintiff's claims. The Court held that "general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.' " Hope, 536 U.S. at 741 (quoting United States v. Lanier, 520 U.S. 259. 270-

38

71 (1997)). As the Second Circuit has stated:

> [T]he absence of legal precedent addressing an identical factual scenario does not necessarily yield a conclusion that the law is not clearly established. Indeed, it stands to reason that in many instances "the absence of a reported case with similar facts demonstrates nothing more than widespread compliance with" the well-recognized application of the right at issue on the part of government actors.

Johnson, 239 F.3d at 251 (Internal citations omitted).

**IV.  CONCLUSION**

For the foregoing reasons, the plaintiff respectfully requests that the Court deny the

defendants' motion for summary judgment.

THE PLAINTIFF

/s/ Lanny Marden
Lanny Marden, Pro Se
Inmate #181275
Osborn Correctional Institution
335 Bilton Road
P.O. Box 100
Somers, CT 06071

Although not appearing herein, the undersigned
assisted in the preparation of this memorandum of law:


/s/ Richard P. Cahill
Richard P. Cahill, Esq.
Schulman & Associates
Inmates' Legal Assistance Program
78 Oak Street, P.O. Box 260237
Hartford, CT 06126-0237
Tel: (860) 246-1118
Fax: (860) 246-1119


## CERTIFICATION

I hereby certify that a copy of the foregoing was mailed, postage prepaid, on

this 3rd day of May, 2006, to:

Lynn D. Wittenbrink, Esq.
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105


/s/ Lanny Marden
Lanny Marden

40